## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case Number: _____

| | |
|---|---|
| **LLOYD CHASE ALLEN,** )<br><br>Prisoner No:   890793 )<br><br>Place of Confinement:<br>Union Correctional Institution, Raiford, FL  )<br><br>Petitioner, )<br><br>v. )<br><br>**JAMES V. CROSBY,**<br>Secretary, Florida Department<br>of Corrections, )<br><br>Respondent. )<br>_____/ | **03 - 10077**<br><br>**CIV-HIGHSMITH**<br><br>**MAGISTRATE JUDGE<br>TURNOFF** |

### PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Pursuant to 28 U.S.C. § 2254, Petitioner Lloyd Chase Allen, though his undersigned

counsel, submits this Petition for Writ of Habeas Corpus by a Person in State Custody,

challenging his conviction and sentence of death in the Florida state courts.

### PROCEDURAL HISTORY

A grand jury indicted Mr. Allen for first-degree premeditated murder (R. 4-5)1. He was

also charged by information with kidnapping, robbery with a deadly weapon, grand theft, and

grand theft of an automobile (R. 6-8). Mr. Gerod J. Hooper, an assistant public defender,

---

[1]Citations designated "R", "TRT" and "PC ROA" are to the state court record-on-appeal,
accompanying transcript of the trial, and state post-conviction record-on-appeal, respectively.

cat / div.
Case #   4:03cv 10077
Judge   SH   Mag   WL1
Motn ifp   Fee pd $ 5.00
'rece'p #   3003TR

represented Mr. Allen during the pre-trial and guilt-innocence portions of the capital trial.

The trial court entered judgments of acquittal for the charges of robbery with a deadly weapon and theft of the victim's ring. *See Allen v. State*, 662 So. 2d 323, 326 (Fla. 1995) (hereinafter, "*Allen I*"). Mr. Allen did not testify at trial. At the conclusion of the guilt-innocence portion of the trial, the jury found Mr. Allen guilty of first-degree murder and grand theft of the automobile. *See id.* The jury found him not guilty of kidnapping. *See id.* The Circuit Court of the Sixteenth Judicial Circuit in and for Monroe County, Florida imposed the judgments of conviction on March 3, 1993.

After the verdict was announced and prior to the start of the penalty phase proceedings, Mr. Hooper moved to withdraw from the case on the grounds that Mr. Allen wanted to waive the presentation of mitigating evidence and possibly affirmatively ask for the death penalty (TRT 661). During a subsequent colloquy regarding his desire to waive counsel, Mr. Allen made known that he intended to affirmatively ask to be executed (TRT 669, 670, 671). After conducting the colloquy with Mr. Allen, the court allowed Mr. Allen to waive counsel and exercise his right to self-representation (TRT 662-72). The court appointed Mr. Hooper as standby counsel (TRT 673). The court then decided to order that Mr. Allen be examined for competency pursuant to rule 3.210 of the Florida Rules of Criminal Procedure (TRT 674).

Two psychologists thereafter evaluated Mr. Allen and testified at a hearing as to their findings (TRT 684-95). Mr. Allen was permitted to represent himself at this proceeding and, after stipulating to each psychologists' expertise, asked no questions of either witness (TRT 684-95).

During the penalty phase, Mr. Allen presented no evidence and denied the existence of mitigation. He denied that he suffered from alcoholism or drug abuse and denied that he was an

abused child. He also asserted that he was innocent of the murder and suggested that the victim had been murdered by an un-named associate Mr. Allen had summoned to help make repairs on the victim's house. However, even though he claimed he was innocent, he asked the jury to recommend the death penalty because he felt responsible and remorseful for the victim's death and because he preferred death to life in prison. *See Allen* at 327. The jury recommend that he be executed by a vote of 11 to 1. *See id.*

At the subsequent sentencing proceeding before the trial judge, Mr. Hooper again represented Mr. Allen. *See Id.* at 329. Mr. Hooper told the trial court that he had no mitigating evidence to present because Mr. Allen refused to cooperate in not providing Mr. Hooper with mitigating factors and because Mr. Allen repeatedly requested that he not plead for Mr. Allen's life (TRT 801); *see Allen I* at 329. Furthermore, as the Florida Supreme Court found on direct appeal, there was no indication on the record that Mr. Hooper did any mitigation investigation in apparent acquiescence to Mr. Allen wish to be executed if found guilty (TRT 801-04); *see Allen I* at 329. Unlike the penalty phase, Mr. Hooper did not move to withdraw during the sentencing hearing. *See id.* However, like the did at the penalty phase, Mr. Allen asked the court to order that he be executed (TRT 808). The court thereafter sentenced Mr. Allen to death (TRT 812).

On direct appeal, the Florida Supreme Court affirmed both the convictions and the sentence of death. *See Allen I.* Mr. Allen filed a petition for writ of certiorari in the United States Supreme Court which was denied on March 25, 1996. *See Allen v. Florida,* 517 U.S. 1107 (1996).

On March 19, 1997, Mr. Allen filed in the state Circuit Court (the "trial court") a motion for post-conviction relief pursuant to rules 3.850 and 3.851 of the Florida Rules of Criminal

3

Procedure with a request for leave to amend.  After filing a final amended motion for post-conviction relief, the trial court summarily denied the motion without an evidentiary hearing.

Mr. Allen appealed the summary denial of his post-conviction motion to the Florida Supreme Court and, at the same time, filed with that same court a state petition for a writ of habeas corpus.  On July 10, 2003, the Florida Supreme Court issued an opinion affirming the trial court's denial of Mr. Allen's post-conviction motion and denying his petition for issuance of a state writ of habeas corpus. *See Allen v. State*, 2003 Fla. LEXIS 1156 (July 10, 2003)(hereinafter, "*Allen II*").  The court subsequently denied Mr. Allen's motion for rehearing and issued the mandate on October 8, 2003.

The attorneys who represented Mr. Allen are as follows: Pre-trial and trial - Mr. Gerod J. Hooper; direct appeal - Valerie Jonas; state post-conviction - Martin J. McClain, Todd Scher, Dan D. Hallenberg, Kenneth M. Malnik; state post-conviction appeal - Kenneth M. Malnik, Dan D. Hallenberg.

## STATEMENT OF THE FACTS

The Florida Supreme Court summarized the facts on direct appeal:

> Cribbs left her home in Ohio to drive to Florida in November, 1991. She apparently met Allen at a truck stop in Atlanta.  Allen accompanied Cribbs during her visit with friends in Jacksonville Beach and during a stop in Bunnell to set her trailer.
>
> Allen, whom Cribbs introduced as "Lee Brock," told Cribbs' friends in Jacksonville Beach and Bunnell that he owned a ranch in Texas and a trucking rig.  Cribbs told the friends that she was going into the trucking business with Allen after she sold her trailer in Bunnell and vacation home in Summerland Key.  Cribbs was paid $4100 in hundred dollar bills for the trailer.  Allen witnesses this transaction on November 12.  The friends in both locations stated that Cribbs was

4

wearing a diamond-studded horseshoe-shaped ring, which was valued at $8,000.

A man[, Larry Woods,] working at the house across the street from Cribbs' Summerland Key house saw her exit and reenter the house early on the morning of November 13. He also observed [a person he identified at trial as] Allen exit and re-enter the house around 11 a.m. The worker left for lunch at 11:45 a.m. When he returned a little after 1 p.m., the worker noticed that Cribbs' 1988 Ford Taurus was gone.

The real estate agent who managed Cribbs' property arrived between 12:30 and 1 p.m. to investigate Cribbs' unexpected arrival at the house. When no one responded to his knocks, the agent used his own key to enter the house. The television set, which was on high volume, was emitting loud static and a snowy picture. The coffee pot was turned on and half-full. The agent discovered Cribbs' body on the floor of the master bedroom. She was lying face down on a pillow and her body was surrounded by a puddle of blood.

The medical examiner placed the time of death between 4 a.m. and 2 p.m. on November 13. There were two stab wounds to the right side of Cribbs' face, ligature marks on her wrists and ankles, and a stab would to her left neck that severed the carotid artery. The angle of the neck would indicated that it was inflicted as Cribbs lay face down. The left stab would caused Cribbs to bleed to death. The medical examiner estimated that Cribbs lived for fifteen to thirty minutes after this wound was inflicted and was conscious for fifteen minutes. Based upon the lack of defensive wounds and blood splatter, the medical examiner opined that Cribbs was bound at the time that she was stabbed.

The following items were recovered from the scene: a suitcase containing a blue shirt and a camera loaded with undeveloped film depicting Allen; a pair of grey lizard skin boots; a pair of blue jeans containing a blood stain on the right knee, found at the foot of the bed; a sperm-stained hand towel, found by the side of the bed; a piece of window sash cord found under Cribbs' left arm consistent with the ligature marks and also consistent with a cord that had been cut in the spare bedroom; and a sheathed knife and a rag found in the spare bedroom. The contents of Cribbs' purse were scattered across the bed; the $4100 and diamond ring were missing. There were no signs of forcible entry and no fingerprints of value were found. The interior of

5

the house and its contents appeared to have been wiped clean with a
damp rag.

Expert witnesses testified that the body fluids found on the hand
towel were consistent with Cribbs' and Allen's blood types and DNA
genotypes; the blood on the jeans was consistent with Cribbs' blood.
The suitcase, boots, and shirt recovered from the scene were identified
by witnesses as items that Allen had or wore in Jacksonville Beach
and Bunnell.  Pursuant to the State's motion granted by the court,
Allen tried on these items of clothing, which, with the exception of the
jeans, fit him.  Allen's inability to fit into the jeans was explained by a
considerable weight gain following his arrest.

A taxi driver testified that he picked up Allen at the Buccaneer
Lodge Tiki Lounge between 12:30 and 12:45 p.m. on November 13,
that he took Allen to Key Largo, and that Allen paid the eighty-dollar
fare with a hundred-dollar bill.  Cribbs' automobile was located in the
parking lot of the Buccaneer Lodge on December 23.  The car was
covered with debris, indicating that it had been parked there for some
time.  Allen's prints were lifted from the car.  A trucker's log book
containing a credit card number and a sequence of telephone numbers
led the police to Allen's location in California, where he was arrested
on February 18, 1992.

*Allen I,* 662 So. 2d at 325-27.

The medical examiner testified that the victim's legs and arms were tied, and the victim

was alive when she was repeatedly stabbed (TRT 412-15).  Nevertheless, defense counsel

suggested in cross-examination that it was possible that Ms. Cribbs killed herself (TRT 428).

However, the medical examiner explained how unlikely that was due to the nature of the wounds

that Ms. Cribbs would stab herself (TRT 429-30).  All the evidence from witnesses indicated that

Ms. Cribbs appeared incredibly happy with Mr. Allen (TRT 182, 89, 93, 201, 02, 10, 11).

Nevertheless, defense counsel suggested with no testimony to support it that Ms. Cribbs was so

devastated by a con man that she killed herself (TRT 569, 65, 607).

6

The jury did not hear any incriminating statements by Mr. Allen. Nor was the jury presented with any physical evidence linking Mr. Allen to a knife found in Ms. Cribbs house that could have been the murder weapon (TRT 319).

## REQUEST FOR EVIDENTIARY HEARING

Mr. Allen requests that the Court conduct an evidentiary hearing as to those claims detailed that follow.

## AEDPA DISCUSSION

**A.**   **THE *WILLIAMS V. TAYLOR* DECISION.**

In *Williams (Terry) v. Taylor*, 120 S. Ct. 1495 (2000) [*Williams I*], the Supreme Court addressed how federal courts should apply the new standards set forth in the AEDPA, specifically 28 U.S.C. § 2254(d).  Section 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . .

The first step in applying this standard is to determine the "clearly established Federal law" at the relevant time.  *Williams I* at 1511-12.  The relevant time is the time at which the state court adjudicated the petitioner's claim.  *Id.*  The "clearly established Federal law" is the law which Supreme Court precedent dictated should be applied to the particular claim.  *Id.*

As to the other prong of § 2254(d)--that being that the state court adjudication resulted in a decision that is contrary to or involves an unreasonable application of the law--the Supreme Court held that this provision "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court."

8

*Williams I* at 1519 (O'Connor, J., concurring).2  Justice O'Connor explained that a state court

decision falls into the "contrary to" category when "the state court applies a rule that contradicts

the governing law set forth in our cases" or when "the state court confronts a set of facts that are

materially indistinguishable from a decision of this Court and nevertheless arrives at a result

different from our precedent." *Williams I* at 1519-20.  Justice O'Connor defined the

"unreasonable application" category as occurring when a state court identifies the correct

governing legal rule from Supreme Court precedent but "unreasonably applies the law of this

Court to the facts of a prisoner's case." *Id.* at 1520-21.  Justice O'Connor explained, "a federal

habeas court making the 'unreasonable application' inquiry should ask whether the state court's

application of clearly established federal law was objectively unreasonable." *Id.* at 1521.

**B.    EVIDENTIARY HEARING UNDER AEDPA.**

Title 28 U.S.C. § 2254(e)(2), as amended by the AEDPA, governs evidentiary hearings in

federal habeas corpus cases.  § 2254(e)(2) precludes a habeas petitioner from being afforded an

evidentiary hearing only if he "has failed to develop the factual basis of [the] claim in State court

proceedings." The Supreme Court has made clear in *Williams v. Taylor*, 120 S. Ct. 1479 (2000)

[*Williams II*], that "failure" requires a lack of diligence or some other fault by the petitioner. *Id.*

at 1487-91.

Thus, the federal court, in determining whether a habeas petitioner should be afforded an

evidentiary hearing, must first analyze whether the petitioner has failed to develop the factual

basis of the claim in state court.  In *Breedlove v. Moore*, 279 F. 3d 952 (11th Cir. 2002), the

_____

[2]Justice O'Connor's opinion constitutes the opinion of the Court on the definitions of these
categories.

Eleventh Circuit addressed the diligence requirement of § 2254 (e)(2), concluding, along with other circuit courts of appeal, that if a habeas petitioner "sought an evidentiary hearing . . . at every stage of his state proceedings" and the "state courts denied him the opportunity" to present evidence at a hearing, the petitioner "was prevented from developing a factual basis for his claim in state court." *Breedlove*, 279 F. 3d at 960. Under these circumstances, § 2254 (e) (2) does not preclude an evidentiary hearing in federal court.

If there was no failure by the Petitioner, the AEDPA does not preclude the petitioner from receiving an evidentiary hearing. In those instances where the habeas petitioner has not "failed" to develop the factual basis in state court, Mr. Allen submits that this Court should look to pre-AEDPA law, that is, the standards set forth in *Townsend v. Sain*, 372 U.S. 293 (1963), to determine the need for an evidentiary hearing.3 Under *Townsend*, a federal court evidentiary

3Mr. Allen acknowledges that "[t]he interrelation of 28 U.S.C. §2254 (e)(2) and *Townsend* is a matter of considerable dispute." *Edwards v. Murphy*, 96 F. Supp. 31, 53 (D. Mass. 2000). Some courts have presumed that *Townsend* has not survived the AEDPA, and that if a habeas petitioner did not fail to develop the facts in state court within the meaning of §2254 (e)(2), a federal court is still not obligated to order a hearing, but rather the granting of a hearing is left to the discretion of the district court. *See, e.g. Campbell v. Vaughn*, 209 F. 3d 280, 287 (3d Cir. 2000) (even if evidentiary hearing is permitted under AEDPA, the "AEDPA, unlike *Townsend and Keeney [v. Tamayo-Reyes, 504 U.S. 1 (1992)]*, does not require that such a hearing be held. Instead, federal courts have discretion to grant a hearing or not"); *Henry v. Horn*, 218 F. Supp. 671 (E.D. Pa. 2002) ("If the federal habeas court determines that petitioner did not `fail` to develop the state court record, then the decision about whether to hold an evidentiary hearing is left to the discretion of the habeas court") Other courts have assumed that if a petitioner has been diligent under §2254 (e)(2), the *Towsend* factors must be assessed to determine whether a federal court is obligated to grant a hearing. *Fullwood v. Lee*, 290 F. 3d 663, 681 (4th Cir. 2002) ("even though §2254 (e)(2) presents no bar to a hearing, an evidentiary hearing is not automatic . . . [T]he the district court is permitted to hold a hearing only if the petitioner alleges additional facts that, if true would entitle him to relief . . . and Petitioner must establish one or more of the six factors set forth in *Townsend . . .*"); *McDonald v. Johnson*, 139 F. 3d 1056, 1059-60 (5th Cir. 1998) ("This conclusion does not end the analysis, however, for even if McDonald's claim is not precluded by § 2254(e)(2), that does not mean he *is* entitled to an evidentiary hearing--only that he *may* be. Consistent with AEDPA's goal of streamlining the

10

hearing is *required* to be held "[i]f (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Townsend*, 372 U.S. at 313.

Because all the allegations in the instant petition were never subjected to evidentiary development in state court, despite a request by Mr. Allen for an evidentiary hearing both at the state Circuit Court level and on appeal, Mr. Allen is not precluded from a federal evidentiary hearing. *See Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002). A federal hearing should be granted at this time. All factual allegations must be accepted as true and thus an evidentiary hearing is required because, if true, the allegations would entitled Mr. Allen to relief. *See Stano v. Dugger*, 901 F. 2d 989, 899 (11th Cir. 1990).

habeas process, § 2254(e)(2) specifies the situations where evidentiary hearings are *allowed*, not where they are *required*. Thus, if a petitioner seeking a hearing clears this initial hurdle, he must still persuade the district court"); *Smith v. Bowersox*, 2002 U.S. App. LEXIS 24279 at *13-14 (8th Cir. Nov. 29, 2002) ("The district court's discretion to hold an evidentiary hearing is constrained from two directions. On the one hand, when an evidentiary hearing is not prohibited by statute, the district court must hold a hearing if the petitioner has alleged disputed facts which, if proved, would entitle him to habeas relief"). Commentators, too, have argued that "[e]ven after AEDPA, . . . *Townsend*'s mandatory-hearing standards—and its delegation to district courts of broad discretion to hold evidentiary hearings that are not mandated—continues to govern all situations save those in which the petitioner's procedural default accounts for the state courts' failure to develop the material facts." HERTZ & LIEBMAN, **FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE**, § 20.1b at p. 804 (4th Ed. 2001).

## CLAIMS FOR RELIEF

By his petition for a writ of habeas corpus, Mr. Allen asserts that his conviction and sentence of death were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution for all of the reasons presented to the Court in this proceeding. Mr. Allen is a state prisoner being held in violation of the United States Constitution.

## CLAIM I

**MR. ALLEN WAS DENIED HIS RIGHT TO AN ADVERSARIAL TESTING AT THE GUILT PHASE OF HIS CAPITAL TRIAL DUE TO THE CUMULATIVE EFFECTS OF INEFFECTIVE ASSISTANCE OF COUNSEL AND THE WITHHOLDING OF MATERIAL EVIDENCE, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

All other allegations and factual matters contained elsewhere in this petition are fully incorporated herein by specific reference.

**A.      Respondent Withheld Material Evidence**

Mr. Allen was denied his right to due process of law under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny because Respondent withheld favorable evidence material to guilt or innocence. *See Strickler v. Green,* 527 U.S. 263 (1999).  Specifically, Respondent withheld (1) a laboratory report from the Florida Department of Law Enforcement ("FDLE") establishing that two hairs found on or in the victim's hand were not Mr. Allen's hair and also indicating that FDLE could not determine whether or not the victim herself was the source of the two hairs because police contaminated the victim's hair samples that had been removed at the autopsy and sent to FDLE for comparison purposes; (2) notations contained in the FDLE hair sample report indicating that FDLE personnel informed Assistant State Attorney McLaughlin and Dr. Pope, Serologist for the Monroe County Sheriff's Office that the victim's hair samples sent to FDLE for comparison testing were contaminated and, therefore, could not be tested, and (3) another FDLE laboratory report indicating that no latent prints found in the victim's car matched Mr. Allen's fingerprints.

*Hair analysis results*

Mr. Allen's defense at trial was that he did not kill the victim and that the prosecution failed to prove its case beyond a reasonable doubt. The thrust of his defense was the circumstantial nature of the state's evidence and that the police investigators "conducted a cursory and error-prone investigation" *See Allen II*, 2003 Fla. LEXIS 1156, *15. Had Respondent not suppressed the evidence that FDLE test results established that the two hairs found on or in the victim's hand did not belong to Mr. Allen, Mr. Allen could have argued to the jury that it was a reasonable possibility that the hairs found in the victim's hand belonged to a third party, who was the true the killer, and, because FDLE excluded Mr. Allen as the source of the hairs, Mr. Allen was not the killer. The fact that FDLE was unable to exclude the victim as a possible source of the two hairs does not negate the materiality of the evidence excluding Mr. Allen. The mere fact that there existed the <u>possibility</u> that the hairs were the victim's own does not preclude the contrary possibility that the source of the hairs was the person who killed the victim. In other words, the fact that there existed two mutually exclusive possible sources of the hair - the victim or a third party - does not negate, render immaterial, or make impossible the quite reasonable possibility that the hair belonged to the person who killed the victim. Mr. Allen could have made this viable and powerful reasonable doubt argument to the jury had Respondent not suppressed the results of FDLE's hair analysis.

Viewed another way, absent the suppressed hair analysis results, there existed three possible sources of the hair: Mr. Allen, the victim, or a third party. In a probabilistic sense, absent Mr. Allen's exclusion as a source of the hair, and assuming that Mr. Allen was with the victim as alleged by Respondent at trial, the probability that the hair was deposited by a third

14

party was one in three.  Once FDLE eliminated Mr. Allen as the source of the hair, however, the

probability that the hair belonged to a third party <u>increased</u> from one in three to one in two.  The

critical point here is the revelation that Mr. Allen could not have been the source of the hairs

<u>increased the likelihood that the hairs were from a third party</u>.  Viewed in this light makes it clear

that the results of FDLE's hair analysis would have made Mr. Allen's reasonable doubt argument

significantly stronger.  The test results constituted significant evidence of reasonable doubt

despite the fact that the possibility that the victim was the source of the hairs was not eliminated.

The fact that FDLE was unable to eliminate the victim as a possible source of the hair is

no panacea to Respondent in defending this claim especially because the suppressed FDLE hair

analysis report also revealed significant impeachment evidence detailing the reason <u>why</u> FDLE

was unable to eliminate the victim as a possible source.  FDLE was unable to eliminate the

victim because the Monroe County Sheriff's Office investigators contaminated the victim's hair

samples that had been removed from the victim by police investigators and sent to FDLE for the

hair comparison analysis.  Thus, Respondent's own sloppy and "error-prone" investigation -

which was the cornerstone of Mr. Allen's reasonable doubt defense - made it impossible for

FDLE to determine whether or not the hairs found in the victim's hand were the victim's own

hairs.  Had Respondent properly disclosed the hair analysis report to Mr. Allen, he would have

been able to argue to the jury not only that he was not the source of the hairs found in or on the

victim's hand - thus raising the realistic possibility that the killer was a third party - but that

Respondent's own inept investigation and failure to preserve physical evidence in a capital

murder case precluded the jury from knowing whether or not the hairs were from the victim

herself.  Notwithstanding the fact that FDLE could not eliminate the victim as a source of the

hairs, the analysis results indicating that Mr. Allen could not have been the source, would have made for a much stronger reasonable doubt argument. The withheld evidence was clearly favorable and material to Mr. Allen's guilt or innocence.

*Notes revealing contaminated evidence*

As previously discussed, *supra,* pp.11-14, the FDLE report concerning the two hairs in the victim's hand that did not match Mr. Allen's known hair sample also indicates that the victim's hair samples collected and sent to FDLE for comparison purposes was contaminated. The reports indicates that FDLE lab technicians refused to test some of the evidence because the incompetence of the Monroe County Sheriff's Office resulted in contaminated samples that could not yield scientifically sound results. Handwritten notes included in the FDLE report that was withheld from trial counsel indicate that the FDLE lab contacted Assistant State Attorney McLaughlin and Dr. Pope, serologist for the Monroe County Sheriff's Office, about the contamination problem. These notes reveal that Respondent was aware prior to trial that crucial crime scene evidence had been lost due to the police investigators botched handling of physical evidence. Again, Mr. Allen's defense was that he was innocent and that the error-prone investigation regarding the physical evidence left the prosecution's case riddled with reasonable doubt. This evidence of contaminated evidence, which was withheld from the defense, confirms that valuable evidence, which may have led the police to the real killer and could have exonerated Mr. Allen, was lost due to the incompetence or bad faith of the police in gathering evidence. Resondet's failure to disclose this evidence also deprived Mr. Allen of powerful impeachment evidence that would have impugned the reliability of the police investigation.

16

***Fingerprint report***

Respondent also withheld an FDLE report regarding latent fingerprints lifted from the inside of the victim's car. The report indicates that *none of the latent prints match known prints of Mr. Allen.* This evidence would have strongly supported Mr. Allen's reasonable doubt defense by placing doubt on Respondent's theory of the case, by proving that Respondent presented false evidence, and by providing yet another example of how Respondent's investigation in this case was fraught with sloppiness and critical error. Marjorie Rohner, latent print examiner for the Monroe County Sheriff's Office, testified at trial that one print from the interior of the victim's car matched Mr. Allen's known fingerprints (R. 462). Ms. Rohner testified that she found forty-five (45) points of comparison (R. 462). Her testimony starkly contradicts the FDLE analyst's conclusion as set forth in the withheld report that none of the latent impressions found in the car matched Mr. Allen's fingerprints. Trial counsel could not impeach Mr. Rohner's testimony because the State withheld the FDLE report. Evidence that could have been used to impeach a state witness is *Brady* material that must be provided to defense counsel. *United States v. Bagley*, 473 U.S. 667 (1985). The FDLE report establishes Ms. Rohner's false testimony on this point and strongly suggests that her other testimony regarding fingerprints found at the crime scene may also be false in violation of *Napue v. Illinois*, 360 U.S. 264 (1959)(reversing conviction because false testimony prevents "a trial that could in any real sense be termed fair").

The jury was deprived of significant exculpatory evidence due to Respondent's failure to disclose the two FDLE reports of the hair analysis and the latent impressions from the car. Mr. Allen can demonstrate that the result of his trial would have been different if Respondent had disclosed these reports to defense counsel. *Bagley*, 473 U.S. at 682. In addition, because

Respondent knowingly presented false testimony regarding the fingerprints, Mr. Allen is entitled to a new trial if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 478 U.S. 97, 103 (1976). The fact that Respondent had other evidence against Mr. Allen is not dispositive, as the Supreme Court emphasized in *Kyles*, "none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone." 514 U.S. at 435 n.8. The test is whether this Court "can be confident that the jury's verdict would have been the same." *Id.* at 453. Mr. Allen can meet that standard, particularly in light of the cumulative effect of the other errors described in this pleading.

A federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States." *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000) *quoting* 28 U.S.C. § 2254(d)(1). The Florida Supreme Court's decision on Mr. Allen's *Brady* claims is both contrary to and an unreasonable application of clearly established federal law. Therefore, the limitations on relief set forth in section 2254(d) are inapplicable. First of all, rather than analyzing the materiality issue "in terms of suppressed evidence considered collectively," the court, contrary to *Kyles v. Whitley*, 514 U.S. 419 (1995) and *United States v. Bagley*, 473 U.S. 667 (1985), instead considered the suppressed evidence "item by item." *Kyles*, 514 U.S. at 436. The state's obligation under *Brady* to disclose favorable evidence to the defense "turns on the cumulative effect of all such evidence suppressed by the government." *Kyles* at 421. In denying of Mr. Allen's *Brady* claim, the Florida Supreme Court's

18

opinion, contrary to *Bagley* and *Kyles*, "is compatible with a series of independent materiality evaluations, rather than the cumulative evaluation required by *Bagley* . . . ." *Kyles*, 514 U.S. at 441; *see also id.* n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion . . . ."). This "item by item" treatment is evident from the outset when the court in its opinion immediately separated the *Brady* claim into three separate and distinct claims (Claims "1", "2", and "3"). *See Allen II*, 2003 Fla. LEXIS at *4, n.3. The court then proceeds to limit all discussion of materiality strictly to the hair analysis test results ("Claim 1"). *See Allen II*, 2003 Fla. LEXIS at *4, *6-13. The court's discussion of the other suppressed evidence (the FDLE fingerprint report ("Claim 2") and the FDLE report indicating that evidence sent by police for testing was contaminated ("Claim 3")) was relegated to a footnote in which the court simply stated in conclusory fashion that "Claims 2, 3, . . . lack merit because Allen was not prejudiced by the alleged errors." *Allen II* at *6, n.5. In analyzing an alleged *Brady* violation, the materiality determination is synonymous with a determination of prejudice. *See Benn v. Lambert*, 283 F.3d 1040, 1053, n.9 (9th Cir. 2002). The Florida Supreme Court's analysis of Mr. Allen's *Brady* claim is contrary to the analysis required by *Kyles* and *Bagley* because the court failed to assess materiality based on the cumulative effect of all the suppressed evidence. The court denied Mr. Allen *Brady* claim on materiality grounds, specifically because "The fact that two hairs found on or in the victim's hand did not belong to Mr. Allen does not place the case in such a different light as to undermine confidence in the verdict." *Allen II*, at *13. The court's failure to analyze the materiality element in terms of all the suppressed evidence is contrary to *Kyles. See Kyles*, 514 U.S. at 440 (lower court's opinion that

dismissed particular items of evidence as immaterial "suggest[ed] that cumulative materiality was not the touchstone.").

In addition to the Florida Supreme Court's failure to conduct a proper materiality analysis by limiting its analysis to the effect of a single item of the suppressed evidence (the hair analysis results), the court's opinion is also contrary to clearly established federal law because, in finding this particular piece of suppressed evidence immaterial, the court effectively conducted a sufficiency of the evidence or weight of the evidence test instead of analyzing whether the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict". *Kyles*, 514 U.S. at 435. In concluding that the hair analysis results were not material to Mr. Allen's defense, the court reasoned that, "[a]lthough the hair analysis excluded Allen as the source, it did not exclude the victim . . . [t]hus, the analysis neither supported nor negated Allen's argument that an unidentified third person committed the murder." *Allen II*, 2003 LEXIS 1156 at *11-12 (emphasis added). The court noted that it was undisputed that Mr. Allen was present at the scene shortly before the victim's death. *Id.* at *13. Because the court found this evidence not material for the purposes of *Brady*, the court held that Mr. Allen was not prejudiced by Respondent's suppression of this favorable evidence.4

The FSC's analysis is contrary to clearly established federal law. The FSC held that the result of the hair analysis could not reasonably place the case in such a different light as to

---

4Because the lower state post-conviction court denied this claim without an evidentiary hearing, the FSC assumed for the purpose of its review that the hair analysis test results were favorable to Mr. Allen because the record does not refute Mr. Allen claim that the test results excluded him as the source of the two hairs. *See Allen II* at *7-8. The court also assumed for the purposes of its review that Respondent withheld the report containing the results of the hair analysis. *Id.* at *9.

undermine confidence in the verdict because, although the hair analysis excluded Mr. Allen as

the source, it did not exclude the victim. *Allen II* at *11. The FSC concluded that the fact that the

victim was not excluded as the source did not undermine confidence in the verdict because, "the

analysis neither supported nor negated Allen's argument that an unidentified third person

committed the murder." *Id.* at *11-12. This rational by the FSC is nothing short of an application

of a sufficiency of the evidence test, directly contrary to clearly established federal law. *See Kyles*

*v. Whitley*, 514 U.S. 419,434-35 (1995); *see also Williams v. Taylor*, 529 U.S. at 405-06 (citing

as an example of a decision contrary to governing law an instance when a court applies a

preponderance of the evidence test instead of a "reasonable probability of a different outcome

test to an ineffective assistance of counsel claim). As held in *Kyles*:

> The second aspect of *Bagley* materiality bearing emphasis here is
> that it is not a sufficiency of evidence test. A defendant need not
> demonstrate that after discounting the inculpatory evidence in light
> of the undisclosed evidence, there would not have been enough left
> to convict. The possibility of an acquittal on a criminal charge does
> not imply an insufficient evidentiary basis to convict. One does not
> show a *Brady* violation by demonstrating that some of the
> inculpatory evidence should have been excluded, but by showing
> that the favorable evidence could reasonably be taken to put the
> whole case in such a different light as to undermine confidence in
> the verdict. n8
>
> > n8 This rule is clear, and none of the *Brady* cases
> > has ever suggested that sufficiency of evidence (or
> > insufficiency) is the touchstone. And yet the dissent
> > appears to assume that Kyles must lose because
> > there would still have been adequate evidence to
> > convict even if the favorable evidence had been
> > disclosed. (citations omitted)

*Kyles*, 514 U.S. at 435-35. Because the FCS applied a sufficiency of the evidence test contrary to

*Kyles*, Mr. Allen is not precluded from habeas relief under section 2254(d). *See Dilosa v. Cain*,

21

279 F.3d 259, 264 (5th Cir. 2002)(state court applied rule of law contrary to that of *Kyles* by considering the "sufficiency of the evidence in light of its potential to exculpate [the defendant] instead of through the lens of its confidence in the verdict."). Implicit in the FSC's language that "the analysis neither supported nor negated Allen's argument that an unidentified third person committed the murder" is a sufficiency of the evidence or weight of the evidence test contrary to *Kyles*. Whether or not the results of the suppressed hair analysis excluding Mr. Allen as the source of the hairs found in the victim's hand "supported" Mr. Allen's defense that he did not kill the victim "is for the jury to decide." *Dilosa* at 265. As discussed *supra* pp.xxx, especially when considered with the other suppressed evidence, the evidence in fact is material because, in view of the entire case, including the other excluded evidence, the results of the hair analysis could have been used by Mr. Allen to create reasonable doubt.

The Florida Supreme court's justification for finding the hair analysis results evidence not material - that "the analysis neither supported nor negated Allen's argument that an unidentified third person committed the murder" - constitutes an unreasonable application of law of *Brady* and its progeny. "[A] state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. at 407. The gist of the FSC's reasoning is that the suppressed evidence that excluded Mr. Allen as a possible source of the hairs found in the victim's hand was rendered entirely neutral in terms of its probative value on the issue of the identity of the person who killed the victim because (due to incompetent police work), the victim herself was not excluded as a possible source of the hairs. This is an objectively unreasonable conclusion. The court's

reasoning fails to recognize that, as previously discussed, *supra*, pp.xx, the FDLE's exclusion of Mr. Allen as a source of the hairs effectively increased the likelihood that the hairs came from a third person. Logic dictates that the existence of the mere possibility that the hairs came from the victim does not act to foreclose or negate the alternative possibility that the hair is from a third party, and, therefore, from the real killer. The court's conclusion that the hair analysis results do not support Mr. Allen' argument that an unidentified third person committed the murder ignores the fact that, by affirmatively eliminating Mr. Allen as a source, the likelihood that the hairs came from a third party increased. The evidence therefore <u>would</u> have supported the third party theory. The court's conclusion to the contrary is objectively and logically unreasonable.

## B. Ineffective assistance of counsel

The Florida Supreme Court's decision on Mr. Allen's claim of ineffective assistance of counsel cannot be squared with the proper *Stickland* analysis. The court's decision is contrary to *Strickland* because the court clearly failed to review "the record as a whole" in assessing whether Mr. Allen was denied the effective assistance of counsel. *See Williams v. Taylor*, 120 S. Ct. 1495, 1516 (2000) (if "the entire postconviction record, viewed as a whole and cumulative of [] evidence presented originally, raise[s] a 'reasonable probability that the result of the [] proceeding would have been different' if competent counsel" had represented the defendant, then prejudice is established). *Accord Hardwick v. Crosby*, 320 F. 3d 1127, 1191 (11th Cir. 2003) (noting that proper *Strickland* analysis requires review of "[t]he entirety of [the habeas petitioner's] postconviction record"). In Mr. Allen's case, it is apparent from the face of the Florida Supreme Court opinion that it considered the deficient performance and prejudice prongs as to each separate issue of alleged ineffectiveness, as opposed to reviewing the deficiencies as a

23

whole and then, in light of the entire record, analyzing prejudice under the appropriate *Strickland*

test. Nowhere in the court's opinion is there any mention of the cumulative impact of counsel's

alleged deficiencies on the outcome of the trial. The only discussion of prejudice by the court

was limited to trial counsel's "suicide theory". *See Allen II*, 2003 Fla. LEXIS at *14-16. The

court treats each instance of deficient performance alleged (as well as each instance of withheld

favorable evidence supporting Mr. Allen's *Brady* claim, *see supra*, pp.xx) as independent claims,

contrary to *Strickland*. Indeed, the Florida Supreme Court expressly refused to conduct the

requisite cumulative analysis by rejecting Mr. Allen's argument that he was deprived of a fair

trial based upon the errors as a whole because of "the disposition of Allen's other claims." *Allen

II*, 2003 Fla. LEXIS 1156, n.5.

### Failure to investigate and discover evidence of innocence

Trial counsel was ineffective for failing to investigate and discover evidence that Mr.

Allen was registered as a guest at the Buccaneer Lodge with another adult male on the day the

victim's body was discovered. This evidence, had it been presented to the jury, would have

corroborated Mr. Allen's defense that he did not kill the victim and was consistent with his

penalty phase statement to the jury that the person killed the victim was with him when he

checked into the Buccaneer Lodge (R. 750). This evidence was also consistent with the other

evidence that the jury never learned about due to Respondent's *Brady* violations and trial

counsel's ineffectiveness. *i.e.*, (1) FDLE's analysis excluded Mr. Allen as the source of hairs

found on or in the victim's hand, thereby increasing the likelihood that the hairs were from a

third party killer ;(2) that witness Larry Woods, who identified Mr. Allen in court as the person

he saw outside the victim's house, gave a description to police that was highly inconsistent with

24

Mr. Allen's appearance; (3) that witness Tonia McClain saw <u>two</u> vehicles parked at the house the night before the murder and on the morning of the murder and later noticed that both cars were gone; (4) that McClain's description of the person she saw with the victim was inconsistent with Mr. Allen's appearance; and (5) the evidence that police contaminated and failed to test or examine critical physical evidence.   In assessing the cumulative effect of the errors in conjunction with counsel's failure to discover the Buccaneer Lodge evidence, the prejudice to Mr. Allen is clear.  Had Respondent not withheld material evidence and had counsel not been ineffective, Mr. Allen defense that he did not kill the victim and that the prosecution failed to prove his guilt beyond a reasonable doubt would have been markedly stronger.  So much stronger that there is a reasonable probability that the outcome of the guilt phase would have been different.

The Florida Supreme Court addressed the guilt phase portion of this claim in a footnote in which the court wrote, "Claim 13 lacks merit because Allen was not prejudiced by counsel's performance in the guilt phase . . . ." *Allen II*, 2003 Fla. LEXIS 1156 at n.5.  Because the court did not conduct a cumulative analysis of the effect of all the instances of deficient performance and Respondent's *Brady* violations, the court's adjudication of this and all the claims of ineffectiveness os contrary to *Strickland*.

Not only did the jury never learn about this critical evidence, but, adding insult to injury, Detective Jay Glover testified falsely during the penalty phase that the Buccaneer Lodge <u>did not</u> have any records showing that Mr. Allen had registered there (R. 789) in violation of Mr. Allen's right to due process under the authority of *Napue v. Illinois*, 360 U.S. 264 (1959). *See discussion, infra*).  The Buccaneer Lodge indeed had records proving that Mr. Allen was registered had that

25

he was accompanied by another adult.  Detective Glover knowingly testified to the contrary in an

effort to convince the jury to impose the death penalty.

### Failure to challenge DNA evidence

Trial counsel was ineffective for failing to request a "*Frye* hearing" before the State's

DNA evidence was admitted. *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).  A *Frye*

hearing is particularly important in this case because Mr. Allen's trial was delayed due to

problems with the DNA evidence and the FDLE lab (R. S843, S848).  At the hearing on the

State's motion for continuance, the prosecutor, Mr. McLaughlin offered the following

explanation:

> What happened in the case, the analyst at the FDLE laboratories
> did not leave the substance under x-ray long enough.  Apparently,
> there was some difficulty in the specimens that were shipped up
> there due to the fact they had come from a body.  These specimens
> take an extra, between 8 and 12 weeks.  They were not sufficiently
> processed to be utilized at this time and they have to go through the
> same process again.

(R. S848).  The court responded:  "You are telling me you are looking for another continuance of

three months because you blew it?" (R. S848).  Trial counsel was put on notice that the State's

DNA-related evidence was possibly unreliable or contaminated and that the specimen may have

been contaminated during transport to the lab; clearly, the difficulty did not arise from the fact

that the DNA "had come from a body" as this is the only source of DNA.

Trial counsel should have known that a *Frye* hearing is required before scientific

evidence can be admitted. *See Frye*, 293 F. at 1014 ("while the court will go a long way in

admitting expert testimony deduced from a well-recognized scientific principle or discovery, the

thing from which the deduction is made must be sufficiently established to have gained general

26

acceptance in the particular field in which it belongs."). The Florida Supreme Court formally

adopted the *Frye* test in 1989 when it reversed a conviction that had been obtained partially on

the basis of hypnotically induced testimony. *See Stokes v. State*, 548 So. 2d 188 (Fla. 1989). The

Florida Supreme Court has reversed convictions in cases in which DNA evidence was admitted

without a *Frye* hearing or when the *Frye* hearing conducted by the trial court failed to adequately

determine the reliability of DNA evidence.

In *Murray v. State*, 692 So. 2d 157 (Fla. 1992) the court remanded for a new trial because

the State failed to meet the requirements for admission of expert DNA testimony. In that case,

Daniel Nippes (the same expert who testified for Respondent in Mr. Allen's case) misled the trial

court about the status of PCR testing (the same test that was performed on the evidence in Mr.

Allen's case). The Florida Supreme Court explained the basis for reversing the defendant's

conviction:

> Nippes told the court that the report of the National
> Research Council (NRC), DNA Technology in Forensic Science
> (1992) [hereinafter NRC report], "was an endorsement of the
> forensic DNA application to forensic science whether it was RFLP
> or PCR." In fact, the NRC's 1992 report expressly withheld
> endorsement of PCR methodology. The committee explained that
> although the PCR method had "enormous promise," "it has not yet
> achieved full acceptance in the forensic setting." NRC Report, at
> 70.

692 So. 2d at 160 n.5. The Court concluded:

> In this case, the State completely failed to carry its burden
> as the proponent of the DNA evidence. Not only did the State's
> expert repeatedly avoid answering questions as [to] the actual
> procedures used in conducting the PCR DNA tests at issue here, he
> also affirmatively misled the trial court as to the NRC's acceptance
> of PCR DNA methodology at the time of hearing. His testimony
> was equally unenlightening as to the probability calculations he
> used to report Murray's DNA sample matched the DNA sample

27

> recovered from the scene, and "91.8 percent of the population
> would be anticipated to have different DNA types." As we noted
> above, the State's expert based this conclusion on population
> frequency statistics from a database about which he had no
> knowledge and which was not generated by his own laboratory.

692 So. 2d at 163. *See also Hayes v. State*, 660 So. 2d 257 (Fla. 1995)(emphasizing the

importance of determining whether the laboratory has followed accepted testing procedures that

meet the Frye standard to protect against false readings and contaminations); *Brim v. State*, 695

So. 2d 268 (Fla. 1997) (emphasizing that each stage of the DNA process -- the methodology of

determining DNA profiles and the statistical calculations -- are subject to the Frye test).

In this case, Respondent initially sent the evidence to the FDLE lab for DNA analysis.

Kathy Gunther, a forensic serologist, testified that she conducted RFLP testing on the blood stain

on a pair of jeans found in the bedroom alleged to have belonged to Mr. Allen and the known

samples from Mr. Allen and Ms. Cribbs (R. 395). The test resulted in "an uninterpretable DNA

pattern." (R. 395). Ms. Gunther could not explain the results (R. 396). Daniel Nippes testified

that he conducted PCR testing on the same evidence that was tested by Ms. Gunther as well as on

a hand towel (R. 505-06). He testified that the blood on the jeans was from the victim and that

there was fluid from the victim on the hand towel (R. 509). Mr. Nippes also testified that the

seminal fluid on the towel matched Mr. Allen's DNA (R. 509). In regard to the statistical

probability, Mr. Nippes testified that "98.1 percent of the population have different DQalpha

genotypes, but Mr. Allen has the same genotype as that on the towel." (R. 513).

Trial counsel should have known that a *Frye* hearing was necessary before the admission

of scientific evidence. A *Frye* hearing was absolutely required in this case where there were

unexplained difficulties with the DNA analysis. In addition, the fact that Mr. Nippes lied to the

trial court in another case (*see Murray*) about the same testing procedure used here indicates that this evidence is unreliable and would not have been admitted. Mr. Allen was prejudiced by his counsel's failure to request a *Frye* hearing to test the reliability of the State's DNA evidence. The prejudice to Mr. Allen cannot be underestimated due to the overwhelming persuasiveness of DNA evidence.

The lower state post-conviction court denied this claim without an evidentiary hearing. On appeal, the Florida Supreme Court summarily disposed of the claim in a footnote as "lack[ing] merit because Allen was not prejudiced" *Allen II*, 2003 Fla. LEXIS 1156, n.5. Mr. Allen contends that the Florida Supreme Court's conclusion is an objectively unreasonable application of clearly established federal in that the court's conclusion ignores the great weight that Respondent attached to the DNA evidence. Respondent argued in closing that the jeans tied Mr. Allen to the scene, and there was more than a little spot of blood on the jeans (TRT 587). Respondent noted that the blood on the jeans could have come from 10.4% of population and the jeans were one foot from the victim's body (TRT 588). Respondent then argued that the DNA on the semen on the towel narrowed the percentage down to 1.4% of the population matching Mr. Allen (TRT 588). Trial counsel's failure to object to Mr. Nippes' expert opinion was deficient performance by Mr. Hooper. Mr. Allen was prejudiced by the introduction of inadmissible expert testimony that conveyed the false impression that Mr. Allen was scientifically linked to items that suggested Mr. Allen's culpability in this homicide.

### Trial counsel's suicide argument

Mr. Hooper's failure to investigate and prepare for Mr. Allen's trial resulted in a desperate trial strategy - arguing to the jury that the victim had committed suicide. The victim

had two superficial stab wounds on her face and her carotid artery was cut(R. 414-15).  The medical examiner described the neck wound:

> [T]here was a long cut, which is part of a stab wound entering the left neck below the ear, a little over one inch below the ear.  The cut was a little over an inch long or three centimeters long.  The cut was a little irregular with jagged edges.  When it was probed the stab would extended through the neck and actually into the mouth behind the left molar teeth.

(R. 415).  There was also evidence that the victim's wrists and ankles had been tied when she was stabbed - abrasions and ligature marks on her wrists and ankles (R. 412-13) and the absence of defensive wounds on her hands (R. 414, 421).

Despite the evidence that Ms. Cribbs was bound and stabbed, Mr. Hooper suggested to the jury that she had killed herself.  He raised this theory during his cross-examination of the medical examiner:

> Q. Would it have been medically possible for Ms. Cribbs to have put that knife into her own throat?
>
> A. In what manner?  You mean standing there and -
>
> Q. Standing there or lying down, would it have been possible for her to puncture her own throat with that knife?
>
> A. If she were able to stand pain by self-hypnosis she might be able to penetrate her throat.  There is a reflex when you try to stab yourself that stops you.  That is why you have hesitation marks when someone tries to cut themself.  It's hard to envision how she would do it by standing there and driving the knife in.  I can't say it is not possible, but it is highly improbable.
>
> Q. You mentioned overcoming pain and hesitation marks.  What did you mean when you say hesitation marks, doctor?
>
> A. Well, the only time I have seen self-induced wounds is actually slashing wounds rather than stab wounds.  I can't say I have seen a person stab themselves.  With a slashing type of wound there may

be some superficial type of slash.  Even the deeper slashes have several slashes before it got that deep just because of the reflect that a person has to pull away.

Q. Is common that in a suicide the person makes a couple of hesitation marks and then makes a final cut?

A. That is the way it looks.  You see several superficial cuts and at least one deeper cut that cuts through the vessel.

Q. The wound to the neck , is that on the left side?

A. Yes.

Q. The other mark was to the right side over here?

A. Yes.

Q. Is it medically possible they were hesitation marks, she took two attempts and brought the knife up this way to her neck?  Is that a medical possibility?

A. I believe she could reach those areas and could make the superficial stabs.  The deeper stab perhaps, if she were able to block the pain she could do it.  I don't think, I just don't think it's probable.  I don't know if I can say it's impossible, but I have never seen it happen.

(R. 428-30).  The prosecutor essentially destroyed the suicide theory on redirect:

Q. Would it be possible for someone to stab themselves in the neck and then, as this victim was stabbed all the way through to the back of the throat, stop the bleeding long enough to wash off the knife and put it in another room and come back and lay down to bleed to death?

A. That is more improbable than stabbing yourself in the first place.

(R. 431-32).

31

However, Mr. Hooper clung desperately to the suggestion of suicide in his closing statement. First, he attempted to ridicule the medical examiner for eliminating it as the cause of death:

> [H]e is so desperate to get in the scenario that fits the prosecutions' theory that he says: Well, I ruled out suicide. So could she have done it? Yes. Why did you rule it out? I don't think someone could kill her, that is not natural. Suicide is not natural. If you are going to rule out suicide because it is not natural, don't even consider it, no matter what the circumstances are. No one likes to think about it and it is not natural. It is possible. Should it be casually ruled out by the Medical Examiner because he is uncomfortable with the thought? No one likes to think about a lonely widow that is taken in by a drifter and one who is traveling under an assume name. No one likes to talk about things like that. We are not having a chat at Happy Hour.

(R. 564-65). Mr. Hooper repeatedly suggested to the jury that the victim had committed suicide (R. 567, 570). Again during his rebuttal argument, Mr. Hooper mentioned suicide:

> Suicide? Can't be ruled out, not by the Medical Examiner. He doesn't like it and it doesn't fit in with what he said on the stand with the State's scenario, but he can't rule it out medically. The woman lost her husband, she was lonely and was never seen in the company of men and she would go out with the girls dancing.

(R. 607-08) Trial counsel's suicide theory fell well outside the bounds of objectively reasonable trial strategy because counsel made the argument as a direct result of his desperate attempt to defend Mr. Allen after doing no investigation and inadequately preparing for trial. *See Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)(holding that "case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."). Counsel's desperation argument to the jury that maybe the victim committed suicide was so inconceivable that it fatally discredited the entirety of the defense in the jury's eyes.

32

The Florida Supreme Court affirmed the lower state post-conviction court's summary denial of this claim on the basis that Mr. Allen was not prejudiced. Specifically, the court found no prejudice based upon the court's factual determination that "[c]ounsel used the suicide theory merely to illustrate his argument about the superficial nature of the State's investigation." *Allen II*, 2003 Fla. LEXIS at *16. The court's adjudication of this claim is not entitled to the limitations on relief set forth in section 2254(d) because the court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A review of the above quoted portion of the trial transcript establishes that, contrary to the court's factual conclusion, trial counsel did not advance the suicide theory "merely to illustrate his argument about the superficial nature of the State's investigation." Instead, he advanced the undeniably incredulous scenario as a possible cause of the victim's death. Why else would trial counsel point out to the jury that the victim had lost her husband, was lonely, and never scene in the company of men (T. 607-08) other than to provide the jury with a reason why the victim may been suicidal.

### Failure to impeach Larry Woods

Trial counsel was also ineffective for failing to competently cross-examine Larry Woods regarding prior inconsistent descriptions of the man he eventually identified at trial as Mr. Allen. As a result, the jury was deprived of critical evidence that supported Mr. Allen's defense that someone else murdered the victim. Mr. Woods testified that he saw Mr. Allen at the victim's house on the morning of the crime (R. 388). Mr. Woods made the composite sketch and viewed a photograph shown to him by the police (R. 386-87). Mr. Hooper was ineffective for failing to ask Mr. Woods whether he saw anyone else near Ms. Cribbs' house on the morning of the murder,

information that would have supported Mr. Allen's argument that someone else committed this crime. In addition, in an initial statement to the police, Mr. Woods admitted that he was not sure whether the person he saw outside Ms. Cribbs' house was a man or a woman; in fact, he told the police that the individual he saw "was either an anorectic [sic] looking man or a very thin woman." Further, the physical description given by Mr. Woods to the police was inconsistent with Mr. Allen; Mr. Woods told the police that the individual he saw was approximately 5'5" to 5'8" tall; by all accounts, Mr. Allen is significantly taller. For example, Department of Corrections records describe him at being 6'1"; the information charging Mr. Allen also describes him as being 6'1". Mr. Woods' handwritten statement to the police also described an individual of vastly different weight than Mr. Allen. In his statement, Woods describes the person he saw as "135-145lb". By all accounts, Mr. Allen is a much larger man - again, the Department of Corrections lists Mr. Allen as weighing 175 pounds and describe him as "tall and stocky"; the charging document written at the time also describes Mr. Allen as weighing 175. Mr. Allen's actual physical characteristics can hardly be described as an "Anorexic looking man" as described by Mr. Woods. Moreover, Mr. Woods described the person as having "sandy blonde" hair; Mr. Allen's hair is brown. Trial counsel was ineffective for failing to use these prior statements to impeach Mr. Woods' identification of Mr. Allen at the trial; in fact, counsel did not question Mr. Woods at all about his alleged description and identification of Mr. Allen. Therefore, the failure to impeach Woods constitutes deficient performance and prejudiced Mr. Allen

***Failure to impeach Tonia McClain***

The failure to impeach Woods' identification of Mr. Allen was even more prejudicial to the case in light of the failure of counsel to elicit the testimony by Tonia McClain. McClain told the police in a handwritten statement that on the evening before the victim was discovered, she noticed two vehicles parked at Ms. Cribbs' house - a light colored vehicle and a dark colored vehicle. The following morning (the same morning that the victim was discovered and the same morning that Woods described the person he saw to police), McClain informed the police that she saw a heavy-set female and a "thin man" on the porch of the victim's home. She described the man as "young looking w/dirty blond hair." Importantly, she also told the police that "Both vehicles were at the residence this morning." She later noticed that the vehicles were "gone." McClain's description also does not match Mr. Allen. Significantly, the existence of more than one vehicle at Ms. Cribbs' home both the night before and the morning of her death, completely contradicts the Respondent's case and further buttresses Mr. Allen's defense at trial that another person killed her. Counsel unreasonably failed to elicit this testimony at trial.

The combination of the above-described errors - both the *Brady* violations and counsel's deficient performance - rendered the results of the trial unreliable. Absent these errors, there is more than a reasonable probability that the outcome would have been different.

## CLAIM II

**MR. ALLEN IS INNOCENT OF FIRST-DEGREE MURDER. EVIDENCE THAT WAS NOT PRESENTED TO THE JURY DUE TO STATE MISCONDUCT AND TRIAL COUNSEL'S INEFFECTIVENESS PROVES THAT MR. ALLEN IS INNOCENT. THE JURY WAS DEPRIVED OF EVIDENCE NECESSARY TO ITS DETERMINATION IN THE GUILT PHASE OF MR. ALLEN'S TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

All other allegations and factual matters contained elsewhere in this petition are fully incorporated herein by specific reference.

Mr. Allen is innocent of the crime for which he was convicted and sentenced to death. The execution of an innocent person is "the quintessential miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 13 L.Ed.2d 808, 115 S. Ct. 851, 866 (1995). As Justice O'Connor has explained:

> Regardless of the verbal formula employed -- "contrary to contemporary standards of decency," "shocking to the conscience," or offensive to a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," -- the execution of a legally and factually innocent person would be a constitutionally intolerable event.

*Herrera v. Collins*, 113 S. Ct. 853, 870 (1993)(O'Connor, J., concurring)(citations omitted).[5] Even in the context of noncapital cases, the Supreme Court has recognized that "a prisoner retains a powerful and legitimate interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated." *Kuhlmann v. Wilson*, 477 U.S. 436, 452 (1986). *See also, Schlup*, 115 S. Ct. at 866 (recognizing that "concern about the injustice that results from

---

[5]While the Court denied the petitioner's claim in *Herrera*, it did recognize that "in a capital case a truly persuasive demonstration of `actual innocence' made after trial would render the execution of a defendant unconstitutional." 113 S. Ct. at 856.

the conviction of an innocent person has long been at the core of our criminal justice system").
*See also Smith v. Murray*, 477 U.S. 478 (1986)(reaffirming the priority of an individual's interest
in presenting evidence of actual innocence over the State's interest in finality). The Court has
noted the necessity of creating an exception to finality in cases of actual innocence because of
"the overriding importance of th[e] greater individual interest" in presenting an innocence claim.
*Schlup*, 115 S. Ct. at 866. *See also, Stone v. Powell*, 428 U.S. 465, 491 n. 31 (1976)(noting that
the miscarriage of justice exception to a showing of cause for procedural default serves as an
"additional safeguard against compelling an innocent man to suffer an unconstitutional loss of
liberty."). This recognition of the individual's "overriding" interest in cases of actual innocence
emphasizes that when a prisoner is factually innocent his interest outweighs that of the State
simply because the State has no finality interest in the imposition of a sentence, whether
incarceration or execution, which would be fundamentally unjust.

Due to trial counsel's ineffectiveness and the State misconduct detailed elsewhere in this
petition, evidence of Mr. Allen's innocence was not discovered and presented to the jury.
Evidence was available proving that Mr. Allen's explanation to the jury -- that someone else had
committed this crime -- was, in fact, true. As a result of counsel's failure to investigate, Mr.
Allen's defense consisted only of his unsworn statement to the jury. Clearly, the support of
documentary and other evidence would have assisted Mr. Allen's efforts to prove his innocence.
Trial counsel was also hindered in his representation of Mr. Allen by the State's misconduct. The
State withheld crucial exculpatory evidence contained in two reports from the Florida
Department of Law Enforcement further proving Mr. Allen's claim that someone else murdered
Ms. Cribbs. In addition to failing to disclose material, exculpatory evidence, the State also relied

upon inadmissible DNA evidence that was presented through an expert found to be unqualified by the Florida Supreme Court in a later case.  *See Murray v. State*, 692 So. 2d 157 (Fla. 1992) (reversing conviction due to trial court's admission of unreliable DNA evidence through the false testimony of the State's expert, Daniel Nippes).  The State also knowingly presented false testimony through the medical examiner regarding the victim's lingering consciousness and suffering.  This highly prejudicial testimony was used by the State to improperly elicit the jury's sympathy for the victim in order to secure the conviction of Mr. Allen despite the absence of evidence proving his guilt.  Respondent also knowingly presented false testimony at the sentencing hearing the Mr. Allen was not registered at the Buccaneer Lodge.  An innocent man was convicted as a result of the combined effects of trial counsel's ineffectiveness and the State's misconduct.

The standard for reversal of convictions and sentences obtained through the use of false or misleading testimony is clear:  reversal is required if the false testimony could in any reasonable likelihood have affected the outcome.  *United States v. Bagley*, 473 U.S. 667 (1985). In cases involving the use of false or misleading testimony, "the Court has applied a strict standard . . . not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking process." *United States v. Agurs*, 427 U.S. 97, 104 (1976).  The prosecution not only has the constitutional duty to fully disclose any deals it may make with its witnesses, *Bagley; Giglio v. United States*, 405 U.S. 150 (1972), but also has a duty to alert the defense when a State's witness gives false testimony, *Napue v. Illinois*, 360 U.S. 264 (1959), and to correct the presentation of false state-witness testimony when it occurs. *Alcorta v. Texas*, 355 U.S. 28 (1957).  Where, as here, the State uses false or misleading

evidence, and suppresses material exculpatory and impeachment evidence, due process is violated whether the material evidence relates to a substantive issue, the credibility of a State's witness, or interpretation and explanation of evidence.

This Court must consider the cumulative effect of State misconduct, trial counsel's ineffectiveness. In this case, the State withheld exculpatory laboratory reports, knowingly presented false testimony, urged the jury to convict Mr. Allen on the basis of false medical testimony, and aroused the jury's passions by making an improper appeal to their sympathy. In addition, trial counsel failed to discover and present evidence proving Mr. Allen's innocence and failed to challenge the State's physical evidence. As a result of trial counsel's failure to investigate and prepare for Mr. Allen's trial, he presented a far-fetched theory that the victim had committed suicide not as a well-thought out defense strategy but as a desperate attempt to argue reasonable doubt. As a result of the combined misconduct of the State and trial counsel's ineffectiveness, an innocent man was wrongly convicted. Mr. Allen was deprived of a fair trial in violation of his rights under the Sixth, Eighth and Fourteenth Amendments. Relief is proper.

## CLAIM III

**MR. ALLEN WAS DENIED AN ADVERSARIAL TESTING AT THE SENTENCING PHASE OF HIS CAPITAL TRIAL BECAUSE TRIAL COUNSEL WAS INEFFECTIVE AND RESPONDENT KNOWINGLY PRESENTED FALSE EVIDENCE.  MR. ALLEN WAS DEPRIVED OF A FAIR TRIAL AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

All other allegations and factual matters contained elsewhere in this petition are fully incorporated herein by specific reference.

Trial counsel was ineffective for failing to challenge Respondent's evidence against Mr. Allen presented at the sentencing hearing.  Mr. Allen's penalty phase closing statement consisted of his interpretation of the evidence and how it demonstrated that someone else murdered the victim (R. 745-54).  Mr. Allen stated that the registration at the Buccaneer Lodge (the location where the victim's car was later discovered and where Mr. Allen was picked up by taxi (R. 441, 401-02)) would demonstrate that Mr. Allen registered at the lodge with another person and that that person the true killer (R. 752-543).  At the sentencing hearing before the judge, at which Mr. Allen was represented by trial counsel (*see Allen I*, 662 So. 2d at 329), Respondent called three witnesses to rebut Mr. Allen's innocence argument.  Detective Jay Glover testified that the Buccaneer Lodge did not have any records showing that Mr. Allen had registered there (R. 789).  Trial counsel was ineffective for failing to conduct an investigation to prove Mr. Allen's defense that someone else had committed the crime.  As a result, counsel was unaware that Detective Glover had lied because the Buccaneer Lodge in fact had records proving that Mr. Allen was registered as a guest and that he was accompanied by another adult.  This evidence supports Mr. Allen's innocence and would have assisted trial counsel at both the guilt and penalty phases of

40

Mr. Allen's trial.  The State knowingly presented false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and trial counsel was ineffective for failing to adequately investigate and prepare. *Strickland v. Washington*, 466 U.S. 668 (1984).

This evidence, had it been presented to the sentencing judge, would have corroborated Mr. Allen's defense that he did not kill the victim and was consistent with his penalty phase statement to the jury that the person who killed the victim was with him when he checked into the Buccaneer Lodge (R. 750).  This evidence was also consistent with the other evidence that the neither the judge nor the jury ever learned about as detailed above in Claim I, due to Respondent's *Brady* violations and trial counsel's ineffectiveness, namely, (1) FDLE's hair analysis results that excluded Mr. Allen as the source of hairs found on or in the victim's hand, thereby increasing the likelihood that the hairs were from a third party killer; (2) the fact that witness Larry Woods, who identified Mr. Allen in court as the person he saw outside the victim's house, gave a description to police that was highly inconsistent with Mr. Allen's appearance; (3) the fact that witness Tonia McClain saw <u>two</u> vehicles parked at the house the night before the murder and on the morning of the murder and later noticed that both cars were gone; (4) the fact that McClain's description of the person she saw with the victim was inconsistent with Mr. Allen's appearance; and (5) the evidence that police contaminated and failed to test or examine critical physical evidence.   In assessing the cumulative effect of the these errors in conjunction with both counsel's failure to discover the Buccaneer Lodge evidence and Respondent's presentation of false evidence alleging the contrary, the prejudice to Mr. Allen is clear.

Trial counsel was also ineffective for failing to object to the introduction of Mr. Allen's radio interview at the sentencing hearing.  On February 16, 1993, after the jury returned its

41

penalty phase recommendation, Mr. Allen gave a radio interview (R. 894-907). The prosecutor played the interview for the judge at the sentencing hearing (R. 781). The court had already heard Mr. Allen's closing statement to the jury in which he asserted his innocence and suggested an alternative theory based on the evidence. The radio interview was irrelevant to sentencing, and trial counsel was ineffective for failing to object to the admission of this prejudicial evidence.

For several reasons, this claim is not subject to the limitations on the granting of federal habeas relief set forth in section 2254(d). First of all, the Florida Supreme Court only adjudicated the merits of the ineffectiveness portion of this claim. The court did not adjudicate the merits of Mr. Allen's claim that Respondent knowingly presented false evidence. In footnote 3 of the court's opinion, the court characterizes the claim (identified by the court as "Claim 13") as a claim of "ineffective assistance of counsel for failing to challenge the State's evidence". *Allen II* at n.3. The court does not recognize or even acknowledge the knowing presentation of false evidence claim. In its disposition of the claim (again, in a footnote), the court concluded that, "Claim 13 lacks merits because Allen was not prejudiced by counsel's performance in the guilt phase and he represented himself during the penalty phase." *Allen II*, at n.5. Because the court did not adjudicate the merits of the knowing presentation of false evidence portion of the claim, this part of the claim is not subject to the limitations on the granting of relief set forth in section 2254(d).

Secondly, the court's decision is based upon an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d). The court held that the claim

42

lacked merit because "[Mr. Allen] represented himself during the penalty phase." *Allen II*, at n.5. However, the claim is that trial counsel was ineffective and Respondent knowingly presented false evidence <u>at the sentencing hearing</u>. As previously noted, at the sentencing hearing, unlike at the penalty phase. Mr. Allen was indeed represented by trial counsel. Therefore, the Florida Supreme Court's decision is unreasonable both in its application of the law and it determination of the facts forming the basis for its decision. The fact that Mr. Allen represented himself at the penalty phase proceedings has no bearing whatsoever on the instant claim that, at the subsequent sentencing hearing at which Mr. Allen was represented by trial counsel, counsel was ineffective. Furthermore, Mr. Allen's *pro se* status simply could have no bearing whatsoever on a claim such as this one asserting the knowing presentation of false evidence by the state. A defendant's due process rights are violated when the state knowingly presents false evidence whether the defendant is *pro se* or represented by counsel.

## CLAIM IV

**MR. ALLEN DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE SENTENCING PROCEEDINGS OF HIS CAPITAL TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND DID NOT KNOWINGLY AND VOLUNTARILY WAIVE THE PRESENTATION OF MITIGATION EVIDENCE. MR. ALLEN AS A RESULT WAS ALSO DENIED A MEANINGFUL PROPORTIONALITY REVIEW IN VIOLATION OF THE EIGHTH AMENDMENT.**

All other allegations and factual matters contained elsewhere

in this petition are fully incorporated herein by specific reference.

## A. DENIED EFFECTIVE COUNSEL AND WAIVER OF MITIGATION

## INVOLUNTARY

Mr. Allen was denied his right to the effective assistance of counsel guaranteed by the

Sixth and Fourteenth Amendments when counsel conducted absolutely no investigation into

mitigation. As a result, neither the penalty phase jury nor the sentencing trial court knew that

substantial mitigation evidence existed. Had counsel presented this evidence, there is more than

a reasonable probability that the trial court would not have sentenced Mr. Allen to death.

Furthermore, because trial counsel conducted no investigation, Mr. Allen did not knowingly,

intelligently, and voluntarily waive his constitutional right to present the available mitigation

evidence.

Mr. Allen was entitled to the effective assistance of counsel at his capital sentencing

proceedings. *Strickland v. Washington*, 466 U.S. 668 (1984). In order to establish his

entitlement to relief, Mr. Allen must establish both (1) deficient performance, and (2) prejudice.

A defendant establishes prejudice under *Strickland* if he demonstrates that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

44

been different.  A reasonable probability is a probability sufficient to undermine confidence in

the outcome." *Strickland*, 466 U.S. at 694.  If "the entire postconviction record, viewed as a

whole and cumulative of [] evidence presented originally, raise[s] a `reasonable probability that

the result of the [] proceeding would have been different' if competent counsel" had represented

the defendant, then prejudice is established.  *Williams v. Taylor*, 120 S. Ct. 1495, 1516 (2000).

*Accord Hardwick v. Crosby*, 320 F. 3d 1127, 1174-75 (11th Cir. 2003) (citation omitted) ("errors

that undermine confidence in the fundamental fairness of the state adjudication certainly justify

the issuance of the writ").  Mr. Allen need not establish his claim by a preponderance of the

evidence; rather, the standard is less than a preponderance.  *See Williams*, 120 S. Ct. at 1519

("[i]f a state court were to reject a prisoner's claim of ineffective assistance of counsel on the

grounds that the prisoner had not established by a preponderance of the evidence that the result of

his criminal proceeding would have been different, that decision would be `diametrically

different,` `opposite in character or nature,` and `mutually opposed' to our clearly established

precedent").

### Deficient Performance

Trial counsel did not conduct <u>any</u> mitigation investigation and therefore failed to discover

substantial available evidence that would have established both statutory and non-statutory

mitigation.  Trial counsel's failure in this regard constituted objectively unreasonable

performance because counsel's reason for not conducting an investigation was simply because

Mr. Allen expressed a desire not to present evidence in mitigation.  However, a client's desire

not to present mitigating  evidence does not terminate counsel's duty to conduct an investigation

into potential  mitigation. *See Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991).

45

Mr. Hooper conducted no investigation into mitigation. He all but admitted that he conducted no investigation to discover mitigating circumstances.  As Mr. Hooper himself explained:

> I don't have any mitigating factors to present simply because -- he does not have the attitude or spirit of uncooperativeness but he refused to provide me with mitigating factors.  He also repeatedly requested I not plead for his life in this case.

(TRT 801). Mr. Hooper's explanation that Mr. Allen "refused to provide" him "with mitigating factors" is inadequate to excuse his failure to investigate.

> The sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility.  We find that reluctance on [the defendant's] part to present a mental health defense or to testify should not preclude counsel's investigation of these potential factors.

*Carter v. Bell*, 218 F.3d 581, 596-97 (6th Cir. 2000).  It is not the client's responsibility to know what mitigating factors apply to his case or to understand what in his background constitutes mitigation. The client's uncooperativeness or refusal to supply information is irrelevant to counsel's duty to investigate and prepare for the penalty phase. *See Williams v. Taylor*, 120 S.Ct. 1495 (2000).  Mr. Hooper did not conduct a mitigation investigation because he latched onto Mr. Allen's desire to seek death and "blindly follow[ed]" Mr. Allen's wish not to present mitigation.

Mr. Hooper was clearly deficient under *Strickland v. Washington* for latching onto Mr. Allen's desire not to present mitigation evidence as a reason to forego a mitigation investigation. It is well-established that the failure to investigate a client's background for mitigation constitutes the ineffective assistance of counsel. *See Williams v. Taylor*, 120 S.Ct. 1495 (2000); *Baxter v.*

46

*Thomas*, 45 F.3d 1501, 1513 (11th Cir. 1995); *Stephens v. Kemp*, 846 F.2d 642, 653 (11th Cir.

1988); *Thompson v. Wainwright*, 787 F.2d 1447, 1450-51 (11th Cir. 1986); *Beavers v. Balkcom*,

636 F.2d 114, 116 (5th Cir. 1981). Mr. Hooper's duty to investigate Mr. Allen's background for

mitigation was not obviated by Mr. Allen's expressed desire to waive mitigation. *See Blanco v.*

*Singletary*, 943  F.2d 1477, 1502-03 (11th Cir. 1991); *Dobbs v. Turpin*, 142 F.3d 1383, 1388-89

(11th Cir. 1998).  Thus, Eleventh Circuit caselaw rejects the notion that a lawyer may "blindly

follow" the commands of the client. *See also Eutzy v. Dugger*, 746 F. Supp 1492, 1499 (N.D. Fla.

1989), *aff'd*, No. 89-4014 (11th Cir. 1990) (quoting *Thompson v. Wainwright*, 787 F.2d 1447 (11th

Cir. 1986).  Mr. Hooper's decision to forego an investigation was unreasonable, particularly in light of

the fact that Mr. Allen's family was available and willing to provide any information concerning

mitigation, records were easily available had counsel sought them out, and powerful mental health

evidence was available had counsel done an adequate investigation.

     The reason lawyers may not "blindly follow" the commands of their client is that "although

the decision whether to use such evidence in court is for the client, . . . the lawyer first must evaluate

potential avenues and advise the client of those offering possible merit." *Thompson*, 787 F.2d  at 1451

(citations omitted). In Mr. Allen's case, counsel clearly "decided not to investigate . . . [Mr. Allen's]

background only as a matter of deference" to Mr. Allen's wish. *Id*. "Although [Mr. Allen's] directions

may have limited the scope of [counsels'] duty to investigate, they did not excuse [counsels'] failure to

conduct <u>any</u> investigation of his background for possible mitigating evidence." *Id*.

     In *Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000), the defense neither investigated nor introduced

any evidence of mitigating factors, basing its argument on a theory of residual doubt in an attempt to

dissuade the jury from imposing the death penalty. *Id*. at 587.  At the evidentiary hearing on Carter's

ineffective assistance habeas corpus claim, trial counsel testified that counsel did not investigate or

introduce any mitigation because Carter "reacted violently" to the idea of a mental health defense,

because Carter "never volunteered any information about his family background or childhood",

because counsel saw nothing in Carter's demeanor to support an argument based on mental defect,

because Carter's family were uncooperative, and because Carter did not want to testify at the

sentencing hearing. *Id.* at 596.  The Sixth Circuit held:

> Trial counsel here did Carter a disservice by failing to investigate
> mitigating evidence. While counsel advanced several reasons for
> adopting their strategy, their reasons do not excuse their deficiency.
> The sole source of mitigating factors cannot properly be that
> information which defendant may volunteer; counsel must make some
> effort at independent investigation in order to make a reasoned,
> informed decision as to their utility. We find that reluctance on
> Carter's part to present a mental health defense or to testify should not
> preclude counsel's investigation of these potential factors.  Under the
> American Bar Association guidelines for appointed death penalty
> defense counsel, "the investigation for preparation of the sentencing
> phase should be conducted regardless of any initial assertion by the
> client that mitigation is not to be offered." American Bar Association,
> Guidelines for the Appointment and Performance of Counsel in Death
> Penalty Cases § 11.4.1.c (1989). We agree, therefore, with the district
> court's conclusions that defense counsel made no investigation into
> Carter's family, social or psychological background and that the
> failure to do so constituted representation at a level below an objective
> standard of reasonableness.

*Id.* at 596-97; *see also Coleman v. Mitchell*, 268 F.3d 417, 449-50 (6th Cir. 2001)("defendant

resistance to disclosure of information does not excuse counsel's duty to independently investigate"

*citing Carter*).  In *Coleman*, the court acknowledged that, under the doctrine of *Faretta v. California*,

422 U.S. 806, 45 L. Ed.2d 562, 95 S.Ct. 2525 (1975), counsel may properly respect the wishes of "an

informed" client not to investigate or present mitigation evidence. *Coleman*, 268 F.3d at 448.

However, the court held that *Faretta* was not applicable because Coleman's counsel's failure to

conduct an <u>independent</u> investigation into Coleman's background and mental health precluded a

finding that Coleman's instructions to counsel were "informed by counsel's presentation of various

mitigation strategy options." *Coleman*, n.16.  The court also held that requiring counsel to conduct an

independent mitigation investigation in the face of the client's indication that the client does not want

to pursue mitigation does not violate *Faretta*:

> Requiring counsel to independently investigate Petitioner's personal
> background does not "thrust counsel upon the accused, against his
> considered wish," *Faretta,* 422 U.S. at 820, especially where, as in
> this case, the record fails to indicate both Petitioner's mitigation
> preferences and the informed consideration supporting such
> preferences . . . . Also under *Faretta,* a defendant "must first be 'made
> aware of the dangers and disadvantages of self-representation.'"
> *Martinez v. Court of Appeal of Calif.,* 528 U.S. 152, 162, 145 L. Ed.
> 2d 597, 120 S. Ct. 684 (2000) (*quoting Faretta,* 422 U.S. at 835).
> Again, the record offers no indication that Petitioner was so made
> aware in this case.

*Coleman,* 268 F.3d at 449.  In *Silva v. Woodford,* 279 F.3d 825 (9th Cir. 2002), the court held:

> [C]ounsel's duty to investigate mitigating evidence is neither entirely
> removed nor substantially alleviated by his client's direction not to call
> particular witnesses to the stand.  Furthermore, a lawyer who
> abandons investigation into mitigating evidence in a capital case at the
> direction of his client must have at least adequately informed his client
> of the potential consequences of that decision and must be assured that
> his client has made [an] "informed and knowing" judgment.

*Silva,* at 838.  The court in *Silva* held that trial counsel's "abandonment of the investigation" was

unreasonable. *Id.* at 840.  The court noted:

> Our holding is supported by the 1980 American Bar Association
> ("ABA") Standards for Criminal Justice in effect at the time of trial.
> While not directly addressing a situation where a client purportedly
> seeks to prohibit an attorney from investigating his background, these
> guidelines suggest that <u>a lawyer's duty to investigate is virtually
> absolute, regardless of a client's expressed wishes</u>. *See* 1 ABA
> Standards  for Criminal Justice 4-4.1, cmt. At 4-55 (2d ed. 1980) . . . .

*Silva* at 840. (footnote omitted)(emphasis added). The court held that, even in the face of his client's instructions not to present certain mitigation witnesses,

> [Counsel] still had a duty to determine what evidence was out there in mitigation in order to make an informed decision as to how to best represent his client. Indeed, if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial. In addition, [counsel] had a concomitant duty top try to educate or dissuade Silva about the consequences of his actions - - neither of which he attempted to do.

*Silva* at 847.

The ABA guidelines for appointed death penalty defense counsel in place at the time of Mr. Allen's capital trial, provided:

> GUIDELINE 11.4.1 INVESTIGATION
>
> A. Counsel should conduct **independent** investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations **should begin immediately** upon counsel's entry into the case and **should be pursued expeditiously**.
>
> * * * *
>
> C. **The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered**. This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.
>
> * * * *
>
> Commentary
>
> * * * *

> **Counsel's duty to investigate is not negated by the expressed desires of a client**. Nor may counsel "sit idly by, thinking that investigation would be futile". The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each. Without investigation, counsel's evaluation and advice amount to little more than a guess.

American Bar Association Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases 1989, § 11.4.1.C and Commentary. (emphasis added)(footnotes omitted). The United States Supreme Court has repeatedly relied upon American Bar Associations standards as guides to determine whether counsel's conduct regarding investigation into capital case mitigating circumstances was reasonable under *Strickland*. *See Wiggins v. Smith*, 123 S.Ct. 2527, 2535-36 (2003); *Williams v. Taylor*, 529 U.S. at 396; *Strickland*, 466 U.S. 688-89; *see also Silva v. Woodford*, 279 F.3d at 840; *Carter*, 218 F.3d at 596-97. In Mr. Allen's case, trial counsel failed to follow the ABA guidelines by using Mr. Allen's expressed desire not to present mitigation as a justification to conduct no mitigation investigation whatsoever and by failing to independently investigate mitigation in regardless of any purported lack of cooperation by Mr. Allen.

Mr. Hooper's duty to prepare for the penalty phase did not arise at the conclusion of the guilt phase so any suggestion that he had no penalty phase responsibility because he withdrew from representation after the conclusion of the guilt phase and before the penalty phase actually began is irrelevant. In fact, the trial court only allowed one hour for penalty phase preparations so both sides were expected to be prepared to proceed directly to the penalty phase. *See Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir. 1985)("It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by the objective standard of reasonableness."); *Martin v. Maggio*, 711 F.2d 1273, 1280 (5th Cir. 1983)("defendant's instructions that his lawyers obtain an acquittal or the death

penalty did not justify his lawyer's failure to investigate the intoxication defense . . . uncounseled

jailhouse bravado, without more, should not deprive a defendant of his right to counsel's better-

informed advice.").

### Prejudice

Beyond the guilt-innocence stage, defense counsel must discharge very significant

constitutional responsibilities at the sentencing phase of a capital trial. The Supreme Court has held

that in a capital case, "accurate sentencing information is an indispensable prerequisite to a reasoned

determination of whether a defendant shall live or die [made] by a jury of people who may have never

made a sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion). In

*Gregg* and its companion cases, the Court emphasized the importance of focusing the sentencer's

attention on "the particularized characteristics of the individual defendant." *Id.* at 206.  *See also*

*Roberts v. Louisiana*, 428 U.S. 325 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

Counsel here did not meet rudimentary constitutional standards. As explained in *Tyler v. Kemp*,

755 F.2d 741 (11th Cir. 1985):

> In *Lockett v. Ohio*, the Court held that a defendant has the right to
> introduce virtually any evidence in mitigation at the penalty phase.
> The evolution of the nature of the penalty phase of a capital trial
> indicates the importance of the [sentencer] receiving accurate
> information regarding the defendant.  Without that information, a
> [sentencer] cannot make the life/death decision in a rational and
> individualized manner.  Here the [sentencer] was given no information
> to aid [him] in the penalty phase.  The death penalty that resulted was
> thus robbed of the reliability essential to confidence in that decision.

*Id.* at 743 (citations omitted).  No tactical motive can be ascribed to an attorney whose omissions are

based on ignorance, *see Brewer v. Aiken*, 935 F.2d 850 (7th Cir. 1991), or on the failure to properly

investigate or prepare. *See Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991); *Kimmelman v. Morrison*, 477 U.S. 365 (1986).

A wealth of compelling mitigation evidence was not presented to the jury or the sentencing judge in violation of Mr. Allen's right to a fair and reliable sentencing required by the Eighth Amendment. *See Wiggins v. Smith*, 123 S.Ct. 2527; *Williams v. Taylor*, 120 S.Ct. 1495 (2000); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Furman v. Georgia*, 408 U.S. 238, 309-10 (1972). Because of counsel's lack of investigation and preparation, Mr. Allen did not knowingly or intelligently waive his right to present mitigation. As a result, the judge and jury received a woefully incomplete personal portrait of the person they convicted and sentenced to die.

Mr. Hooper's complete failure to conduct a mitigation investigation substantially prejudiced Mr. Allen. Even the most cursory investigation of Mr. Allen's background would have revealed the presence of significant statutory and nonstatutory mitigation. Had Mr. Hooper conducted even a minimal mitigation investigation, he would have discovered that following critical mitigation:

Lloyd Chase Allen's childhood was marked by savage physical domestic violence, by the severe alcoholism of his father and the complete emotional withdrawal of his mother, and by a vacuum of moral values or parental guidance. He was born into, and grew up in, a home filled with violence and fear. Lloyd's parents, Arvil "Blackie" Allen and Natha Wynn, were locked into a pattern of physical and emotional violence throughout their entire relationship. Blackie and Natha were married on December 23, 1944, only one day after Blackie's divorce from his first wife Estelle. Blackie and Natha's relationship was volatile and explosive from the beginning. Blackie was a severe alcoholic. Within three months of their wedding day, Natha, pregnant with their first child, filed for

divorce from Blackie.  The divorce petition, which was found to be true by the trial court, states in

part:

> Soon after their marriage, plaintiff discovered that the defendant was a
> person of violent and ungovernable temper and within two months
> after they were married, he began a course of harsh tyrannical and
> cruel treatment consisting of violent physical abuse, physical injury,
> slapping, beating, cursing, and threatening which continued with only
> slight intermission until their final separation.  The defendant is
> addicted to the use of intoxicating liquor and frequently comes home
> in an intoxicated condition and on such occasions places the plaintiff
> in deadly fear of the defendant for days at a time.

The divorce petition also notes that Blackie's physical abuse of Natha intensified when she

became pregnant.  Their volatile relationship erupted into physical violence as Blackie, in a rage,

brutally beat his pregnant wife, but was restrained by Natha's father.  Although Natha separated from

Blackie, they soon resumed living together, a common pattern in situations of domestic violence.  This

pattern of abuse continued throughout their marriage.

Within six months of their first separation, by September 21, 1944, violence again reached a

breaking point and Natha petitioned the court for a restraining order to keep Blackie away and for

custody of their unborn child.  On September 21, Natha went to the hospital for medical treatment.

Blackie was furious that Natha was pregnant and by this time had become more abusive to her than

ever.  When Blackie learned Natha had gone to the hospital, he went to her room, violently dragged

her out of the hospital and forced her to go with him to Plains, Texas, a remote and isolated area away

from her family and from medical care.  On this occasion, Blackie hit her in the face with a coca-cola

bottle and gave her a black eye.  He also struck her causing bruises on her arms, legs, and breasts.  At

the time of this physical abuse, Natha was about eight months pregnant.  Blackie threatened to kill

Natha many times and on one occasion attempted to push her out the door of a car traveling at fifty miles per hour.

Natha's and Blackie's first child was born in October 1944, and their divorce was granted approximately twenty days later. However, they continued their relationship after the divorce, and Lloyd, their first son, was born in October 1945 to an unwed Natha. Four months after Lloyd was born, Blackie and Natha remarried in New Mexico on February 15, 1946. Ultimately, Blackie and Natha had five children, four boys and one girl. The cycle of violence continued in their relationship and the children were included in the chaos and violence. Natha was a cold person and was verbally abusive to her children, telling them constantly they were worthless and "just like their father." She was a self-absorbed woman who had no time or interest in providing emotional to support to her children.

Blackie Allen was well known in the small Texas town where they lived for his drinking and for his explosive and violent temper. Most people in Levelland, including government authorities, were afraid of Blackie. He was known to start fights easily and to always brutally beat any opponents. Everyone feared being the object of Blackie's wrath. Levelland is located in West Texas and in the 1940's and 1950's was an extremely tough town full of cowboys struggling to survive in a harsh physical environment. Blackie Allen was known as the meanest and the toughest of the cowboys in town. Natha was known to be an inadequate mother who failed to interact with her children, establish any rules of conduct, demonstrate love or affection, or protect them from their violent father. When Lloyd was a baby, Natha would disappear from the house for an entire day, leaving Lloyd alone in a pen, from which neighbors heard him crying for hours.

Carol, Lloyd, and Arvil, aka "Topper", were the first three of Natha's and Blackie's five children.  When Blackie would come home from work drunk, and the fighting between Natha and Blackie would reach a breaking point, Natha would flee with the children to her parents' home.  Blackie abused the children also, punishing the least transgression by striking them with his fists, household items, or a belt, leaving bruises, lashmarks, an swelling that sometimes lasted for days.  Unfortunately, Natha's parents could not afford to care for her and her children and economic circumstances would force Natha and the children to return to Blackie.  Inevitably, within a month or two, the fights would start again, quickly escalating to physical violence, and Natha would leave again taking the children with her.  This pattern repeated itself over and over again, disrupting the children's lives throughout Natha and Blackie's marriage.  However, there came a time when Natha would not take Lloyd with her when she escaped to her parents' home.  Lloyd was left behind with his alcoholic and abusive father.

Blackie was a very driven and harsh man and he used his children to work for him as though they were adults from the time they were very young.  Lloyd started working in Blackie's construction business by the age of 8 or 9 years old.  Lloyd would start work for him during the summer as early as 5:30 a.m. and work as late as midnight.  Both Topper and Lloyd were taught to drive at age 10; their grandmother made pillows for them to sit on so they could see over the steering wheel of their father's construction trucks.  Lloyd was driving alone throughout the area by age 10, making deliveries and running errands for his father.  When Blackie was dissatisfied with his sons' performance, or, when they objected to having to work for him, he would beat them severely.

In addition to the construction business, Blackie was known to make money through illegal activity -- selling bootleg liquor and gambling.  He was known as an outlaw but the authorities looked

the other way.  Blackie had Lloyd delivering bootleg whiskey for him in the back of a farm truck by the time Lloyd was 12 years old.  Lloyd never had an opportunity to be a child because he was used by his father and treated as an adult all his life.  Lloyd and Topper were always either working at home in the barn and yard, or at the construction business, and Lloyd helped the father with his gambling and bootlegging business.  Blackie also owned a restaurant/motel on the edge of town called the Sky View.  There was a private club at the Sky View where powerful and influential men from the area met to gamble and drink.  Many of these men appeared to be Blackie's partners in his bootlegging and other illegal activities.  Lloyd was frequently at the Sky View as a child and was exposed to and a participant in these activities apparently sanctioned by the authorities in this town.

Lloyd always tried to obtain his father's respect and approval but never succeeded.  Blackie would beat Lloyd and give him black eyes which Lloyd would have to explain to his friends.  Blackie's violent temper was continued during Lloyd's childhood and the family suffered constant fear throughout those years.  When Lloyd was about 15 or 16, Natha and Blackie's marriage finally ended.  Natha moved home with her parents, but Lloyd did not go with her.  By this time, Lloyd had quit school.  He stayed with his father briefly and then left Levelland and travelled throughout the country with a band of gypsies, making a living the only way his father had taught him to do.  Eventually, Lloyd joined the marines at the age of seventeen.

Lloyd suffers with the debilitating effects of severe and chronic alcohol abuse problem.  He has had three alcohol-related criminal convictions:  disturbing the peace in 1968; drinking in public in 1968; and driving while intoxicated in 1972.  In 1986, a Shipley Hartford scale intellectual functioning test was administered to him while he was incarcerated at the Kansas Department of Corrections.  The results indicated a wide discrepancy between Mr. Allen's vocabulary I.Q. and his

conceptual I.Q., suggesting an inability to use abstract reasoning and suggesting organicity. The testing psychiatrist noted that this "is often associated with people who have used drugs and alcohol for a long period of time." Several penal institutions have recommended that Mr. Allen receive substance abuse counseling. He was briefly enrolled in a seven-step program.

Between 1966 and 1986, Mr. Allen incurred numerous criminal convictions, but all were for minor offenses and none involved force or the threat of force. Similarly, his incarceration records are remarkable for the absence of any violent incidents or apparent propensity to violence. All of those who have described Mr. Allen's character and history have remarked that he is nonviolent.

Mr. Allen's history also is marked by severe bouts with depression, a major mental illness. However, because trial counsel failed to investigate and obtain the services of a mental health expert, this issue was not explored. At an evidentiary hearing, Mr. Allen is prepared to demonstrate through the testimony of a qualified mental health expert that Mr. Allen suffers and suffered from severe depression, which alone, and in conjunction with the above-described background, would establish the presence of statutory and nonstatutory mitigation.

Because trial counsel failed to conduct any investigation in mitigating circumstances, Mr. Allen's purported waiver of his constitutional right to present mitigation at his capital trial was not knowing, intelligent, or voluntary. Trial counsel's failure to conduct a constitutionally adequate pretrial investigation into potential mitigation evidence prevented counsel from competently advising Mr. Allen regarding penalty phase proceedings, thus rendering the client's purported waiver of his right to present mitigation neither knowing nor voluntary. Because Mr. Allen did not knowingly and voluntarily waive his right to present mitigation, trial counsel's failure to present the voluminous

58

available mitigation to either the penalty phase jury or the sentencing judge rendered the outcome -

Mr. Allen's death sentence -  unreliable.

In *Battenfield v. Gibson*, 236 F.3d 1215, 1234 (10th Cir. 2001), the court held that the state

court unreasonably applied *Strickland* when the state court rejected the capital defendant's claim that

trial counsel was ineffective in failing to present mitigation evidence.  The state court had rejected the

claim on the ground that the lower state court had found that the defendant had knowingly waived his

right to present mitigating evidence. *Id.* at 1227.   The Tenth Circuit explained what factors must be

examined in order to determine whether a defendant's waiver of mitigation evidence in knowing and

voluntary:

> Because the [state appellate court]'s decision was based on the [lower]
> state district court's finding that Battenfield knowingly waived his
> right to present mitigating evidence, we must examine the propriety of
> that finding. In performing our analysis, it is necessary to review
> several factors, including the investigative efforts of defense counsel
> prior to the beginning of the penalty phase, his penalty phase strategy,
> the advice he rendered to Battenfield prior to Battenfield's alleged
> decision to waive the presentation of mitigating evidence, and the trial
> court's examination of Battenfield regarding his alleged waiver.

*Id.* at 1227.  The court concluded that because Battenfield's trial counsel failed to conduct a

constitutionally adequate pretrial investigation into potential mitigation evidence, counsel could not

have  competently advised Battenfield regarding penalty phase proceedings and, therefore,

Battenfield's purported waiver was neither knowing nor voluntary. *Id.* at 1234.  The court reached this

conclusion because it found that trial counsel spent little time investigating possible mitigation

strategies and, as a result, counsel was "unaware at the time of trial of various mitigation strategies

and accompanying pieces of evidence that could have been presented during the mitigation phase"

and "was wholly unprepared to rebut the aggravating factors argued by the prosecution" *Id.* at 1229.

The court found:

> [Trial counsel]'s failure to investigate clearly affected his ability to competently advise Battenfield regarding the meaning of mitigation evidence <u>and the availability of possible mitigation strategies</u>. . . . [T]here is no indication [trial counsel] ever explained the general meaning of mitigation evidence to Battenfield <u>or what specific mitigation evidence was available.</u>

*Id.* at 1229 (emphasis added).  As a result, when the trial court questioned Battenfield on the record about his decision not to present mitigation evidence, Battenfield "did not have a proper understanding of the general nature of mitigating evidence or the specific types of mitigating evidence that might be available for presentation." *Id.* at 1231.

Finally, the court found that the trial court's questioning of Battenfield on his decision to waive was "inadequate" because "[t]he trial court failed to adequately determine that Battenfield had been provided sufficient information from [trial counsel] to make a knowing choice." *Id.*  The trial court judge, who testified at the state post conviction evidentiary hearing regarding the waiver, testified that he thought that trial counsel had discussed mitigation with his client.  The Tenth Circuit found that "the trial judge's assumptions about what transpired between [trial counsel] and Battenfield prior to the waiver are not borne out by the record." *Id.* at 1232.

The court also rejected as "a patently unreasonable application of *Strickland*" the state court's conclusion that, even without the waiver, counsel could not have been ineffective because of Battenfield's refusal to cooperate with counsel.  *Id.* at 1233.

> We see no difference between Battenfield's purported waver and his so-called 'lack of cooperation.  If the waiver is found to be neither knowing nor intelligent, the so-called lack of cooperation must fall by the wayside.  Even ignoring this flaw in the [state post conviction appellate court's] reasoning, we fail to see how Battenfield can be held

> responsible for [trial counsel]'s failure to present mitigating evidence
> unknown to [trial counsel]. Had [trial counsel] conducted adequate
> investigation or potential mitigating evidence, he would have had a
> variety of witnesses from whom to choose.

*Id.* 1233-34 (footnote omitted).

Like trial counsel in *Battenfield*, Mr. Allen's trial counsel failed to conduct an adequate pre-trial investigation. In fact, he conducted no mitigation investigation at all. As a result, before Mr. Allen decided to waive mitigation - it was simply impossible for counsel to competently advise Mr. Allen regarding "the meaning of mitigation evidence and the availability of possible mitigation strategies." Most importantly, counsel absolutely never could have "explained . . . what specific mitigation evidence was available." *Battenfield* at 1229. Furthermore, the trial court's colloquy on the waiver of mitigation- in which the trial court never asked counsel what mitigation counsel had available to present and, if any, whether this information had been conveyed to Mr. Allen - was entirely inadequate and ineffectual. As in *Battenfield*, mere assumptions about what counsel had discussed with Mr. Allen cannot refute Mr. Allen's claim that he did not knowingly and voluntarily waive mitigation.

Any suggestion that Mr. Allen's reluctance to provide counsel with information relative to mitigation precludes a finding of ineffective assistance of counsel "must fall by the wayside". *Battenfield* at 1233-34. Moreover, as previously discussed, counsel's constitutional duty to conduct a mitigation investigation did not evaporate simply because Mr. Allen told counsel that he did not wish to pursue mitigation.

In *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir. 2003), the court held that trial counsel's investigation of the client's social history was inadequate and prejudicial. "Douglas was not forthcoming with useful information, but, . . . this does not excuse counsel's obligation to obtain

mitigating evidence from other sources. *Silva*, 279 F.3d at 846-47.  When it comes to the penalty

phase of a capital trial. "it is imperative that all relevant mitigation information be unearthed for

consideration." *Caro* [*v. Calderon,*] 165 F.3d [1223] at 1227 [(9th Cir. 1999)].   In concluding that

neither counsel nor the client made a fully informed decision not to present mitigation evidence to the

penalty phase jury because counsel failed to conduct an adequate investigation into the client's mental

health and social background, the court reasoned:

> We also note that even when we have placed emphasis on the
> client's desires, we have required that the client make an "informed
> and knowing" decision not to present mitigating evidence. *Jeffries v.
> Blodgett.* 5 F.3d 1180, 1193(9th Cir. 1993); *see also  Silva*, 279 F.3d
> at 847 (holding that counsel has duty to "try to educate or dissuade"
> the defendant about the consequences of actions). It is, of course,
> difficult for an attorney to advise a client of the prospects of success or
> the potential consequences of failing to present mitigating evidence
> when the attorney does not know that such evidence exists. *See
> Landrigan*, 272 F.3d at 1228 ("If the investigation had been more
> thorough, [defendant] would have had more  information from which
> he could make an intelligent decision about whether he wanted some
> mitigating evidence presented.").
>
> Moreover, we have been careful to note that although the
> client's desires are not to be ignored altogether, it may be
> inappropriate for counsel to acquiesce to the client's demands. As we
> recently held in *Williams v. Woodford*, counsel "cannot be faulted for
> deferring to the defendant's desire to forgo presentation of mitigating
> evidence *when the defendant's wish coincides with counsel's
> reasonable professional judgment that no mitigating evidence be
> introduced.*" 306 F.3d 665, 720(9th Cir. 2002)(emphasis added); *see
> also Campbell v. Kincheloe,* 829 F.2d 1453, 1462 n.5(9th Cir.
> 1987)(holding counsel not ineffective for adhering to a client's desire
> not to present evidence when counsel had legitimate strategic reasons
> for not presenting the evidence). "Counsel must, at a minimum,
> conduct a reasonable investigation enabling him to make informed
> decisions about how best to represent his client." *Sanders v. Ratelle,*
> 21 F.3d 1446, 1456-57 (9th Cir. 1994)(emphasis omitted); *see also
> Jennings v. Woodford*, 290 F.3d 1006, 1014(9th Cir. 2002)
> ("Attorneys have considerable latitude to make strategic decisions . . .
> *once they have gathered sufficient evidence upon which to base their
> tactical choices.*")(emphasis in original). Instead, as in *Silva*, Peters

> "could not make a reasoned tactical decision about the trial precisely
> because 'counsel did not even know what evidence was available.'"
> 279 F.3d at 847(quoting *Deutscher v. Whitley*, 884 F.2d 1152,
> 1160(9th Cir. 1989)). As a result, neither Douglas nor Peters made a
> fully informed decision not to present the evidence to the jury. n4

>> n4 This case also amply illustrates the need for counsel
>> to discover and independently evaluate the potential
>> evidence, as a person with a mental disorder may be
>> reluctant to recognize his own problems. *See  Bundy v.
>> Dugger*, 816 F.2d 564, 566-67 n.2(11th Cir. 1987).

*Douglas* at 1089-90(emphasis added).

The trial court's finding that Mr. Allen was competent and knowingly and voluntarily waived

the right to counsel during the penalty phase is irrelevant to the validity of his waiver of mitigation --

the relevant issue here is whether his purported waiver of mitigation was knowing, voluntary, and

intelligent.  A *pro se* defendant's waiver of mitigation is not necessarily and automatically made

knowing and voluntary by virtue of the mere fact that he waived counsel and is permitted to proceed

*pro se.* Even if Mr. Allen was competent to waive counsel during the penalty phase and did so

knowingly and voluntarily, he still possessed his separate and distinct constitutional right to present

mitigation. To say that Mr. Allen's waiver of counsel also acted as a knowing and voluntary waiver of

mitigation turns on its head the concept of what constitutes a knowing and voluntary waiver of a

constitutional right. "The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether

the defendant actually *does* understand the significance and consequences of a particular decision and

whether the decision is uncoerced." *Godinez v. Moran*, 509 U.S. 389, 401, n.12 (1993). In *Boykin v.

Alabama*, 395 U.S. 238 (1969), the Supreme Court, in discussing a criminal defendant's waiver of

constitutional rights, held:

> The requirement that the prosecution spread on the record the
> prerequisites of a valid waiver is no constitutional innovation. In

63

Carnley v. Cochran, 369 U.S. 506, 516 [1962], we dealt with a problem of waiver of the right to counsel, a Sixth Amendment right. We held: "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver."

We think that the same standard must be applied to determining whether a guilty plea is voluntarily made. For, as we have said, a plea of guilty is more than an admission of conduct; it is a conviction. [footnote omitted] Ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality.

*Boykin*, 395 U.S. 242-43 (emphasis added). The Court noted that, for a plea of guilty to be valid under the Due Process Clause, it must be

. . . "'an intentional relinquishment or abandonment of a known right or privilege.' Johnson v. Zerbst, 304 U.S. 458, 464 (1938). Consequently, if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void. Moreover, because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts."

*Boykin* at 243, n.5 *quoting McCarthy v. United States*, 394 U.S. 459, 466 (1969). A capital defendant's constitutional right to present mitigation should be afforded no less consideration when the defendant desires to waive his right to present such evidence.

Mr. Allen's waiver of his right to counsel during the penalty phase did not eliminate or make unnecessary the need for an inquiry to determine if his decision to waive mitigation was knowing and voluntary. For example, and by analogy, suppose a defendant wishes to represent himself and plead guilty to a crime. After obtaining from the defendant a valid waiver of counsel pursuant to *Faretta*, the trial court could not thereafter constitutionally impose a judgment of guilt without conducting an additional and constitutionally sufficient inquiry pursuant to *Boykin*. In other words, because there are

two distinct constitutional rights sought to be waived (in Mr. Allen's case, the right to counsel and the right to present mitigation in a capital trial), separate colloquies to assure the knowing and voluntary waiver of each right are necessary. In Mr. Allen's case, the mere fact that he waived his right to counsel at the penalty phase did not and cannot substitute as establishing a knowing and voluntary waiver of his right to present mitigating evidence.

Even assuming, *arguendo*, that Mr. Allen's waiver of his right to counsel during the penalty phase rendered as a non-issue any claim that he did not validly waive mitigation <u>during the penalty phase</u> (a proposition that Mr. Allen maintains is erroneous), as the Florida Supreme Court noted on direct appeal (*see Allen I*, 662 So. 2d at 329), Mr. Allen was in fact represented by counsel <u>during the subsequent sentencing hearing</u> before the judge. His previous waiver of counsel for purposes of the penalty phase was rescinded for the purposes of the sentencing hearing and therefore could have had no possible effect on his waiver of mitigation during the sentencing hearing. While the Florida Supreme Court decided on direct appeal that the trial court did not err in following the procedure mandated by *Koon v. Dugger*, 619 So. 2d 246 (Fla. 1993) when Mr. Allen purportedly waived mitigation during the penalty phase proceedings in front of the jury, the court clearly did not address the issue of whether Mr. Allen's purported waiver <u>during the sentencing hearing</u> was knowing and voluntary.

An analysis of the state court's treatment of the instant claim establishes that the state courts never ruled on the merits of the claim. Therefore, the restrictive limitations on the granting of relief set forth in section 2254(d) are not applicable to this claim. The Florida Supreme Court's opinion on direct appeal reads in pertinent part:

After the verdict was announced, defense counsel moved to

65

withdraw from representation during the penalty phase. Counsel informed the court that Allen wanted to waive presentation of mitigating evidence and to affirmatively argue for imposition of the death penalty. Defense counsel explained that he was uncomfortable advocating this position and that Allen was competent to represent himself. The court conducted a *Faretta* inquiry and concluded that Allen knowingly and voluntarily waived his right to counsel and was competent to represent himself. The court ordered Allen's defense attorney to remain present in a stand-by counsel status. The court also ordered an examination for psychological competency pursuant to Florida Rule of Criminal Procedure 3.210. At the subsequent competency hearing, two mental health experts testified that Allen satisfied all six items of competency under Florida Rule of Criminal Procedure 3.211 and was competent to proceed to the penalty phase. The court found Allen competent to represent himself in the penalty phase.

In his closing argument to the jury, Allen expressly denied the existence of mitigating evidence and specifically denied that he was abused in childhood or that he suffered from alcoholism or drug abuse. While Allen asserted his factual innocence of murder, he also urged the jury to vote for death because he felt responsible and remorseful for Cribbs' death. Allen theorized that Cribbs had been murdered by an unnamed associate that he had summoned to assist with house repairs and whom he had told that Cribbs carried a large sum of cash in her purse. Allen also stated that he preferred death to life in prison. The jury recommended death by a vote of eleven to one.

The court followed the jury's recommendation and imposed a sentence of death, and also sentenced Allen to five years for grand theft of an automobile. The court found three aggravating factors: the murder was committed while under a sentence of imprisonment based upon Allen's escape from a work release program in Kansas; the murder was committed for pecuniary gain based upon Allen's statements, the contents of the purse scattered across the bed, and the theft of the automobile; and the murder was especially heinous, atrocious, or cruel based upon the medical examiner's testimony that it took fifteen to thirty minutes for death to occur and that Cribbs would have been conscious for fifteen minutes after being stabbed. §§ 921.141(5)(a), (f), (h), Fla. Stat. (1991). The court also found two nonstatutory mitigators that were not argued but were contained within the record: Allen's family background and his military service in Vietnam. The court also stated that it did not consider Allen's request for the death sentence in imposing the sentence.

*Allen I* at 326-27.  Also significant to the instant claim is the fact that, as noted by the Florida

Supreme Court on direct appeal, while Mr. Allen was permitted to represent himself at the penalty

phase proceeding before the jury,

> Counsel, however, also represented Allen during the sentencing
> proceeding where the State presented three witnesses to rebut the
> residual doubt argument that Allen had made to the jury during
> closing argument in the penalty proceeding. The State also presented
> into evidence a radio interview with Allen that was taped after the jury
> returned its recommendation of death. During argument to the court at
> sentencing, defense counsel stated that he had no mitigating factors to
> present because Allen refused to provide any and "repeatedly
> requested that I not plead for life in his case." Counsel further stated
> that he was "biting his lip" because he was "not allowed to open up
> and say everything that I would like to say and argue everything that I
> want to argue," but was instead respecting Allen's wishes on this
> matter and would "do exactly what [Allen] asked me to do." Although
> the judge asked defense counsel whether he had informed Allen about
> the statutory mitigating factors available, there was no indication that
> counsel had investigated Allen's background or history to determine
> whether particular mitigating evidence was available. Counsel also
> made no proffer of mitigating evidence that could be presented to the
> court.

*Id.* at 329.

On direct appeal, Mr. Allen was represented by new counsel.  Direct appeal counsel argued

the following:

> THE TRIAL COURT ERRED IN ACCEPTING THE
> DEFENDANT'S WAIVER OF MITIGATION EVIDENCE,
> WHERE DEFENSE COUNSEL HAD NEVER PERFORMED ANY
> INVESTIGATION INTO THE PRESENCE OF MITIGATING
> EVIDENCE, AND CONSEQUENTLY THERE EXISTS NO
> RECORD SHOWING OF MITIGATION EVIDENCE, IN
> VIOLATION OF *KOON V. DUGGER*, 619 SO. 2D 246 (FLA. 1993),
> AND THE SIXTH, EIGHTH AND FOURTEENTH
> AMENDMENTS TO THE UNITED STATES CONSTITUTION
> AND ARTICLE 1, §§ 2, 9, 9, 16, 17 AND 22 OF THE FLORIDA
> CONSTITUTION.

(Initial Brief of Appellant on direct appeal p.29).  Specifically, Mr. Allen argued that, based on the

record of the trial proceedings, the trial court erred by not following the procedure required to be

followed as held in *Koon*. (*Id.* at p.30). In *Koon*, the court "established <u>a procedure </u>that must be

followed when a defendant, against his counsel's advice, refuses to permit the presentation of

mitigating evidence. . . ." *Allen I*, 662 So. 2d at 328 (emphasis added). The *Koon* procedure requires

counsel to inform the trial court of the defendant's decision and then inform the court "[b]ased upon

an investigation . . . whether there is mitigating evidence that could be presented and what that

evidence would be." *Id.* (Emphasis added). The *Koon* procedure also requires the defendant to

confirm on the record that counsel has discussed these matters with him, and, despite counsel's

recommendation, the defendant wishes to waive the presentation of mitigation. *Id.* Mr. Allen argued

on direct appeal:

> There is no record showing that counsel conduced an investigation, or
> what mitigating evidence he had uncovered. There is no record
> confirmation by the defendant that he had discussed this mitigating
> evidence with counsel prior to waiving its presentation.
>     In fact, defense counsel conceded that he had conducted no
> investigation at all into the existence of potential mitigating evidence,
> producing as reasons that (1) the defendant had expressed a preference
> for death over life in prison, in the event of his conviction of first
> degree murder; and (2) the defendant had not himself revealed to
> counsel potential mitigating evidence:
>
>> I don't have any mitigating factors to present simply
>> because - - he does not have the attitude or spirit of
>> uncooperativeness but he refused to provide me with
>> mitigating factors. He also repeatedly requested I not
>> plead for life in his case. (T. 801).
>
>> This is no justification for counsel's dereliction. *Koon, Blanco*
>> *and Deaton* stand for the proposition that the defendant's desire to
>> waive mitigation does not extinguish counsel's duty to investigate it.
>> Furthermore, these cases plainly contemplate application to the
>> recalcitrant defendant who will not cooperate in investigating
>> mitigation because he has chosen to waive its presentation. Counsel

has a duty in this event to elicit information from other sources.

All counsel did in this case was to tell the defendant what the mitigating factors are - - counsel had even given him a book on the subject (T. 803-804) - - but not what evidence from the defendant's history would establish their existence in his own life. There is no record evidence that the defendant had understood counsel, or had read the book, or otherwise subjectively knew what the mitigating factors are, or the kind of proof required to establish their existence. Neither the trial court nor defense counsel made any record inquiry of the defendant to test his claim of knowledge.

Mostly importantly, contrary to the rule of *Koon*, there is no record evidence that the defendant understood what, from his life history, would comprise proof of these factors, even assuming that he knew what they were. It cannot be assumed that the defendant had sufficient mastery or understanding of his own life history to know what events or conditions therein tend to establish statutory and non-statutory mitigating factors. . . .

This case demonstrates the principle underlying the prophylactic rule of *Koon*, that a defendant cannot be presumed to know the mitigating circumstances of his life . . . .

(Initial Brief pp.30-33)(footnotes omitted).  As further argued on direct appeal, even though Mr. Allen expressly denied in front of the penalty phase jury that he had a troubled childhood or that he was an alcoholic or drug addict (T. 739-40), "a cursory mitigation investigation into the defendant's life history" would have reveled that "Mr. Allen's child hood was marked by savage physical domestic violence and emotional neglect; he is a severe alcoholic and chronic alcoholic; he is a drug abuser" (Initial Brief p.33).  The argument concluded:

In view of the defendant's denials of mitigating factors which predict for denial and which did in fact exist, it may be presumed that the defendant did *not* know what he was giving up when he waived the right to present mitigation.

In the absence of a record recitation of mitigation evidence disclosed upon investigation and communicated to the defendant, the defendant's waiver of mitigation was invalid, and *Koon* compels reversal of sentence.

(Initial Brief pp.33-34)(footnotes omitted).  Direct appeal counsel's reference in the Initial Brief to

mitigation evidence of Mr. Allen's severely troubled upbringing was of course a reference to <u>non-record</u> evidence that direct appeal counsel discovered and that trial counsel never knew about because he did no investigation. (*See* Appellant's Motion to Relinquish Jurisdiction for the Purpose of Resentencing). Because this was non-record evidence, the Florida Supreme Court could not and did not consider it on direct appeal. As the argument in the Initial Brief makes clear (as does the Florida Supreme Court's opinion on direct appeal discussed below), the issue raised and considered by the Florida Supreme Court on direct appeal was whether or not the trial court erred by allowing Mr. Allen to waive the presentation of mitigation evidence when the trial court failed to follow the procedural requirements set forth in *Koon*. This is a separate and distinct claim from the instant claim, which was subsequently raised by Mr. Allen in state post-conviction court, that trial counsel was ineffective for doing no mitigation investigation and, as a direct result of counsel's failure, Mr. Allen did not - and could not have - knowing and voluntarily waived his constitutional right to present mitigation evidence.

In its opinion on direct appeal, the Florida Supreme Court never addressed whether or not trial counsel was deficient or whether counsel's complete failure to investigate mitigation prejudiced Mr. Allen. Nor did the court decide or even address whether Mr. Allen knowingly, intelligently, and voluntarily waived his right to present mitigation. Instead, the Florida Supreme Court held that the trial court did not err in not following *Koon* procedure:

> We find the procedure established in Koon inapplicable to this case for two reasons: 1) during the penalty proceedings before the jury, Allen asserted his right of self-representation and the court found him competent to represent himself in the penalty phase; and 2) the opinion in Koon did not become final until several months after Allen's sentencing was conducted.

* * * *

> . . . Because the Koon procedure was not applicable either during the
> penalty proceeding before the jury or during the sentencing proceeding
> before the judge, we find no error on this point.

*Allen I*, 662 So. 2d at 329.  The Florida Supreme Court never addressed the issue of whether trial

counsel was ineffective for failing to investigate mitigation6 or whether or not Mr. Allen knowingly

and voluntarily waived his constitutional right to present mitigation.  The court decided only that,

based on the trial record alone, the fact that the trial court failed to follow the *Koon* procedure did not

merit reversal.

In his state motion for post-conviction relief, Mr. Allen argued that trial counsel was

ineffective for failing to investigate Mr. Allen's background for mitigation. (*See* Petitioner's "Second

Amended Motion To Vacate Judgments of Conviction and Sentence with Request for Evidentiary

Hearing")( (hereinafter "state post-conviction motion") at pp.67-82; PC ROA 814-29).  Mr. Allen

argued that his decision to waive mitigation was made while Mr. Hooper was representing him,

before Hooper moved to withdraw at the at the penalty phase (State post-conviction motion at 69; PC

ROA 816).  He also clearly asserted that "Mr. Hooper's failure to investigate Mr. Allen's background

during the ten months that he was his lawyer precluded Mr. Allen from making valid waiver of

mitigation." (State post-conviction motion at 69-70;PC ROA 816-17) and that his decision to waive

mitigation was "uniformed" (State post-conviction motion at p.69; PC ROA 816).  Mr. Allen further

argued:

> The trial court's finding that Mr. Allen was competent to represent

---

[6]The court merely looked to the trial record and noted that "there was <u>no indication</u> that
counsel had investigated Allen's background or history to determine whether particular
mitigating evidence was available" and that "[c]ounsel also made no proffer of mitigating
evidence that could be presented to the court." *Allen I* at 329 (emphasis added).

himself is irrelevant to the validity of his waiver of mitigation - - **the relevant issue here is whether that waiver was knowing, voluntary, and intelligent**.

\* \* \* \*

. . . Counsel's decision to forego an adequate investigation was unreasonable, particularly in light of the fact that Mr. Allen's family was available and willing to provide any information concerning mitigation, records were easily available had counsel sought them out, and powerful mental health evidence was available had counsel done an adequate investigation.

\* \* \* \*

. . . Without an adequate background investigation, Mr. Allen did not know what mitigating factors might apply to his case, and because he did not know what he was waiving, his waiver was invalid.
. . . The fact that Mr. Allen represented himself at the penalty phase is irrelevant to his counsel's duty to prepare for the penalty phase by investigating Mr. Allen's background for the presence of mitigation.

\* \* \* \*

. . . In this case, trial counsel made no proffer of available mitigating evidence because he neglected to conduct any investigation.

\* \* \* \*

Because of counsel's lack of investigation and preparation, Mr. Allen executed an invalid waiver of his right to present mitigation.  As a result, the judge and the jury received an incomplete personal portrait of the person they convicted and sentenced to die.

(State post-conviction motion at pp.69, 72, 73, 74, 80; PC ROA at 816, 819, 820, 821, 827)(emphasis

added).  Mr. Allen also alleged the existence at the time of trial of a plethora of significant mitigation,

both statutory and non-statutory, relating to his background and mental health. (State post conviction

motion at pp.74-80; PC ROA 821-827).  The quality and quantity of this evidence are incomparable

to the trial court's scant mitigation findings in the trial record..

The post-conviction lower state court denied the claim without a hearing based on the erroneous rationale that the claim was procedurally barred because it was "raised on direct appeal and decided adversely to the Defendant" (*See* State court's "Order Denying Motion For Postconviction Relief Without An Evidentiary Hearing", p.52; PC ROA 1077). The court quoted at length the Florida Supreme Court's opinion on direct appeal. On appeal of the post-conviction order summarily denying relief, the Florida Supreme Court agreed, concluding in a footnote that this claim was raised on direct appeal. *See Allen II*, 2003 Fla. LEXIS 1156, n.4.

The limitations of the granting of relief set forth in section 2254(d)(1) that were enacted in by the AEDPA 1996 are not applicable to this claim because the claim was never adjudicated on the merits in state court. *See* 28 U.S.C. § 2254(d). Therefore, in reviewing this claim, this Court is obliged to employ the traditional, pre-AEDPA standard of *de novo* review of legal and mixed legal-factual rulings. *See Davis v. Sec'y. Dept. Corr.*, 341 F.3d 1310 (11th Cir. 2003)(deferential standard of review established in 2254(d)(1) not required when Florida courts failed to resolve the merits of defendant's claim). In Mr. Allen's case, the only issue reached by the Florida Supreme Court on direct appeal was whether or not the trial court erred by not following the *Koon* procedure when Mr. Allen announced that he did not wish to present mitigation. The Florida Supreme Court never discussed, much less decided, whether or not trial counsel was ineffective regarding his duty to conduct a mitigation investigation, or whether Mr. Allen knowingly, intelligently, and voluntarily waived his right to present mitigation evidence. When Mr. Allen squarely raised this issue in his state post-conviction motion, both the lower state court and the Florida Supreme Court erroneously and unreasonably concluded that the claim had been decided on direct appeal. Because the state courts have never decided the merits of this claim even though raised by Mr. Allen both in his state post-

conviction motion and his subsequent appeal, the restrictive limits on granting relief in section 2254(d)(1) do not apply. *See Davis*. This Court therefore must review the instant claim *de novo* and cannot properly apply the limitations of 2254(d)(1).

## B. DENIED EIGHTH AMENDMENT REQUIRED PROPORTIONALITY REVIEW

As a result trial counsel's failure to investigate and discover readily available mitigation and Mr. Allen's resultant involuntary waiver of the constitutional right to present mitigation, the Florida Supreme Court was precluded from conducting a meaningful and constitutionally sufficient proportionality review, thereby rendering Mr. Allen's death sentence in violation of the Eighth Amendment. The Florida Supreme Court held on direct appeal that it was not precluded from conducting the required proportionality review when, according to the court, Mr. Allen's waiver was "valid" *Allen I*, 662 So. 2d at 331. As discussed above, however, the court decided on direct appeal only that the trial court did not err in not following the *Koon* procedure. Therefore, the finding by the Florida Supreme Court that Mr. Allen's waiver was "valid" on direct appeal is not a finding that Mr. Allen knowingly and voluntarily waived mitigation. As also discussed previously in this Claim, both the lower state post-conviction court and the Florida Supreme Court unreasonably concluded that the merits of Mr. Allen's post-conviction attack on the voluntariness of his waiver of mitigation were decided on direct appeal. The Florida Supreme Court also held that Mr. Allen was precluded from raising in his petition for state habeas corpus relief the issue of the denial of the required proportionality review caused by the ineffective assistance of counsel and the resultant involuntary waiver of mitigation. *See Allen II*, 2003 Fla. LEXIS 1156, *16.

The Florida Supreme Court held that because Mr. Allen had raised the issue of the denial of a proportionality review on direct appeal, he could not raise it again in his post-conviction petition for

state habeas relief.  The Florida Supreme Court's rejection of this claim as raised in the petition for

state habeas is erroneous because the court failed to recognize and address Mr. Allen's ineffective

assistance of counsel/involuntary waiver of mitigation claim which, if found to have merit, would

establish that the court was precluded from knowing of the existence of substantial mitigation.  This

in turn would have established that the death penalty is disproportionate in Mr. Allen's case. Claims

raised on direct appeal but which are later raised in postconviction are not procedurally barred for

federal habeas purposes. *See e.g. Barclay v. Florida*, 463 U.S. 939, 946 (1983)("Since the Florida

Supreme Court held that it had considered Barclay's claims in his first appeal, and simply refused to

reconsider its previous decision in the second appeal, those claims are properly before us").  Habeas

relief is warranted.

## CLAIM V

**MR. ALLEN WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT AND PENALTY PHASES OF HIS CAPITAL TRIAL BECAUSE TRIAL COUNSEL FAILED TO OBTAIN AN ADEQUATE MENTAL HEALTH EXAMINATION.  MR. ALLEN'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION WERE VIOLATED.**

All other allegations and factual matters contained elsewhere in this petition are fully incorporated herein by specific reference.

Trial counsel was ineffective because counsel failed to investigate and discover information needed in order for a mental health expert to render a professionally competent evaluation and failed to provide Mr. Allen with competent mental health assistance.  Counsel's failure in this regard deprived the judge and the jury of being able to determine Mr. Allen's mental condition.  As a result, specific and significant mental health-related background information existed but was not investigated or discovered by trial counsel.  In fact, trial counsel did no mitigation investigation at all. Trial counsel was ineffective for not discovering this information and providing it to a mental health expert. Mr. Allen was prejudiced because counsel's failure meant that neither the judge nor the jury knew of the significant mental-health mitigation detailed in Claim IV of this petition and incorporated into the instant Claim by specific reference.

Counsel failed to provide his client with "a competent psychiatrist . . . [to] conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).  When counsel is aware that his client has a mental health problem, reasonably effective representation requires that the client's background be investigated and that a mental health examination be conducted by a confidential defense expert.  When counsel fails

76

to fulfill these duties, due process is violated.  The judge and jury are deprived of the facts which are necessary to make a reasoned finding as to guilt and sentencing.  Information which was needed in order to render a professionally competent evaluation was not investigated and counsel failed to secure the assistance of a mental health expert.  Mr. Allen's judge and jury were not able to "make a sensible and educated determination about the mental condition of the defendant <u>at the time of the offense</u>."  *Ake*, 470 U.S. at 81 (emphasis added).

Counsel was ineffective for failing to recognize that a mental health evaluation was necessary.  After the jury returned a guilty verdict, Mr. Hooper moved to withdraw from representing Mr. Allen.  Mr. Allen spoke before the judge for the first time:

> If you are asking, I am well-aware that the man who represents himself has a fool for a client.  I am not only aware of it, but I believe it.  At this stage of the trial, the trial is over.  We are going to extenuating and mitigating and aggravating factors.  We are talking about a penalty phase of a trial.
>
> If what you are trying to ascertain is what is my demeanor or if how I present myself in this courtroom might hurt or help me, I believe after the amount of time you have seen and spoke with me today what I am going to go in and do, I believe you should know this is.  Simply put, my argument forward is my right to the jury for the sentence that I think I deserve.  It's not what the prosecution thinks I might deserve as a different sentence.  I won't get in his way.  I want to give mitigating and aggravating factors why I should receive it.
>
> I want to do it in a way that I won't disrespect the bench or my attorney or either one of these prosecutors.  I want it on the record that I think I was treated fairly by both of them.  I have no personal animosity for either one of these people.  I have the utmost respect for them.  I don't want to offend any member of that jury.  I have no hard feelings here.
>
> THE COURT:  My concern is that you have sufficient familiarity to be able to present what you want to present in proper form?

77

THE DEFENDANT:  Let me ask you, if I am out of bounds here, I have reviewed the law myself and I was amazed that the prosecution needs time for a penalty phase because I am totally amazed by that.  Although I hoped for an innocent plea at the same time, I recognized the fact I could be found guilty and that there was a second trial.  I have prepared myself for either eventuality.  I did do that.  I am amazed that the prosecution did not.

At the same time, maybe I don't need -- what the funny part of this is two of us are going in to ask for the same thing.  I think when I am through I believe the way it goes, if the procedure that I read is right, the State will proceed first?

THE COURT:  Yes.

THE DEFENDANT:  Okay.  I don't know how long he wants in front of the jury but I can tell you it would take me approximately 20 minutes to present mine and be done with it.  Since we are both asking for the same thing, I think the scenario, and I want you to be well-aware we use the word scenario because I did not testify at the trial, there were many theories brought forward about what might have happened at this trial.

The way I read the law, I can bring a scenario forth.  If the jury chooses to believe it happened, the scenario the way it did, and at the end of this scenario want to give me the death penalty, not only -- my job, the way I see it, is to get the sentence I want.  That is my job.  If I wanted 25 to life, I would go in there and get 25 to life.

In my opinion, I am better in front of both of those in front of a jury.  I will wait and see.  No doubt in my mind that I would get it.

What I want to do is go in and put forth my scenario and at the end of it talk about aggravating factors and convince the jury that they should not be out over 10 minutes.  It would be an insult to me if they were out over 10 minutes.  That means I did not do my job.  Write down the death penalty and come in and we'll chose up sides and go home.

THE COURT:  **I don't mean to be insulting, but have you ever been in a mental health facility or treated for any mental disability?**

(R. 667-70)(emphasis added).  After listening to Mr. Allen for only a few minutes, the trial court

78

suspected that he suffered from a mental disability.  Mr. Hooper represented Mr. Allen for ten

months.  If he had even minimal contact with Mr. Allen during that time, Mr. Hooper should have

realized that a mental health evaluation was necessary for both phases of the trial.  Even if Mr.

Hooper had no indication that Mr. Allen suffered from mental health problems, he is still required to

secure the assistance of a mental health expert and to investigate his client's background.  *Mauldin v.*

*Wainwright*, 723 F.2d 799, 800 (11th Cir. 1984)(finding counsel who assumed that his own judgment

regarding client's mental health condition was sufficient, instead of having him examined by qualified

mental health expert, rendered deficient performance).

      The assistance of a mental health expert is necessary to determine whether a client is

competent and sane, as well as to determine the applicability of diminished capacity defenses.  In

regard to the penalty phase, the client's background and family history must be investigated for the

presence of statutory and nonstatutory mitigation.  As a result of counsel's failure to secure the

assistance of a mental health expert and to conduct an adequate background investigation, the jury

that convicted and sentenced Mr. Allen to die was deprived of relevant information necessary to a fair

trial and a reliable sentencing.

      Mr. Allen's trial counsel also rendered prejudicially deficient performance in failing to object

and/or impeach one of the court-appointed experts with his lack of qualifications.  Pursuant to the trial

court's Faretta inquiry, two court-appointed mental health experts examined Mr. Allen and thereafter

testified that he was competent to represent himself (R. 683-93). While the trial court permitted Mr.

Allen to represent himself during the *Faretta* hearing (R. 683-4), the court noted for the record that

Mr. Allen was consulting Mr. Hooper during the examination of the court-appointed experts (R. 689).

Despite Mr. Hooper's ability to consult and advise Mr. Allen during this hearing, there was absolutely

no inquiry conducted into their qualifications, specifically that of Marshall Wolfe. Post-conviction counsel has uncovered information that Wolfe, who identified himself as a psychologist, was in fact not licensed as a psychologist.

During his testimony. Wolfe identified himself as a psychologist (R. 684). However, Wolfe was not and is not licensed as a psychologist in the State of Florida. This fact was never revealed to the court. Mr. Allen in fact stipulated to Wolfe as a qualified expert (R. 684). As a result, no inquiry into Wolfe's qualifications to conduct the mental health evaluation and give an opinion on Mr. Allen's competence was ever conducted.

The fact that Wolfe has never qualified to obtain a license in psychology in the State of Florida raises questions about his expertise in the field and, in turn, raises questions about the validity of his opinion concerning Mr. Allen's competency. Due to the trial court's decision to allow Mr. Allen to proceed without counsel during the *Faretta* hearing, as well as Mr. Hooper's failure to effectively assist Mr. Allen in cross-examining the court-appointed mental health experts, Wolfe's opinion stood entirely untested. The trial court's ultimate decision to allow Mr. Allen to represent himself at the penalty and sentencing phases of the trial was made absent a meaningful adversarial testing of the information relied upon by the court. Mr. Allen's death sentence was the resulting prejudice.

## CLAIM VI

**MR. ALLEN WAS DENIED AN ADVERSARIAL TESTING AT THE PENALTY AND SENTENCING PHASES OF HIS CAPITAL TRIAL BECAUSE, BUT FOR TRIAL COUNSEL'S INEFFECTIVENESS AND RESPONDENT'S KNOWING PRESENTATION OF FALSE EVIDENCE, MR. ALLEN WOLD HAVE BEEN FOUND INNOCENT OF THE DEATH PENALTY. MR. ALLEN  WAS DEPRIVED OF A FAIR TRIAL AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

All other allegations and factual matters contained elsewhere in this petition are fully incorporated herein by specific reference.

The sentencing judge relied upon three aggravating circumstances in imposing the death sentence:  under sentence of imprisonment; pecuniary gain; and heinous, atrocious or cruel (R. 239). He found two mitigating factors: that Mr. Allen's parents divorced when he was fourteen and military service (R. 240).  Due to trial counsel's ineffectiveness and Mr. Allen's involuntary waiver of his right to present mitigation, there was no mitigation presented at Mr. Allen's penalty phase.  Mr. Allen wrongly denied the existence of any mitigation and he requested that the jury sentence him to death. Furthermore, Respondent knowingly presented false evidence in order to prove the existence of aggravating circumstances.  As a result, Mr. Allen's death sentence is based on false evidence and the jury was deprived of the information necessary to render a fair and reliable sentencing determination.

The heinous, atrocious or cruel aggravating circumstance does not apply to Mr. Allen's case. Respondent knowingly presented false testimony to prove this factor and then relied upon this evidence to urge the jury and judge to sentence Mr. Allen to death.  The Florida Supreme Court also relied on Respondent's false evidence in upholding this aggravator on direct appeal.

Dr. Robert Nelms testified that the cause of death in this case was the knife wound to the carotid artery (R. 417).  In response to a question about how long it would take a person to bleed to

death through the carotid artery, he testified:

> This is just an estimation but approximately one-sixteenth of the blood flows into that carotid arteries. The blood completely circulates the body in about one minute. Theoretically each minute one-sixteenth of the blood would be bled out through the carotid artery. So in 16 minutes it would have bled out. That is assuming that all of the blood passing through the broken artery goes outward, which most of it probably did. So roughly 16 minutes as long as 30 minutes. If she were to go into shock during that time she may lose the blood at a slower rate through the arteries. I allowed roughly 15 to 30 minutes as a rough estimating.

(R. 419-20). Dr. Nelms was also asked how long the victim would have remained conscious:

> Well, probably the thing that would determine when she was no longer awake is when stock [sic] intervened. She may fainted as a result of the shock, but not as a result of the blockage of that one branch of the artery.
>
> Q        Approximately how long do you think it would have taken here [sic] to lose conciousness [sic] from shock or loss of blood?
>
> A        **It's just a guess**, but I would estimate fairly close to the 15 minutes.

(R. 420)(emphasis added). Respondent knowingly presented this false testimony in violation of

*Napue v. Illinois*, 360 U.S. 264 (1959). Trial counsel was ineffective for failing to challenge this

evidence by presenting an independent pathologist to testify that it is impossible that a person whose

carotid artery is slashed will take 30 minutes to bleed to death and that the victim will be conscious

for 15 of those minutes. Trial counsel was also ineffective for failing to object to Dr. Nelms' "guess"

about the loss of consciousness. Due to the Respondent's misconduct and trial counsel's

ineffectiveness, Mr. Allen was sentenced to death based on an aggravator that does not apply to his

case.

The prosecutor relied upon Dr. Nelms' false testimony to urge the jury to sentence Mr. Allen

to death:

> As Dr. Nelms told you, it took the victim probably 30 minutes to die. She bled to death. You saw the picture with her face in a pillow. You heard the testimony, the television was turned up high and the radio was on so she could not summon help. She lay there bleeding through her mouth for at least 15 minutes that she knew about; 15 minutes that she was in pain. It took her 30 minutes to finally exhaust enough blood to die.
>
> Remember Dr. Nelms' testimony. At least 15 minutes she knew she was bleeding. The pain from that stab wound for the 15 minutes she lay there unable to summon help because she was bound hand and foot, unable to cry out because her head was stuffed in a pillow. If she had cried out, there was background noise that would have stifled her cries for assistance.

(R. 728-29). The prosecutor again relied on Dr. Nelms' false testimony during the sentencing hearing

before the judge:

> Here we are in the final argument to you to apply the death penalty. And the last thing I want you to consider, judge, if you will, is heinousness of the crime. I would like you to remember Dr. Nelms' testimony that the witness was alive for 30 minutes after she was stabbed and she was conscious for somewhere between 15 and 30 minutes as the blood flowed out of her mouth . . . This lady laid there tied up, knowing she was dying, blood flowing through her mouth, unable to do a thing about it. Her face was mashed in a pillow and she had no way to seek help. She was just allowed to bleed to death.

(R. 796-97).

In addition, the trial court relied on this false testimony as the sole support for the heinous,

atrocious, and cruel aggravating factor:

> Further, the Court finds the aggravating circumstance that the capital felony was especially heinous, atrocious and cruel in that the Court finds it extremely wicked, shocking, evil, vile and with a high degree of indifference to the suffering that the victim was mortally wounded and thereafter it took from fifteen to thirty minutes for death to occur. There being unrefuted testimony in the record that the victim would have been conscious and aware of her circumstances for

83

upwards of fifteen minutes prior to losing consciousness.

(R. 239).  Finally, the Florida Supreme Court on direct appeal relied on Dr. Nelms' false testimony to

uphold the HAC aggravator.  *See Allen v. State*, 662 So. 2d 323, 330-31 (Fla. 1995)

The Supreme Court has held that where a person convicted of first degree murder and

sentenced to death can show either innocence of first degree murder or innocence of the death penalty

he is entitled to relief for constitutional errors which resulted in the conviction or sentence of death.

*See Sawyer v. Whitley*, 505 U.S. 333 (1992).[7]  Innocence of the death penalty can be shown by

establishing ineligibility for a death sentence.  The Eighth Amendment permits states to employ any

procedures in determining death eligibility so long as these procedures "genuinely narrow the class of

persons eligible for the death penalty."  *Zant v Stephens*, 462 U.S. 862 (1982).  However, once a state

elects to use certain procedures to determine death eligibility, the state commits Eighth Amendment

error when it fails to assure the "measured and consistent application of the death penalty."  *Zant;*

*Maynard v. Cartwright*, 486 U.S. 356 (1988); *Godfrey v. Georgia*, 446 U.S. 420 (1980).  Failure of a

state to consistently apply its own eligibility standards results in a death sentence that is arbitrary and

capricious.  *Cf. Bush v. Gore*, 2000 WL 1811418 (2000).

Under Florida law, a person is eligible for the death penalty if he is convicted of first degree

murder, § 921.141, Fla. Stat. (1996); and if the cosentencers find at least one aggravating factor

sufficient to justify a death sentence, id.; and if the Florida Supreme Court determines that death is

proportional, *Tillman v. State*, 591 So. 2d 167 (Fla. 1991).  In Florida, innocence of the death penalty

is shown if there are insufficient aggravating circumstances to render the defendant eligible for death

--------

[7]According to *Sawyer*, where a death sentenced individual establishes innocence of the death penalty, his claims must be considered despite procedural bars.  *See Sawyer*, 505 U.S. at 339.

under Florida law or if a death sentence in a particular case is disproportionate to similar cases. Mr. Allen is ineligible for death because no reasonable juror would find sufficient aggravating circumstances absent counsel's deficient performance and Respondent's knowing presentation of false evidence. But for constitutional error there were insufficient aggravating circumstances to justify a death sentence.

The heinous, atrocious or cruel aggravating factor applies only when it is established beyond a reasonable doubt that the crime is "a conscienceless or pitiless [one] which is unnecessarily torturous to the victim." *Sochor v. Florida*, 504 U.S. 527 (1992). The Florida Supreme Court has construed *Sochor* to require that the murder be "both conscienceless or pitiless <u>and</u> unnecessarily torturous to the victim." *Richardson v. State*, 640 So. 2d 1107, 1109 (Fla. 1992). The trial court's reliance on Dr. Nelms' false and incompetent testimony reveals that the crime was not heinous, atrocious or cruel. *See Demps v. State*, 395 So. 2d 501, 505-06 (Fla. 1981)(stabbing not "so conscienceless or pitiless" as to set it apart from other capital felonies where victim was conscious during transport to three different treatment facilities). The inapplicability of this aggravator is clear when the facts of this case are contrasted with those in which the heinous, atrocious or cruel aggravator was upheld. *Spaziano v. State*, 433 So. 2d 508, 511 (Fla. 1983)(defendant admitted torturing victim by stabbing her in the breasts, stomach, and chest); *Dougan v. State*, 595 So. 2d 1 (Fla. 1992)(defendant repeatedly stabbed victim, stepped on his head, shot him once in the head, shot him once in the ear, and admitted enjoying the victim's pain); *Davis v. State*, 604 So. 2d 794 (Fla. 1992)(victim bled to death from 21 stab wounds each of which was insufficient to independently cause death). Respondent presented false evidence in support of this aggravating factor which does not apply to Mr. Allen's case. In addition, the fact that the medical examiner was forced to "guess" about the victim's lingering

85

consciousness indicates that the facts underlying this aggravator were not proved beyond a reasonable doubt; as a result, Mr. Allen was unconstitutionally sentenced to death based upon an aggravator that was not proved beyond a reasonable doubt.

Furthermore, the pecuniary gain aggravating circumstance does not apply to Mr. Allen's case. At the close of the State's guilt phase case, the trial court entered a judgment of acquittal for the robbery of Ms. Cribbs' cash and theft of her ring (R. 530-31). The jury convicted Mr. Allen of car theft (R. 656). The trial court found the pecuniary gain aggravating factor based on the following: the contents of Ms. Cribbs' purse were strewn on the bed at the crime scene; Ms. Cribbs' car was discovered at the location where Mr. Allen was picked up by taxi; statements by Mr. Allen during the penalty phase (R. 239).

As a matter of law, the pecuniary gain aggravating factor does not apply to this case. The Florida Supreme Court has held that this aggravating factor applies only where pecuniary gain is shown beyond a reasonable doubt to be the primary motive for the murder. *See e.g. Peek v. State*, 395 So. 2d 492, 499 (Fla. 1981). Respondent failed to prove that pecuniary gain was the primary motivation for Ms. Cribbs' murder.

On direct appeal, the Florida Supreme Court agreed that the theft of the victim's car did not support this aggravator because "it is possible that the car was taken to facilitate escape rather than as a means of improving Allen's financial worth." However, the court upheld this aggravator on the basis of Mr. Allen's penalty phase statements. The court acknowledged that Mr. Allen denied murdering Ms. Cribbs but found that "by his own admission, Allen's entire association with Cribbs was motivated by pecuniary gain." *Id*. Mr. Allen admitted to being a con man and told the jury that he intended to defraud Ms. Cribbs of the proceeds of her home after she sold it (R. 735, 747). These

86

statements are insufficient, in light of the judgment of acquittal for theft and robbery, to uphold this aggravator. Aside from Mr. Allen's unsworn statements (which clearly are not evidence), there is no evidence in the record to support the pecuniary gain aggravator; the acquittal for theft and robbery precludes a finding that this aggravator was proved beyond a reasonable doubt. When a defendant is acquitted of a charge during the guilt phase, neither that charge nor the facts used to support it can be used in aggravation at the penalty phase. *See Atkins v. State*, 452 So. 2d 529 (Fla. 1984)(where trial court entered judgment of acquittal for sexual battery, it could not rely on sexual battery in aggravation of murder). The Florida Supreme Court has specifically found that when a capital defendant is acquitted of robbery, the State is estopped from arguing the pecuniary gain aggravating factor. *See McCray v. State*, 416 So. 2d 804 (Fla. 1982). Because the Florida Supreme Court found the conviction for car theft insufficient to prove this aggravator, this aggravator was not proved beyond a reasonable and does not apply to Mr. Allen's case.

The second aspect of death-eligibility in Florida is that, in order to comply with the Eighth Amendment, the sentence must be proportional when compared to similar cases. In Florida, a death sentenced individual is rendered ineligible for a death sentence where the record establishes that the death sentence is disproportionate. The proportionality determination is made by the Florida Supreme Court. Mr. Allen was deprived of the proportionality review to which he is constitutionally entitled because, as specifically alleged elsewhere in this petition, trial counsel's ineffectiveness resulted in a penalty phase at which no mitigation was presented despite the availability of significant compelling mitigation evidence which has been discovered by post-conviction counsel. Mr. Allen's case is similar to other cases in which the Florida Supreme Court found the death penalty to be disproportionate. *See Chaky v. State*, 651 So. 2d 1169, 1173 (Fla. 1995); *Clark v. State*, 609 So. 2d

513, 515-16 (Fla. 1992); *Lloyd v. State*, 524 So. 2d 396, 401-03 (Fla. 1988)); *Caruthers v. State*, 465 So. 2d 496, 498-99 (Fla. 1985); *Rembert v. State*, 445 So. 2d 337, 340 (Fla. 1984).  Mr. Allen's death sentence is similarly disproportionate.

In considering Mr. Allen's entitlement to relief under this claim, this Court must also consider the following errors raised elsewhere in this petition which cumulatively worked to deprive Mr. Allen of the fair and reliable sentencing to which he is entitled under the Eighth Amendment:  the State Attorney's improper argument about Mr. Allen's future dangerousness; Mr. Allen's invalid waiver of mitigation and affirmative denial that none existed; trial counsel's ineffectiveness in failing to investigate and prepare for the penalty phase; the vague instructions on the heinous, atrocious or cruel aggravating factor; the State's presentation of false evidence rebutting Mr. Allen's innocence argument; jury instructions that diluted the jury's sense of responsibility for sentencing; and jury instructions that unconstitutionally shifted to Mr. Allen the burden of proving that life is an appropriate sentence.

## CLAIM VII

**MR. ALLEN  WAS DEPRIVED OF A FAIR SENTENCING PROCEEDING AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION DUE TO TRIAL COUNSEL'S INEFFECTIVENESS IN FAILING TO OBJECT TO PREJUDICIAL JURY INSTRUCTIONS AND TO IMPROPER COMMENTS AND ARGUMENTS BY THE PROSECUTION.**

All other allegations and factual matters contained elsewhere

in this petition are fully incorporated herein by specific reference.

Trial counsel was ineffective for failing to object to jury instructions and comments by the

State Attorney that unconstitutionally diluted the jury's sense of its responsibility for sentencing.

During the charge conference, the trial judge addressed the *Caldwell* issue:

> I will give the jury the standard Jury Instruction on penalty proceeding. I will supplement them with language from *Caldwell v. Mississippi*, that indicates your advisory sentence as to what sentence should be imposed is entitled by law and given great weight by this court in determining what sentence to impose in this case.  It is only under rare circumstances that the court could impose a sentence other than what you recommend, in keeping with the general line of cases that indicate that the jury's recommendation should be given great weight and not minimized in any way.

(R. 707-08).  The instructions actually given to the jury differed markedly from those promised by the

judge:

> Ladies and gentlemen of the jury it is now your duty to advise the Court as to what punishment should be imposed upon the defendant for his crime of murder in the first degree.  As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the judge; however, it is your duty to follow the law that will now be given to you by the court and to render to the court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.

(R. 760).  The prosecutor also distorted the jury's role during his closing statement:  "You have to understand when you go back to make your ballot, your ballot is an advisory ballot to the judge, but it is one that he considers very heavily in arriving at his final decision." (R. 712-23).

The instructions given in Mr. Allen's case unconstitutionally diluted the jury's sense of its responsibility for the sentencing decision.  Such comments violate the Eighth Amendment because they deprive the defendant of a reliable and individualized sentencing.  As the Supreme Court explained in *Caldwell v. Mississippi*, 472 U.S. 320, 332-33 (1985), "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role."  The Court in *Caldwell* recognized that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death lies elsewhere." *Id.* at 328-29.  *See also Mann v. Dugger*, 844 F.2d 1446 (11th Cir. 1988)(en banc)(granting relief based on prosecutorial and judicial comments and instructions that diminished the jury's sense of responsibility).

Trial counsel was also ineffective for failing to object to instructions that unconstitutionally shifted the burden to Mr. Allen to prove that life is an appropriate sentence.  The jury was told the consider whether "sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist." (R. 760).  These instructions unconstitutionally shift the burden to the defendant with regard to the ultimate question of whether he should live or die. *Mullaney v. Wilbur*, 421 U.S. 684 (1975).  According to the instructions, the jurors would reasonably have understood that it should consider only mitigating evidence that rose to the level of outweighing the aggravation. *See McKoy v. North Carolina*, 494 U.S. 433, 454 (1990)(Kennedy, J., concurring)(a death sentence

90

arising from erroneous instructions "represents imposition of capital punishment through a system that can be described as arbitrary or capricious.").

Trial counsel was ineffective for failing to object to vague instructions on the heinous, atrocious, or cruel aggravating factor. Mr. Allen's jury was given the following instruction on this aggravator:

> Three, that the crime for which the defendant is to be sentenced was especially heinous, atrocious, or cruel. Heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile. Cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. The kind of crime intended to be included as heinous, atrocious or cruel, is one accompanied by additional acts that show that the crime was consciousless or pitiless and was unnecessarily torturous to the victim.

(R. 761). Mr. Allen's jury was not given adequate guidance as to what was necessary to prove the presence of this aggravating factor; as a result, the jury's discretion was not limited as required by the Eighth Amendment.

In *Maynard v. Cartwright*, the Supreme Court held that "the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." 486 U.S. 356, 362 (1988). The Court in *Maynard* found Oklahoma's HAC aggravator unconstitutional and reversed the death sentence despite the fact that the jury found two other aggravating circumstances that were unchallenged. The sentencing court did not advise Mr. Allen's jury that, to establish the heinous, atrocious or cruel aggravating circumstance, the State must prove beyond a reasonable doubt that Mr. Allen had a specific intent to torture the victim. *Stein v. State*, 632 So. 2d 1361 (Fla. 1994); *Omelus v. State*, 584 So. 2d 563 (Fla. 1991). In order for the judge properly to instruct the jury, and for the

judge to find that the State's evidence established the heinous, atrocious or cruel aggravating factor, the State must prove beyond a reasonable doubt that the defendant intended to inflict a high degree of pain, or that the defendant was indifferent to or enjoyed the suffering of the victim. *State v. Dixon*, 283 So. 2d 1, 9 (Fla. 1973). *See Hamilton v. State*, 678 So. 2d 1228, 1231 (Fla. 1996); *Kearse v. State*, 662 So. 2d 677, 686 (Fla. 1995); *Robertson v. State*, 611 So. 2d 1228, 1233 (Fla. 1993); *Santos v. State*, 591 So. 2d 160, 163 (Fla. 1991); *Cheshire v. State*, 568 So. 2d 908, 912 (Fla. 1990). In fact, the Florida Supreme Court has considered relevant to the finding of the heinous, atrocious or cruel aggravating circumstance that the State failed to show that the motive of the crime encompassed the required torturous intent. *Hamilton*, 678 So. 2d at 1232.

The Court explained in *Espinosa v. Florida* that "an aggravating circumstance is invalid . . . if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor." 505 U.S. 1079, 1081 (1992). The Court in *Espinosa* also clarified that under Florida's bifurcated sentencing procedure, the sentence is invalid if the jury received a vague instruction because the sentencing court indirectly weighs the invalid aggravator when it gives great weight to the jury's recommendation. *Id.* at 1082. *See also Godfrey v. Georgia*, 446 U.S. 420, 433 (1980)(finding the heinous, atrocious, or cruel aggravator unconstitutional for failing to impose any restraint on the arbitrary and capricious imposition of the death sentence because "[a] person of ordinary sensibility could fairly characterize almost every murder as `outrageously or wantonly vile, horrible and inhuman.'"); *Richmond v. Lewis*, 506 U.S. 40, 46 (1992)("[I]n a `weighing' State, where the aggravating and mitigating factors are balanced against each other, it is constitutional error for the sentencer to give weight to an unconstitutionally vague aggravating factor, even if other, valid aggravating factors obtain."). The failure to adequately limit the jury's discretion left no principled

way to distinguish Mr. Allen's case from the many in which the death penalty was not imposed.  Trial counsel was ineffective for failing to object to unconstitutionally vague jury instructions.

Trial counsel was ineffective for failing to object to the prosecutor's improper argument in support of an aggravating factor.  The prosecutor improperly urged the jury to consider Mr. Allen's future dangerousness, based on his prior escape, to sentence him to death.  He argued:

> I do recall that the defendant escaped from that Work Release Program on the 6th of October, 1990.  He was under the sentence of imprisonment at the time he left that program.  What does that tell us?  From the one case alone, that no form of control, whether it was probation or parole or prison or work release was adequate to take care of this defendant.  Had he served out his term of years in Kansas at the time, this crime might not have been committed 13 months later.

(R. 728-29).  The State Attorney repeated this argument before the sentencing court (R. 800).  Trial counsel was ineffective for failing to object to this improper and prejudicial argument.

The evidence shows that Mr. Allen had been imprisoned for fraud and forgery, released on probation, incarcerated for a violation of probation, paroled, re-arrested, and sentenced to work release (T. 725-26).  The prosecutor improperly used these facts to argue that Mr. Allen must be sentenced to death to prevent his commission of violent crimes.  Aggravating circumstances must be limited to those enumerated in the statute. *See Proffitt v. Georgia,* 428 U.S. 242 (1976).

The judge that sentenced Mr. Allen was presented with and considered non-statutory aggravating circumstances.  The sentencers' consideration of improper and unconstitutional <u>non-statutory</u> aggravating factors starkly violated the Eighth Amendment, and prevented the constitutionally required narrowing of the sentencer's discretion.  *See Stringer v. Black*, 503 U.S. 222 (1992); *Maynard v. Cartwright*, 486 U.S. 356 (1988).  As a result, these impermissible aggravating factors evoked a sentence that was based on an "unguided emotional response," a clear violation of

93

Mr. Allen's constitutional rights.  *Penry v. Lynaugh*, 492 So. 2d 302 (1989).

Limitation of the sentencer's ability to consider aggravating circumstances other than those specified by statute is required by the Eighth Amendment.  *See Maynard*.  Aggravating circumstances specified in Florida's capital sentencing statute are exclusive, and no other circumstances or factors may be used to aggravate a crime for purposes of the imposition of the death penalty. *See Proffitt*, 428 U.S. 242, 258, 96 S. Ct. 2960, 49 L.Ed.2d 913 (1976).

Mr. Allen was prejudiced by the State Attorney's improper argument that only a death sentence would prevent his commission of violent crimes in the future.  The other two aggravating factors found by the trial court (heinous, atrocious, or cruel and pecuniary gain) were not supported by the evidence.  In *Songer v. State*, 544 So. 2d 1010 (Fla. 1989), the Florida Supreme Court vacated a death sentence where the only aggravating factor was under sentence of imprisonment; the Court noted that the defendant, like Mr. Allen, "did not break out of prison but merely walked away from a work-release job." *Id.* at 1011.  The Court described Songer's case as "the least aggravated . . . case to undergo proportionality analysis." *Id.*

Trial counsel was ineffective for failing to object to the prosecutor's sentencing hearing argument urging the trial court to consider conscience of the community: "Judge, I believe that the crime -- it screams for the death penalty.  I think that the community has spoken to you through their eleven to one jury decision in favor of the death penalty." (R. 798).  Conscience of the community argument is improper.  *United States v. Beasley*, 2 F.3d 1551 (11th Cir. 1993); *United States v. Bascara*, 742 F.2d 1335 (11th Cir. 1984); *United States v. Kopituk*, 690 F.2d 1289 (11th Cir. 1982).  Counsel was ineffective for failing to object.  The prejudice to Mr. Allen resulting from counsel's failure to investigate, failure to challenge the State's case, and failure to object to the admission of

94

prejudicial evidence is clear.  Confidence in the outcome is undermined; Mr. Allen's death sentence must be vacated.

**CLAIM VIII**

**THE FLORIDA CAPITAL SENTENCING PROCEDURES AS EMPLOYED IN MR. ALLEN'S CASE VIOLATED HIS SIXTH AMENDMENT RIGHT TO HAVE A UNANIMOUS JURY RETURN A VERDICT ADDRESSING HIS GUILT OF ALL THE ELEMENTS NECESSARY FOR THE CRIME OF CAPITAL FIRST DEGREE MURDER, IN VIOLATION OF *RING V. ARIZONA*.**

All other allegations and factual matters contained elsewhere

in this petition are fully incorporated herein by specific reference.

**A.     INTRODUCTION.**

In *Ring v. Arizona*, 122 S.Ct. 2428 (2002), the Supreme Court held the Arizona capital

sentencing scheme unconstitutional because a death sentence in the Arizona scheme is contingent

upon the finding of an aggravating circumstance and assigns responsibility for finding that

circumstance to the judge.  The Arizona scheme was found to violate the constitutional guarantee to a

jury determination of guilt in all criminal cases.  The Supreme Court based its *Ring* holding on its

earlier decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), where it held that "[i]t is

unconstitutional for a legislature to remove from the jury the assessment of facts that increase the

prescribed range of penalties to which a criminal defendant is exposed."  *Id.* at 490 (quoting *Jones v.

United States*, 526 U.S. 227, 252-53 (1999) (Stevens, J., concurring)).  Capital sentencing schemes

such as those in Florida and Arizona violate the notice and jury trial rights guaranteed by the Sixth

and Fourteenth Amendments because they do not allow the jury to reach a verdict with respect to an

aggravating fact that is an element of the aggravated crime punishable by death.  *Ring.*  In Mr. Allen's

case, the majority of the Florida Supreme Court held that Florida's capital sentencing scheme is not

unconstitutional in light of *Ring v. Arizona*, 122 S.Ct. 2428 (2002). *See Allen II*, 2003 Fla. LEXIS

1156 at *16-17.  The majority's only articulated rationale was because:

96

> [O]ne of the aggravating factors in this case was that the murder was committed while Allen was under a sentence of imprisonment. Such an aggravator need not be found by the jury. *Cf. Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L.Ed.2d 435, 120 S.Ct. 2348 (2000)(holding that the fact of a prior conviction need not be submitted to a jury for determination).

*Allen II* at *17. The majority's decision is both contrary to and an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *Ring* applies to Mr. Allen's case and renders his death sentence in violation of his federal notice and jury trial rights. Habeas relief is warranted.

**B.    *RING* APPLIES TO THE FLORIDA CAPITAL SCHEME.**

　　**1. The basis of *Mills v. Moore* is no longer valid**.

　　The Florida Supreme Court has previously held that, "[b]ecause *Apprendi* did not overrule *Walton*. the basic scheme in Florida is not overruled either." *Mills v. Moore*, 786 So.2d 532, 537 (Fla. 2001). *Ring* overruled *Walton v Arizona*, 497 U.S. 639 (1990), *overruled in part, Ring v. Arizona*, 122 S.Ct. 2428 (2002), and the basic principle of *Hildwin v. Florida*, 490 U.S. 638 (1989), which had upheld the basic scheme in Florida "on grounds that 'the Sixth Amendment does not require that the specific findings authorizing imposition of the sentence of death be made by the jury.'" Additionally, *Ring* undermines the reasoning of *Mills* by establishing: (a) that *Apprendi* applies to capital sentencing schemes; (b) that States may not avoid the Sixth Amendment requirements of *Apprendi* by simply specifying death or life imprisonment as the only sentencing options; and (c) that the relevant and dispositive question is whether under state law death is "authorized by a guilty verdict standing alone."

　　In *Mills*, the Court observed that the "the plain language of *Apprendi* indicates that the case is not intended to apply to capital [sentencing] schemes." *Mills*, 786 So.2d at 537. Such statements

appear at least four times in *Mills*. *Mills* reasoned that because first-degree murder is a "capital felony," and the dictionary defines such a felony as "punishable by death," the finding of an aggravating circumstance did not expose the petitioner to punishment in excess of the statutory maximum. *Mills*, 786 So.2d at 538. The logic of *Mills* simply did not survive *Ring*. That *Mills* can no longer survive constitutional scrutiny is further demonstrated by the recent decision by the United States Supreme Court in *Sattahzan v. Pennsylvania*, 2003 WL 10481 (Jan. 14, 2003). *Accord Butler v. State*, 842 So. 2d 817 (Fla. 2003) (Pariente, J., concurring in part and dissenting in part).

      **2.**      **In Florida, Eighth Amendment narrowing occurs at sentencing.**

      With the premise of *Ring* and *Sattahzan* in mind, it becomes clear that Florida's statute is unconstitutional, and that the basis of *Mills* can no longer survive.   Section Fla. Stat. 921.141 provides:

> (3)  FINDINGS IN SUPPORT OF SENTENCE OF DEATH--
> Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set for in writing its findings upon which the sentence is based as to the facts:
>
> (a)  The sufficient aggravating circumstances exist as enumerated in subsection (5), and
> (b)  That there are insufficient mitigating circumstances to outweigh the aggravating circumstances.
>
> In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) and upon the records of the trial and the sentencing proceedings. **If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment in accordance with S. 775.082.**

(Fla. Stat. 921.141(3))(emphasis added).

In *Stringer v. Black*, 503 U.S. 222 (1992), the United States Supreme Court was called upon

to discuss and contrast capital sentencing schemes and their use of aggravating circumstances.

According to the United States Supreme Court:

> In Louisiana, a person is not eligible for the death penalty unless found guilty of first-degree homicide, a category more narrow than the general category of homicide. [Citation]. A defendant is guilty of first-degree homicide if the Louisiana jury finds that the killing fits one of five statutory criteria. [Citation]. After determining that a defendant is guilty of first-degree murder, a Louisiana jury next must decide whether there is at least one statutory aggravating circumstance and, after considering any mitigating circumstances, determine whether the death penalty is appropriate. [Citation]. Unlike the Mississippi process, in Louisiana the jury is not required to weigh aggravating against mitigating factors.

> In *Lowenfield [v. Phelps*, 484 U.S. 231 (1988)], the petitioner argued that his death sentence was invalid because the aggravating factor found by the jury duplicated the elements it already had found in determining there was a first-degree homicide. We rejected the argument that, as a consequence, the Louisiana sentencing procedures had failed to narrow the class of death-eligible defendants in a predictable manner. We observed that "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase." [Citation]. **We went on to compare the Louisiana scheme with the Texas scheme, under which the required narrowing occurs at the guilt phase**. [Citation]. **We also contrasted the Louisiana scheme with the Georgia and Florida schemes**. [Citation].

> The State's premise that the Mississippi sentencing scheme is comparable to Louisiana's is in error. The Mississippi Supreme Court itself has stated in no uncertain terms that, with the exception of one distinction not relevant here, its sentencing system operates in the same manner as the Florida system; and Florida, of course, is subject to the rule forbidding automatic affirmance by the state appellate court if an invalid aggravating factor is relied upon. In considering a *Godfrey* claim based on the same factor at issue here, the Mississippi Supreme Court considered decisions of the Florida Supreme Court to

be the most appropriate source of guidance.

*Stringer*, 503 U.S. at 233-34 (emphasis added).

In fact, the Louisiana statute defined first degree murder as fitting within one of five circumstances, in contrast to Florida's provision that first degree murder is either premeditated or felony murder. *Lowenfield*, 484 U.S. at 242. The Supreme Court in *Lowenfield* found that the Louisiana capital scheme operated similar to the Texas scheme that provided for death eligibility to be determined at the guilt phase of the trial as had been explained in *Jurek v. Texas*, 428 U.S. 262 (1976):

> But the opinion [*Jurek*] announcing the judgment noted the difference between the Texas scheme, on the one hand, and the Georgia and Florida schemes discussed in the cases of *Gregg [v. Georgia*, 428 U.S. 153 (1976)], and *Proffitt [v. Florida*, 428 U.S. 242 (1976)]:
>
>> While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose . . . . In fact, each of the five classes of murders made capital by the Texas statute is encompassed in Georgia and Florida by one or more of their statutory aggravating circumstances . . . . Thus, in essence, the Texas statute requires that the jury find the existence of a statutory aggravating circumstance before the death penalty may be imposed. So far as consideration of aggravating circumstances is concerned, therefore, the principal difference between Texas and the other two States is that the death penalty is an available sentencing option - - even potentially - - for a smaller class of murders in Texas." 428 U.S. at 270-71 (citations omitted).

It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: **The legislature may itself narrow the definition of capital offenses, as Texas and**

100

> **Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.** See also *Zant [v. Stephens*, 462 U.S. 862, 876 n.13 (1983)] discussing *Jurek* and concluding: "[I]n Texas, aggravating and mitigating circumstances were not considered at the same stage of the criminal prosecution."

*Lowenfield*, 484 U.S. 245-47 (emphasis added).

The Florida Supreme Court has recognized that the aggravating circumstances at issue in the penalty phase performed the Eighth Amendment narrowing function in conformity with *Zant v. Stephens*:

> To avoid arbitrary and capricious punishment, this aggravating circumstance "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862 (1983)(footnote omitted). Since premeditation is already an element of capital murder in Florida, section 921.141 (5)(I) must have a different meaning; otherwise, it would apply to every premeditated murder.

*Porter v. State*, 564 So.2d 1060, 1064 (Fla. 1990).

### 3. Florida's Statute Contains Three Death-Eligibility Steps.

Section 921.141, Fla. Stat., requires three factual determinations before a defendant is eligible for a death sentence. The sentencer (1) must find the existence of at least one aggravating circumstance, (2) must find that "<u>sufficient</u> aggravating circumstances exist" to justify imposition of death, and (3) must find that "there are insufficient mitigating circumstances to outweigh the aggravating circumstances." Section 921.141(2), (3), Fla. Stat. (emphasis added). If these findings are not made, "the court <u>shall</u> impose sentence of life imprisonment in accordance with [sec.]775.082." *Id.* (emphasis added).

The Florida penalty phase jury is instructed on these three initial steps but is not required to

reach a verdict on any one of these three factual determinations required before a death sentence may be considered. Neither the sentencing statute, Florida Supreme Court caselaw, nor the jury instructions in Mr. Allen's case required the jurors to find that the State had proven any one aggravating circumstance, or had established "sufficient" aggravating circumstances, or had shown that "there are insufficient mitigating circumstances to outweigh the aggravating circumstances."

Under Ring, aggravating factors are elements of capital murder. Under the Florida capital sentencing statute, the elements of capital murder are the three factual determinations the statute requires before a death sentence may be considered. The Missouri capital sentencing statute follows the same steps followed in the Florida statute. *Compare* Section 921.141(3), Fla. Stat., *with* section 565.030.4(1), (2), (3), Mo. Revised Statutes (1994). The Missouri Supreme Court has explained that the first three steps of the Missouri procedure determine eligibility for a death sentence and therefore, under Ring, must be decided beyond a reasonable doubt by a jury:

> In the second, or "penalty" phase, the jury is required to be instructed to follow the four-step process set out in section 565.030.4:
>
> > The trier shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor:
> >
> > (1) If the trier does not find beyond a reasonable doubt at least one of the statutory aggravating circumstances set out in subsection 2 of section 565.032; or
> >
> > (2) If the trier does not find that the evidence in aggravation of punishment, including but not limited to evidence supporting the statutory aggravating circumstances listed in subsection 2 of section 565.032, warrants imposing the death sentence; or
> >
> > (3) If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier; or

(4) If the trier decides under all of the circumstances not to assess and declare the punishment at death.

*Id*. Section 565.030.4 on its face requires that steps 1, 2, 3, and 4 be determined against defendant before a death sentence can be imposed. *Id*.; *see Whitfield*, 837 S.W.2d 503, 515 (Mo. banc 1992).

**Step 1.** Step 1 requires the trier of fact to find the presence of one or more statutory aggravating factors set out in section 565.032.2. Both the State and Mr. Whitfield agree that this is a fact that normally must be found by the jury in order to impose a sentence of death.

The State contends that steps 2, 3, and 4 merely call for the jury to give its subjective opinion as to whether the death penalty is appropriate, however, not to make findings as to whether the factual predicates for imposing the death penalty are present. It urges that the principles set out in *Ring* are not offended even if the judge rather than the jury determines those three steps. This Court disagrees.

**Step 2.** Step 2 requires the trier of fact (whether jury or judge) to find that the evidence in aggravation of punishment, including but not limited to evidence supporting the statutory aggravating factors, warrants imposition of the death penalty. As noted, the State argues that this step merely calls for a subjective opinion by the trier of fact, not a finding. But, the State fails to note that this Court rejected this very argument in its opinion on Mr. Whitfield's appeal of his initial conviction, in which it remanded for the new trial at issue here. In that decision, this Court held that step 2 requires a "finding of fact by the jury, not a discretionary decision." *Whitfield*, 837 S.W.2d at 515 . This holding is supported by the plain language of the statute. In order to fulfill its duty, the trier of fact is required to make a case-by-case factual determination based on all the aggravating facts the trier of fact finds are present in the case. This is necessarily a determination to be made on the facts of each case. Accordingly, under *Ring*, it is not permissible for a judge to make this factual determination. The *jury* is required to determine whether the statutory and other aggravators shown by the evidence warrants the imposition of death. . . .

**Step 3.** In step 3 the jury is required to determine whether the evidence in mitigation outweighs the evidence in aggravation found in steps 1 and 2. If it does, the defendant is not eligible for death, and the jury must return a sentence of life imprisonment. While the State once more argues that this merely calls for the jury to offer its subjective and discretionary opinion rather than to make a factual finding, this Court again disagrees.

The analysis undertaken in three recent decisions by other state courts of last resort, interpreting similar statutes, is instructive. In *Woldt v. People*, 64 P.3d 256 (Colo. 2003), the Supreme Court of Colorado reversed the death sentences of two capital

defendants after determining that Colorado's three-judge capital sentencing statute was unconstitutional in light of *Ring*. Colorado's death penalty statute, like Missouri's, requires the fact-finder to complete a four-step process before death may be imposed. First, at least one statutory aggravator must be found. Second, whether mitigating factors exist must be determined. Third, mitigating factors must not outweigh the aggravating factors. Finally, whether death is the appropriate punishment is considered.

The Supreme Court of Colorado described the first three of these four steps as findings of fact that are "prerequisites to a finding by the three-judge panel that a defendant was eligible for death." *Woldt*, 64 P.3d at 265. It noted that states are sometimes grouped into "weighing states" that require the jury to weigh the aggravating circumstances against those in mitigation in arriving at their determination of punishment, and "non-weighing states." It explained that, while in steps 1, 2, and 3 the jury is permitted to consider and weigh aggravators and mitigators, and to that extent Colorado's process is like that used in weighing states, Colorado is a non-weighing state in that, in step 4, in which the jury decides whether to impose death or to give a life sentence, the jury is permitted to consider all of the evidence without being required to give special significance to the weight of statutory aggravators or mitigators. *Id.* at 263-64 . This last step thus "affords the sentencing body unlimited discretion to sentence the defendant to life imprisonment instead of death." *Id.* at 265 . Because Colorado's death penalty statute required a three-judge panel to make the first three of these findings, the statute was declared unconstitutional. *Id.* at 266-67.

Similarly, in *Johnson v. State*, 59 P.3d 450 (Nev. 2002), Nevada's Supreme Court considered the constitutionality of its capital sentencing scheme in light of *Ring*. Its sentencing scheme provides for a three-judge panel to determine punishment if the jury is unable to do so. *Johnson* noted that Nevada "statutory law requires two distinct findings to render a defendant death-eligible: 'the jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.'" *Johnson*, 59 P.3d at 460 (citation omitted).

*Johnson* determined the requisite statutory finding that the mitigating circumstances are not sufficient to outweigh the aggravating circumstances is at least "in part a factual determination, not merely discretionary weighing." *Id.* at 460 . It held that, as a result, the rule announced in *Ring* required a jury rather than a judge to determine the mitigating as well as the aggravating factor issues. *Id.*

Finally, on remand from the United States Supreme Court, the Supreme Court of Arizona rejected the state's contention that the requirement of Arizona law -- that the court weigh mitigating circumstances against aggravating circumstances -- did not

require a factual determination, stating:

> In both the superseded and current capital sentencing schemes, *the legislature assigned to the same fact-finder responsibility for considering both aggravating and mitigating factors, as well as for determining whether the mitigating factors, when compared with the aggravators, call for leniency.* Neither a judge, under the superseded statutes, nor the jury, under the new statutes, can impose the death penalty unless that entity concludes that the mitigating factors are not sufficiently substantial to call for leniency. A.R.S. [sections] 13-703.E (Supp.2002) and 13-703.F (Supp.2001). The process involved in determining whether mitigating factors prohibit imposing the death penalty plays an important part in Arizona's capital sentencing scheme.

*Ring* II, 65 P.3d at 943 (emphasis added). The Court continued:

> We will not speculate about how the State's proposal [to allow the judge to make these findings] would impact this essential process. *Clemons v. Mississippi,* 494 U.S. 738, 754, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990) ('In some situations, a state appellate court may conclude that peculiarities in a case make appellate...harmless error analysis extremely speculative or impossible.'); *see also Johnson v. Nevada* , 59 P.3d 450 (Nev. 2002) (as applied to Nevada law, *Ring...* requires [a] jury to weigh mitigating and aggravating factors under Nevada's statute requiring the fact-finder to further find whether mitigating circumstances are sufficient to outweigh the aggravating circumstances).

*Id.* Accordingly, the Court held that, even were the presence of a statutory aggravator conceded or not contested, resentencing would be required unless the court found that the failure of the jury to make these factual findings was harmless on the particular facts of the case. *Id.* This was a necessary result of applying *Ring's* holding that "[c]apital defendants...are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589.

Missouri's steps 1, 2, and 3 are the equivalent of the first three factual determinations required under Colorado's death penalty statute, so that, as in Colorado, the jury is told to find whether there are mitigating and aggravating circumstances and to weigh them to decide whether the defendant is eligible for the death penalty. These three steps are also similar to the aggravating and mitigating circumstance findings required under Nevada and Arizona law. As in those states, these three steps require factual findings that are prerequisites to the trier of fact's determination that a defendant is death-eligible.

*State v. Whitfield*, 2003 WL 21386276 (Mo. June 17, 2003) (footnote omitted).

The three steps in Florida's statute also "require factual findings that are prerequisites to the trier of fact's determination that a defendant is death-eligible." Step 1 in the Florida procedure requires determining whether at least one aggravating circumstance exists. As in Missouri, Colorado, Nevada and Arizona, this step involves a factual determination which is a prerequisite to rendering the defendant death-eligible.

Step 2 in the Florida procedure requires determining whether "sufficient" aggravating circumstances exist to justify imposition of death. Missouri's Step 2 is indistinguishable, requiring a determination of whether the evidence of all aggravating circumstances "warrants imposing the death sentence." This step is obviously not the ultimate step of determining whether death will or not be imposed because other steps remain. Rather, in Florida as well as Missouri, this step involves a factual determination which is a prerequisite to rendering a defendant death-eligible.

Step 3 in the Florida procedure requires determining whether "there are insufficient mitigating circumstances to outweigh the aggravating circumstances." Missouri's and Colorado's Step 3, as well as Nevada's and Arizona's Step 2, are identical, requiring a determination of whether mitigating circumstances outweigh aggravating circumstances. Again, this step is not the ultimate determination of whether or not to impose death because an additional step remains. Rather, in Florida as well as these other states, this step involves a factual determination which is a prerequisite to rendering a defendant death-eligible.

In Florida, as in Missouri and the other states discussed in *Whitfield*, the sentencer does not consider the ultimate question of whether or not to impose death until the eligibility steps are completed. After the first three steps, the Florida statute directs the jury to determine, "[b]ased on these considerations, whether the defendant should be sentenced to life imprisonment or death."

106

Section 921.141(2)(c), Fla. Stat.  The structure of the statute clearly establishes that the steps which occur before this determination are necessary to make the defendant eligible for this ultimate determination, that is, to render the defendant death-eligible.

Thus, it is clear that the factual determination of "sufficient aggravating circumstances" at the sentencing is the finding of those additional facts that are necessary under the Eighth Amendment requirement that death eligibility be narrowed beyond the traditional definition of first degree murder. *Zant*, 462 U.S. at 878 ("[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty").  Clearly in Florida, the narrowing of the death eligible occurs in the sentencing phase.

The factual determination that "sufficient aggravating circumstances exist" has not been made during the guilt phase of a capital trial under Florida law as it has operated during the past 25 years and  certainly was not made in Mr. Allen's case.  The majority's reliance on the committed while under sentence of imprisonment aggravating circumstance as a shield against applying *Ring* to Mr. Allen's capital sentencing proceedings is contrary to and an unreasonable application of Supreme Court precedent.  First of all, to the extent that the so-called exception to the jury determination requirements of *Ring* is viable (Mr. Allen maintains that it is not as argued below), the majority's extension of the prior conviction exception to the committed while under sentence of imprisonment circumstance found by the trial judge in Mr. Allen's case is contrary to *Apprendi* and *Ring*.  Mr. Allen maintains that Chief Justice Anstead was correct when he dissented as follows:

> The majority labels the existence of the "under sentence of imprisonment"
> aggravating circumstance as a means by which we may reject a *Ring* claim. Although
> *Apprendi* . . . may have held that a jury does not need to find the existence of the bare
> fact of a prior conviction, the aggravating circumstance in the instant case was that
> "the murder was committed while under a sentence of imprisonment based upon
> Allen's escape from a work release program in Kansas." *Allen v. State*, 662 So. 2d

323, 327 (Fla. 1995).  I do not believe that the Supreme Court in *Apprendi* or *Ring*
intended this type of aggravating circumstance to fall under the exception for prior
convictions.

*Allen II*, 2003 Fla. LEXIS 1156 at *20-21 (ANSTEAD, C.J., concurring in part and dissenting in

part).  Justice Pariente also agreed:

> I agree that the "sentence of imprisonment" aggravator contained in section
> 921.141(5)(a), Florida Statutes (2002), does not fall within the "prior-
> conviction"exception to the requirement of a jury finding of the existence of any fact
> necessary to qualify the defendant for an enhanced penalty, recognized in *Apprendi* . .
> . and extended to the death penalty in *Ring v. Arizona* . . . .

*Id.* at *17-18 (PARIENTE, J., specially concurring).

Secondly, the majority's reliance on the committed while under a sentence of imprisonment

aggravator is contrary to clearly established federal law because, as a purported extension of the prior

conviction exception, it cannot save the Florida scheme.  Mr. Allen is aware of the opinions of

various members of the Florida Supreme Court which have concluded that *Ring* has no significance

to Florida's capital sentencing scheme because, in the case of a defendant who has been found guilty

of either a contemporaneous felony or who has a prior violent felony conviction, "the sentence of

death . . . could be imposed based on these convictions by the same jury." *Kormondy v. State*, 2003

WL 297027 at n.3 (Fla. Feb. 13, 2003).  *See Almendarez-Torres v. United States*, 523 U.S. 224

(1998).  This view of Florida's sentencing statute, however, is not in accord with the reality of

Florida's system, as demonstrated above.  Unlike states such as Louisiana and Texas, Florida is a

*weighing* state.  This means that, in order to determine death eligibility, Florida penalty phase jurors

*weigh* aggravation and mitigation and determine if there are sufficient aggravating circumstances

when *weighed* against the mitigation to warrant a "recommendation" that the defendant be sentenced

to death.  Nowhere in the Florida Supreme Court's nearly three (3) decades of death penalty

jurisprudence has the Court—or the Supreme Court of the United States, for that matter—classified Florida as a state where death eligibility is determined at the guilt phase.

Even if, *arguendo*, prior violent felony convictions or contemporaneous enumerated felony findings of guilt by the jury act to deny defendants the benefits of *Ring*, such an exception to the *Ring* holding would not apply in Mr. Allen's case. This is because neither of those two aggravators were applied in his case and, as discussed above, to extend the *Ring* prior conviction exception to the committed under sentence of imprisonment circumstance based on Allen's escape from a work release program is contrary to *Apprendi* and *Ring*, without precedent, and objectively unreasonable.

Mr. Allen contends that relying upon the existence of the committed under sentence of imprisonment circumstance based on Allen's escape from a work release program as an extension of the so-called exception for prior violent felony conviction aggravator to deny him the benefit of *Ring* is unconstitutional under the particulars of Florida's capital sentencing scheme. Rather, reliance upon any of the three exceptions now apparently favored by the Florida Supreme Court (the prior violent felony aggravator, the contemporaneous felony conviction aggravator, and, in Mr. Allen's case, the committed while under sentence of imprisonment aggravator) to establish eligibility rewrites the Florida statute. As explained above, the Florida statute requires three findings before a defendant is eligible for a death sentence: the sentencer (1) must find the existence of at least one aggravating circumstance, (2) must find that "sufficient aggravating circumstances exist" to justify imposition of death, and (3) must find that "there are insufficient mitigating circumstances to outweigh the aggravating circumstances." Section 921.141(3), Fla. Stat. Under this three-stage process of establishing eligibility, the existence of an escape from a work release program conviction, a prior violent felony conviction or upon contemporaneous felony convictions do not satisfy *Ring*.

109

The flaw in relying upon these aggravators to establish eligibility is revealed by the view that the jury override in Florida does not survive *Ring*. For example, Justice Lewis acknowledged that after *Ring*, a jury's "life recommendation must be respected." *Bottoson v. Moore*, 833 So. 2d 693, 728 (Fla.) (Lewis, J., concurring in result only), *cert. denied*, 123 S. Ct. 662 (2002). He concluded that as to jury overrides in favor of death, Florida law and *Ring* are in "irreconcilable conflict." *Id*. However, in many cases in which the Florida Supreme Court has reversed an override and ordered imposition of a life sentence, the trial court had found the prior violent felony aggravator or the contemporaneous felony conviction aggravator. *See, e.g., Mahn v. State*, 714 So. 2d 391 (Fla. 1998); *Jenkins v. State*, 692 So. 2d 893 (Fla. 1997); *Fead v. State*, 512 So. 2d 176 (Fla. 1987); *Brown v. State*, 526 So. 2d 903 (Fla. 1988); *Ferry v. State*, 507 So. 2d 1373 (Fla. 1987); *Amazon v. State*, 487 So. 2d 8 (Fla. 1986); *Norris v. State*, 429 So. 2d 688 (Fla. 1983).

If the jury override does not survive *Ring*, it is not logical that the prior violent felony aggravator, the contemporaneous felony conviction aggravator, or the committed while under a sentence of imprisonment aggravator satisfies *Ring* under the particulars of Florida's statute. In *Jenkins*, the Florida Supreme Court stated that the jury's life recommendation should not have been overridden because the jury could have given little weight to the prior violent felony aggravator. *See Jenkins*, 692 So. 2d at 895. This reasoning is correct under the Florida statute: the *Jenkins* jury could have determined that the prior violent felony aggravator did not pass the second step in the sentencing process, *i.e.*, it was not "sufficient" to render Mr. Jenkins eligible for a death sentence. In Mr. Allen's case, the jury could have quite reasonably determined that the fact that Mr. Allen had allegedly walked away from a work release program imposed for a Kansas forgery offense (TRT. 716-17) was not "sufficient" to render Mr. Allen eligible for death. A jury which ultimately recommends death

110

could also decide that the prior violent felony aggravator, the contemporaneous felony conviction aggravator, or the committed while under a sentence of imprisonment aggravator were not "sufficient" to render the defendant death eligible, but that some other factor rendered the defendant death eligible. There is no way to know this, however, because Florida juries do not return specific findings. Thus, reliance upon these any of these aggravators as establishing eligibility is reliance upon a fiction under the particulars of Florida's statute and does not satisfy *Ring*.

Reliance upon the committed under sentence of imprisonment aggravator as establishing eligibility overlooks the structure of Florida's capital sentencing procedure, which requires that, in order for a defendant to be eligible for a death sentence, the sentencer must find not only that an aggravating circumstance exists, but also that "sufficient" aggravating circumstances exist. In conformity with the statutory language, Mr. Allen's jury was instructed to determine whether "sufficient aggravating circumstances" were present that justified considering a sentence of death. Use of the under sentence of imprisonment aggravator may not permissibly be used as a substitute for a jury determination that sufficient aggravating circumstances existed in Mr. Allen's case.

For these reasons, the "exception" that the Florida Supreme Court has relied on to deny relief under *Ring* is contrary to *Apprendi, Ring*, and the subsequent line of *Ring*- related cases. Moreover, Mr. Allen submits that the holding of *Almendarez-Torres* did not survive *Apprendi* and *Ring*. Because the majority relies on the committed while under sentence of imprisonment circumstance simply as an extension of the prior conviction exception, the demise of *Almendarez Torres* means that the majority's decision is contrary to the United States Supreme Court caselaw. In *Apprendi*, Justice Thomas, whose vote was decisive of the five-to-four decision in *Almendarez-Torres*, announced that

111

he was receding from his support of *Almendarez-Torres*.8  The *Apprendi* majority found it

unnecessary to overrule *Almendarez-Torres* explicitly in order to decide the issues before it, but

acknowledged that "it is arguable that *Almendarez-Torres* was incorrectly decided." *Apprendi*, 530

U.S. at 489.  It then went on in a footnote to add to "the reasons set forth in Justice SCALIA's

[*Almendarez-Torres*] dissent, 523 U.S. at 248-60," the observation that "the [*Almendarez-Torres*]

Court's extensive discussion of the term 'sentencing factor' virtually ignored the pedigree of the

pleading requirement at issue," which drive the Sixth Amendment ruling in *Apprendi*.  *Apprendi*, 530

U.S. at 489 n.15.9

     At the same time, the *Apprendi* majority did explicitly restrict whatever precedential force

---

[8]The five-Justice majority in *Almendarez-Torres* was comprised of Justices Breyer, Rehnquist, O'Connor, Kennedy, and Thomas.  The first four of these were the dissenters in *Apprendi*.  The dissenters in *Almendarez-Torres* were Justices Stevens, Souter, Scalia, and Ginsburg, all of whom are in the *Apprendi* majority.  Between 1998 and 2000, Justice Thomas changed his thinking about the appropriate analysis to determine what an "element" of a crime is and accordingly disavowed his vote in *Almendarez-Torres*.  In his *Apprendi* concurrence, Justice Thomas described his change of mind:

> "[O]ne of the chief errors of *Almendarez-Torres* – an error to which I succumbed – was to attempt to discern whether a particular fact is traditionally (or typically) a basis for a sentencing court to increase an offender's sentence . . . For the reasons I have given [here], it should be clear that this approach just defines away the real issue.  What matters is the way by which a fact enters into the sentence.  If a fact is by law the basis for imposing or increasing punishment – for establishing or increasing the prosecution's entitlement – it is an element.

*Apprendi*, 530 U.S. at 520-21.

[9]The majority opinion in *Almendarez-Torres* notably relied on *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), and, in so doing, refused to distinguish between a "sentencing factor . . . [that] triggered a mandatory minimum sentence" in *McMillan* and a "sentencing factor . . . [that] triggers an increase in the maximum permissive sentence" in *Almendarez-Torres*.  523 U.S. at 224.  That aspect of *Almendarez-Torres* has, of course, now been explicitly repudiated.  *See Haris v. United States*, 122 S. Ct. 2406, 2419 (2002) (decided together with *Ring*).

*Almendarez-Torres* ever had to the status of a "narrow exception to the general rule" that every fact which is necessary to enhance a criminal defendant's maximum sentencing exposure must be found by a jury – an exception limited to the "unique facts" in *Almendarez-Torres*. The unique facts of *Almendarez-Torres* were that the defendant **pleaded guilty** to an indictment charging that he had returned to the United States after having been deported and, in addition, **admitted** that he had been deported because he was previously convicted of three aggravated felonies. He thus elected to forgo a trial and accept an uncontested adjudication of his guilt for a crime by definition included the felony convictions later used to enhance his sentence. Nothing about the priors—any more than anything else about the elements of the crime of reentry after deportation—remained for a jury to try in light of the defendant's guilt plea. This should be contrasted to Florida, where a capital jury is to *weigh* the felony conviction to determine its sufficiency together with other aggravation and mitigation.

### 4. In Florida, the eligibility determination is not made in conformity with the right to trial by jury.

The Florida capital sentencing statute, like the Arizona statute struck down in *Ring*, makes imposition of the death penalty contingent upon the factual findings of the judge at the sentencing - not upon a jury determination made in conformity with the Sixth Amendment. Section 775.082 of the Florida Statutes provides that a person convicted of first-degree murder must be sentenced to life imprisonment "unless the proceedings held to determine sentence according to the procedure set forth in § 921.141 result in finding by the court that such person shall be punished by death." The Florida Supreme Court has long held that sections 775.082 and 921.141 do not allow imposition of a death sentence upon a jury's verdict of guilt, but only upon the finding of sufficient aggravating circumstances. *State v. Dixon*, 283 So.2d 1, 7 (Fla. 1973).

113

In *Harris v. United States*, 122 S.Ct. 2406 (2002), the Supreme Court held that under *Apprendi* "those facts setting the outer limits of a sentence, and of the judicial power to impose it, are the elements of the crime for the purposes of the constitutional analysis." *Id.* And in *Ring*, the Court held that the aggravating factors enumerated under Arizona law operated as "the functional equivalent of an element of a greater offense" and thus had to be found by a jury. Pursuant to the reasoning set forth in *Apprendi* and *Ring,* aggravating factors are equivalent to elements of the capital crime itself and must be treated as such. The full panoply of rights associated with trial by jury must therefore attach to the finding of "sufficient aggravating circumstances."

### a. No unanimous determination of eligibility.

In conformity with Florida law for the past 25 years, the guilt phase  verdicts returned by the unanimous jury have not included a finding of "sufficient aggravating circumstances" necessary to render a defendant death eligible. The penalty phase jury is instructed that its recommendation is advisory and need not be unanimous; in Mr. Allen's case, the advisory jury was so instructed and returned a non-unanimous recommendation.  Findings of the elements of a capital crime by a mere simple majority, or anything less than by a unanimous verdict, is unconstitutional under the Sixth and Fourteenth Amendments.  In the same way that the Sixth Amendment guarantees a baseline level of certainty before a jury can convict a defendant, it also constrains the *number* of jurors who can render a guilty verdict. *See Apodaca v. Oregon*, 406 U.S. 404 (1972) (the Sixth and Fourteenth Amendments require that a criminal verdict must be supported by at least a "substantial majority" of the jurors). Clearly, a mere numerical majority -- which is all that is required under Section 921.141(3) for the jury's advisory sentence -- would not satisfy the "substantial majority" requirement of *Apodaca. See, e.g., Johnson v. Louisiana*, 406 U.S. 356, 366 (1972) (Blackmun, J., concurring) (a

114

state statute authorizing a 7-5 verdict would violate Due Process Clause of Fourteenth Amendment).

Because Florida's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense," that element must be found by a jury like any other element of an offense. *Apprendi*, 530 U.S. at 494. *See Sattazahn v. Pennsylvania*, 2003 U.S. LEXIS 748 at *20 (2003). As to the determination of the presence of other elements of a crime, Florida law provides, "No verdict may be rendered unless all of the trial jurors concur in it." Fla. R. Crim. P. 3.440. Florida courts have held that unanimity is required at the guilt phase of a capital case. *Williams v. State*, 438 So.2d 781, 784 (Fla. 1983*). See Flanning v. State*, 597 So.2d 864, 866 (Fla. 3rd DCA 1992)("It is therefore settled that '[i]n this state, the verdict of the jury must be unanimous' and that any interference with this right denied the defendant a fair trial. *Jones v. State*, 92 So.2d 261 (Fla. 1956)"). The right to a unanimous jury verdict must extend to each necessary element of the charged crime. As to an element of the offense, the Florida Supreme Court has recognized that a judge may not make fact finding "on matters associated with the criminal episode" that "would be an invasion of the jury's historical function." *State v. Overfelt*, 457 So.2d 1385, 1387 (Fla. 1984). Neither the sentencing statute, case law from the Florida Supreme Court, nor the standard jury instructions used the past 25 years required that the jurors participating in a penalty phase to concur in finding whether any particular aggravating circumstances had been proved, or "[w]hether sufficient aggravating circumstances exist[ed]," or "[w]hether sufficient aggravating circumstances exist[ed] which outweigh[ed] the mitigating circumstances." Fla. Stat. § 921.141(2). Because Florida law does not require that twelve jurors agree that the State has proven an aggravating circumstance beyond a reasonable doubt, or to agree on the same aggravating circumstances beyond a reasonable doubt, or to agree on the same aggravating circumstances when advising that "sufficient aggravating

115

circumstances exist" to warrant a death sentence, there is no way to say that "the jury" rendered a verdict as to an aggravating circumstance or the sufficiency of them.  As Justice Shaw has observed, Florida law leaves theses matters to speculation.  *Combs v. State*, 525 So. 2d 858, 859 (Fla. 1988) (Shaw, J., concurring).

<b>b.  No verdict in compliance with the Sixth Amendment.</b>

Florida law does not require the jury to reach a verdict on any of the factual determinations required for death.  Section 921.141(2) does not call for a jury verdict, but rather an "advisory sentence."  The Florida Supreme Court has held that "the jury's sentencing recommendation in a capital case is *only advisory*.  The trial court is to conduct its own weighing of the aggravating and mitigating circumstances . . . ."  *Combs*, 525 So.2d at 858 (quoting *Spaziano v. Florida*, 468 U.S. 447, 451 (1984)) (emphasis original in *Combs*).  It is reversible error for a trial judge to consider himself bound to follow a jury's recommendation.  *Ross v. State*, 386 So.2d 1191, 1198 (Fla. 1980).  Florida law only requires the judge to consider "the recommendation of a majority of the jury."  Fla. Stat. § 921.141(3).  In contrast, "[n]o verdict may be rendered unless all of the trial jurors concur in it."  Fla. R. Crim. Pro. 3.440.  No authority of Florida law requires that all jurors concur in finding the requisite aggravating circumstances.

In *Sullivan v. Louisiana*, 508 US. 275 (1993), the Supreme Court said, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt."  *Sullivan*, 508 U.S. at 278.  The Court explained that there must be a verdict that decides the factual issues in order to comply with the Sixth Amendment.  In doing so, the Court explained:

> It would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine (as [*In re*] *Winship*[, 397 U.S. 358 (1970)] requires) whether he is guilty beyond a reasonable doubt.  In other words the

116

> jury verdict required by the Sixth Amendment is a jury verdict of
> guilty beyond a reasonable doubt.

*Sullivan*, 508 U.S. at 278.

In a case such as this, where the error is that a jury did not return a verdict on the essential elements of a capital murder, but instead the responsibility was delegated by state law to a court, "no matter how inescapable the findings to support the verdict might be," for a court "to hypothesize a guilty verdict that was never rendered ...would violate the jury trial right." *Sullivan.*, 508 U.S. at 279. The "explicitly cross-reference[d] . . . statutory provision requiring the finding of an aggravating circumstance before imposition of the death penalty," *Ring*, requires the judge - after the jury has been discharged and "[n]otwithstanding the recommendation of a majority of the jury_" - to make two factual determinations.  Fla. Stat. § 921.141(3).  Section 921.141(3) provides that "if the court imposes a sentence of death, it shall set forth in writing its findings *upon which the sentence of death is based as to the facts.*"  *Id.*  First, the judge must find that "sufficient aggravating circumstances exist" to justify death.  *Id.*  Second, the judge must find in writing that "there are insufficient mitigating circumstances to outweigh the aggravating circumstances."  *Id.*  "If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment in accordance with § 775.082."  *Id.*  Because the Florida death penalty statute makes imposition of a death contingent upon findings of "sufficient aggravating circumstances" and "insufficient mitigating circumstances," and gives sole responsibility for making those findings to the judge, it violates the Sixth Amendment under *Ring.*

As the United States Supreme Court said in *Walton*, "[a] Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona."  *Walton*, 497 U.S. at 648.  The Florida Supreme Court has repeatedly emphasized that a

judge's findings must be made independently of the jury's recommendation.  *See Grossman v. State*, 525 So.2d 833, 840 (Fla. 1988).  Because the judge must find that "sufficient aggravating circumstances exist" "notwithstanding the recommendation of a majority of the jury," Fla. Stat. § 921.141(3), he may consider and rely upon evidence not submitted to the jury.  As the trial court did in Mr. Allen's case, the judge is also permitted to consider and rely upon aggravating circumstances that were not submitted to the jury.  *See Davis v. State*, 703 So.2d 1055, 1061 (Fla. 1998).  Because the jury's role is merely advisory and contains no findings upon which to judge the proportionality of the sentence, the Supreme Court has recognized that its review of a death sentence is based and dependent upon the judge's written findings.  *Morton v. State*, 789 So.2d 324, 333 (Fla. 2001).  The Florida capital scheme violates the constitutional principles recognized in *Ring*.

### c.      The recommendation has been merely advisory.

Moreover, it would be impermissible and unconstitutional to retroactively attach greater significance to the jury's advisory sentence than the jury was told at the time of trial.  The advisory recommendation cannot now be used as the basis for the fact-findings required for a death sentence because the statutes requires only a majority vote of the jury in support of that advisory sentence.

## C.      MR. ALLEN WAS DEPRIVED HIS SIXTH AMENDMENT RIGHTS.

By virtue of *Ring* and its application to Florida law, various constitutional errors that occurred in the proceedings against Mr. Allen are now revealed.

### 1. The indictment against Mr. Allen failed to include all of the elements of the offense of capital murder.

The United States Supreme Court in *Jones v. United States*, 526 U.S. 227 (1999), held that "under the Due Process Clause of the Fifth Amendment and the notice and jury guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a

crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id*. at 243 n. 6.  In *Ring*, the Supreme Court held that a death penalty statute's aggravating circumstances operate as "the functional equivalent of an element or a greater offense."

In *Jones*, the Supreme Court noted that "[m]uch turns on the determination that a fact is an element of an offense, rather than a sentencing consideration," in significant part because "elements must be charged in the indictment." *Jones*, 526 U.S. at 232.  On June 28, 2002, after the Court's decision in *Ring*, the death sentence imposed in *United States v. Allen*, 247 F.3d 741 (8ᵗʰ Cir. 2001), was overturned when the Supreme Court granted the writ of certiorari, vacated the judgment of the United States Court of Appeals for the Eighth Circuit upholding the death sentence, and remanded the case for reconsideration in light of the holding in *Ring* that aggravating factors that are prerequisites of a death sentence must be treated as elements of the offense.  *Allen v. United States*, 122 S.Ct. 2653 (2002).  The question presented in *Allen* was this:

> Whether aggravating factors required for a sentence of death under the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 et seq., are elements of a capital crime and thus must be alleged in the indictment in order to comply with the Due Process and Grand Jury clauses of the Fifth Amendment.

The Eighth Circuit had previously rejected Allen's argument because in its view that aggravators are not elements of federal capital murder but rather "sentencing protections that shield a defendant from automatically receiving the statutorily authorized death sentence."  *United States v. Allen*, 247 F.3d at 763.

The Supreme Court held in *Apprendi* held that the Fourteenth Amendment affords citizens the same protections when they are prosecuted under state law, although the Court noted that the Grand Jury Clause of the Fifth Amendment has not been held to apply to the States.  *Apprendi*, 530 U.S. at 477 n. 3.  However, similar to Grand Jury Clause of the Fifth Amendment to the United States

119

Constitution, Article I, section 15 of the Florida Constitution provides that, "No person shall be tried for a capital crime without presentment or indictment by a grand jury."

Just like the requirements of 18 U.S.C. §§ 3591 and 3592(c), Florida's death penalty statute makes imposition of the death penalty contingent upon the government proving the existence of aggravating circumstances, establishing "sufficient aggravating circumstances" to call for a death sentence, and that the mitigating circumstances are insufficient to outweigh the aggravating circumstance. Fla. Stat. § 921.141(3). Florida law clearly requires every "element of the offense" to be alleged in the information or indictment. In *State v. Dye*, 346 So. 2d 538, 541 (Fla. 1977), this Court said "[a]n information must allege each of the essential elements of a crime to be valid. No essential element should be left to inference." In *State v. Gray*, 435 So.2d 816, 818 (Fla. 1983), this Court held "[w]here an indictment or information wholly omits to alleged one or more of the essential elements of the crime, it fails to charge a crime under the laws of the state." An indictment in violation of this rule cannot support a conviction; the conviction can be attacked at any stage, including "by habeas corpus." *Gray*, 435 So. 2d at 818. In *Chicone v. State*, 684 So.2d 736, 744 (Fla. 1996), this Court held "[a]s a general rule, an information must allege each of the essential elements of a crime to be valid."

The most "celebrated purpose" of the grand jury "is to stand between the government and the citizen" and protect individuals from the abuse of arbitrary prosecution. *United States v. Dionisio*, 410 U.S. 19, 33 (1973); *see also Wood v. Georgia*, 370 U.S. 375, 390 (1962). The Supreme Court explained that function of the grand jury in *Dionisio*:

> Properly functioning, the grand jury is to be the servant of neither the Government nor the courts, but of the people . . . As such, we assume that it comes to its task without bias or self-interest. Unlike the prosecutor or policeman, it has no election to win or executive appointment to keep.

120

410 U.S. at 35. The shielding function of the grand jury is uniquely important in capital cases. *See*

*Campbell v. Louisiana*, 523 U.S. 392, 399 (1998)(recognizing that the grand jury "acts as a vital

check against the wrongful exercise of power by the State and its prosecutors" with respect to

"significant decisions such as how many counts to charge and . . . the important decision to charge a

capital crime").

The State's authority to decide whether to seek the execution of an individual charged with

crime hardly overrides—in fact is an archetypical reason for—the constitutional requirement of

neutral review of prosecutorial intentions. Because the State did not submit to the grand jury, and the

indictment did not state, the essential elements of the aggravated crime of capital murder, Mr. Allen's

right under the Sixth Amendment to the federal Constitution were violated.

### 2.  Mr. Allen's jury was told that its recommendation was merely advisory in nature.

The Florida death statute differs from the Arizona statute in that it provides for the jury to hear

evidence and "render an advisory sentence to the court." Fla. Stat. § 921.141(2). Mr. Allen's jury

was repeatedly instructed, in conformity with the statute and the Florida Supreme Court's precedent,

that its role was advisory only in returning a recommendation.

As the Supreme Court held in *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985):

> [I]t is constitutionally impermissible to rest a death sentence on a
> determination made by a sentencer who has been led to believe that
> the responsibility for determining the appropriateness of the
> defendant's death rests elsewhere.

Were this Court to conclude now that Mr. Allen's death sentence rests on findings made by the jury

after it was told, and Florida law clearly provided, that a death sentence would not rest upon the jury's

recommendation alone, it would mean that Mr. Allen's death sentence was imposed in violation of

121

*Caldwell.* *Caldwell* embodies the principle stated in Justice Breyer's concurring opinion in *Ring:* "the Eighth Amendment requires individual jurors to make, and to take responsibility for, a decision to sentence a person to death."   The fact that Mr. Allen's jury was instructed that its role was merely advisory presents "additional concerns in light of *Ring.*"   *Butler v. State,* 842 So. 2d 817 (Fla. 2003) (Pariente, J., concurring in part and dissenting in part).  *See also Bottoson v. Moore,* 833 So. 2d 693, 731-34 (Fla.) (Lewis, J., concurring in result only), *cert. denied,* 123 S. Ct. 662 (2002).

### 3.    The Burden of Proof was impermissibly shifted to Mr. Allen.

Under Florida law, a death sentence may not be imposed unless there is a factual determination that "sufficient aggravating circumstances" exist to justify imposing the death penalty. Fla. Stat. § 921.141 (3).  The burden is supposed to be on the State to prove that those aggravating circumstances outweigh the mitigating circumstances.  *See State v. Dixon,* 283 So.2d 1 (Fla. 1973). Because imposing a death sentence is contingent on this fact being found, and the maximum sentence that could be imposed in the absence of that fact is life in prison, the Sixth Amendment requires that the State bear the burden of proving this beyond a reasonable doubt.  "Capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  *Ring,* 122 S. Ct. at  2432.

The trial court instructed the jury that:

> The State and the Defendant may now present evidence relative to the nature of the crime and the character of the Defendant. You are instructed that this evidence, when considered with the evidence that you already heard, is presented in order that you might determine, first, whether sufficient aggravating circumstances exist that would justify the imposition of the death penalty, and second, <u>whether there are mitigating circumstances sufficient to outweigh the aggravating circumstances,</u> if any.

* * * *

> [I]t is your duty to follow the law that will now be given to
> you by the Court and render to the Court an advisory sentence based
> upon your determination as to whether sufficient aggravating
> circumstances exist to justify the imposition of the death penalty <u>and
> whether sufficient mitigating circumstances exist to outweigh any
> aggravating circumstances found to exist.</u>

* * * *

> Should you ind sufficient aggravating circumstances do exist,
> <u>it will then be your duty to determine whether mitigating
> circumstances exist that outweigh the aggravating circumstances.</u>

The Due Process clause of the Fourteenth Amendment requires the State to prove beyond a

reasonable doubt every fact necessary to constitute a crime. *In re Winship*, 397 U.S. 358 (1970).  The

existence of sufficient aggravating circumstances that outweigh the mitigating circumstances is an

essential element of death-eligible first degree murder because it is the element that distinguishes it

from the crime of first degree murder, for which life is the only possible punishment.  *See* Fla. Stat. §§

775.082; 941.141.  For that reason, *Winship* requires the State to prove the existence of this element

beyond a reasonable doubt.

The instructions provided to Mr. Allen's jury violated the due process clause and the Sixth

Amendment right to trial by jury because they relieved the prosecution of its burden to prove beyond

a reasonable doubt the element that sufficient aggravating circumstances exist that outweigh the

mitigating circumstances.  For example, in *Mullaney*, the Supreme Court held that the Maine statutory

scheme delineating the crimes of murder and manslaughter violated the Due Process clause of the

Fourteenth Amendment.  The Maine law at issue required a defendant to establish, by a

preponderance of the evidence, that he acted in the heat of passion or sudden provocation, in order to

reduce a charge of murder to manslaughter.  *Mullaney*, 421 U. S. at 691-92.  Like the Florida statute

at issue here, "the potential difference in [punishment] attendant to each conviction . . . may be of

123

greater importance than the difference between guilt or innocence for many lesser crimes." *Id.* at 698. The Supreme Court held that the statutory scheme unconstitutionally relieved the prosecution of its burden to prove the element of intent. *Id.* at 701-02. The Florida instruction produces the same fatal flaw, particularly when viewed in light of *Ring*.

### 4. Mr. Allen's confrontation rights were denied.

Under *Ring*, the determination of the presence of "sufficient aggravating circumstances" is a determination of guilt as to an element of the crime of capital first degree murder. Undeniably, at the guilt phase, hearsay is not admissible under the Confrontation Clause. *See Lilly v. Virginia*, 119 S.Ct. 1887 (1999). In his concurring opinion, Justice Breyer noted:

> As currently interpreted, the Confrontation Clause generally forbids the introduction of hearsay into a trial unless the evidence "falls within a firmly rooted hearsay exception" or otherwise possesses "particularized guarantees of trustworthiness." <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980).

*Lilly*, 119 S.Ct. at 1901-02 (Breyer, J., concurring).

Because Mr. Allen was entitled to a jury trial in conformity with the Sixth Amendment on the issue of whether "sufficient aggravating circumstances existed," he was deprived of that right when hearsay was permitted in support of the State's proof of elements of the offense of capital murder. The hearsay evidence was improperly admitted under the Confrontation Clause. *Ohio v. Roberts*, 448 U.S. 56 (1980). Relief is warranted.

## D. APPLICABILITY OF *RING* TO MR. ALLEN.

Respondent will no doubt argue that *Ring* is not retroactive as held by *Tuner v. Crosby*, 339 F.3d 1247 (11th Cir. 2003). While Mr. Allen of course acknowledges the binding authority of *Turner*, he respectfully contends that *Turner* is incorrect and that *Ring* is retroactive under *Teague* for the reasons set forth in *Summerlin v. Stewart*, 341 F.3d 1082 (9th Cir. 2003). In *Summerlin*, the Ninth Circuit held that *Ring* is retroactive, a decision in direct conflict with *Turner*.

124

E.    **CONCLUSION.**

Certain constitutional error constituting "structural defects in the constitution of the trial

mechanism," have been found to "defy analysis by 'harmless error' standards." *Arizona v.*

*Fulminante*, 499 U.S. 279, 309 (1991).  Structural defects, subject to automatic reversal have been

found where there has been a "complete denial of counsel," a "biased trial judge," "racial

discrimination in [the] selection of [the] grand jury," the "denial of self-representation at trial," the

"denial of a public trial," and a "defective reasonable-doubt instruction." *Neder v. United States*, 119

S.Ct. 1827, 1833 (1999).

In *Rose v. Clark*, 478 U.S. 570, 578 (1986), the Supreme Court stated:

> Similarly, harmless-error analysis presumably would not apply if a
> court directed a verdict for the prosecution in a criminal trial by jury.
> We have stated that "a trial judge is prohibited from entering a
> judgment of conviction or directing the jury to come forward with
> such a verdict . . . regardless of how overwhelmingly the evidence
> may point in that direction." *United States v. Martin Linen Supply
> Co.*, 430 U.S. (1977)(citations omitted).  *Accord, Carpenters v. United
> States*, 330 U.S. 395 (1947).  This rule stems from the Sixth
> Amendment's clear command to afford jury trials in serious criminal
> cases. *See Duncan v. Louisiana*, 391 U.S. 145 (1968).  Where the
> right is altogether denied, the State cannot contend that the deprivation
> was harmless because the evidence established the defendant's guilt:
> the error in such a case is that the wrong entity judge the defendant
> guilty.

The Sixth Amendment error recognized in *Ring v. Arizona* fits into the category described as

structural error.  Certainly, there was no verdict finding Mr. Allen guilty of capital first degree murder

(i.e. first degree murder with "sufficient aggravating circumstances").  Moreover as a result of the

*Ring* error, an element ("sufficient aggravating circumstances") was removed from the guilt phase of

the trial and was placed in the sentencing portion, with sentencing rules of procedure governing.  With

this transfer of an element from one portion of the capital proceeding to another, the structure of the

trial changed.  Since "sufficient aggravating circumstances" were not treated as an element, the grand jury indictment did include a finding of the element.  As a result, Florida law held that the State was under no obligation to give notice of what aggravating circumstances were asserted as present and sufficient to warrant a death sentence.  *Menendez v. State*, 368 So.2d 1278, 1282 n.21 (Fla. 1979). Because the aggravating factors were merely sentencing factors, Florida law permitted an element of first degree murder to be repeated as an aggravating circumstance.  *Johnson v. Singletary*, 991 F.2d 663, 669 (11th Cir. 1993)("We reject Johnson's argument holding that the fact that an element of the underlying conviction and one of the aggravating factors was duplicative did not invalidate that aggravating factor").

The proceedings conducted at Mr. Allen's penalty phase were not conducted in conformity with the Sixth Amendment guarantees.   Under the circumstances presented in Mr. Allen's  case, the *Ring* error can only be described as structural.  Mr. Allen is entitled to relief.

## CLAIM IX

**MR. ALLEN IS DENIED HIS RIGHTS UNDER THE FIRST, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION AND IS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN PURSUING HIS POSTCONVICTION REMEDIES BECAUSE OF THE RULES PROHIBITING HIS LAWYERS FROM INTERVIEWING JURORS TO DETERMINE IF CONSTITUTIONAL ERROR WAS PRESENT.**

All other allegations and factual matters contained elsewhere in this petition are fully incorporated herein by specific reference.

The ethical rule that prevents Mr. Allen from investigating any claims of jury misconduct or bias that may be inherent in the jury's verdict is unconstitutional. Under the Fifth, Sixth, Eighth and Fourteenth Amendments, Mr. Allen is entitled to a fair trial and sentencing. His inability to fully explore possible misconduct and biases of the jury prevent him from fully showing the unfairness of his trial. Misconduct may have occurred that Mr. Allen can only discover through juror interviews *Cf. Turner v. Louisiana*, 379 U.S. 466 (1965); *Russ v. State*, 95 So. 2d 594 (Fla. 1957).

Rule 4-3.5(d)(4), Rules Regulating the Florida Bar, is invalid because it is in conflict with the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. It unconstitutionally burdens the exercise of fundamental constitutional rights. Mr. Allen should have the ability to interview the jurors in this case. Yet, the attorneys statutorily mandated to represent him are prohibited from contacting them. The failure to allow Mr. Allen the ability to interview jurors is a denial of access to the courts of this state under article 1, section 21 of the Florida Constitution. Rule 4-3.5(d)(4) is unconstitutional on both state and federal grounds.

In the alternative, should this Court uphold Rule 4-3.5(d)(4), an individual who is not restricted by the rule from contacting jurors should be appointed to assist Mr. Allen. There are social

scientists conducting this research who could assist Mr. Allen.

Mr. Allen must be permitted to interview the jurors who acted as co-sentencers in his case. Mr. Allen may have constitutional claims for relief that can only be discovered through juror interviews. However, Mr. Allen is incarcerated on death row and is unable to conduct such interviews. He has been provided counsel who are members of the Florida Bar. Rule 4-3.5(d)(4) precludes counsel from contacting jurors and conducting an investigation into constitutional claims that would be discovered through interviews.

For the foregoing reasons, Mr. Allen asks that this Court declare rule 4-3.5(d)(4), Rules Regulating the Florida Bar, unconstitutional and allow his legal representatives to conduct discrete, anonymous interviews with the jurors who sentenced him to death. In the alternative, Mr. Allen asks that the Court appoint researchers not restricted by Rule 4-3.5(d)(4) to conduct juror interviews for the purpose of determining whether overt acts or external influences contributed to his conviction and verdict of death. Relief is proper.

## CLAIM X

**FLORIDA'S CAPITAL SENTENCING STATUTE IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED BECAUSE IT FAILS TO PREVENT THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY, AND IT VIOLATES THE CONSTITUTIONAL GUARANTEES OF DUE PROCESS AND PROHIBITING CRUEL AND UNUSUAL PUNISHMENT.**

All other allegations and factual matters contained elsewhere in this petition are fully incorporated herein by specific reference.

Florida's capital sentencing scheme denies Mr. Allen his right to due process of law and constitutes cruel and unusual punishment on its face and as applied in this case. In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court held that the death penalty may not be imposed under sentencing procedures that create a substantial risk of arbitrary and capricious application. The Court explained its holding in *Gregg v. Georgia*:

> Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitable directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

428 U.S. 153, 189 (1976). In order to withstand constitutional scrutiny, a capital sentencing statute must provide "a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many in which it is not." *Furman*, 408 U.S. at 313. In *Godfrey v. Georgia*, the Court explained:

> [I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion."

446 U.S. 426, 428 (1980).

Thus, Florida's death penalty statute is constitutional only to the extent that it prevents arbitrary imposition of the death penalty and narrows application of the penalty to the worst offenders.  Florida's statute fails to adequately channel the jury's discretion as required by Supreme Court precedent.  *See Gregg*, 428 U.S. at 189 ("*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").  The Florida death penalty statute fails to meet these constitutional guarantees and therefore violates the Eighth Amendment.

The capital sentencing statute in Florida fails to provide any standard of proof for determining that aggravating circumstances "outweigh" the mitigating factors, *Mullaney v. Wilbur*, 421 U.S. 684 (1975), and does not define "sufficient aggravating circumstances."  The statute does not sufficiently define for the consideration each of the aggravating circumstances listed in the statute.  The Supreme Court has recognized the necessity of providing a sentencing jury with precise terms:

> Since the members of the jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given.  To the extent that this problem is inherent in jury sentencing, it may not be totally correctable.  It seems clear, however, that the problem will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision.

*Gregg*, 428 U.S. at 192.  The deficiencies in the Florida statute lead to the arbitrary and capricious imposition of the death penalty in violation of the Eighth Amendment.

Florida's capital sentencing procedure does not have the independent reweighing of aggravating and mitigating circumstances required by *Proffitt v. Florida*, 428 U.S. 242 (1976).

The aggravating circumstances in the Florida capital sentencing statute have been applied in a

130

vague and inconsistent manner, and juries receive unconstitutionally vague instructions on the

aggravating circumstances. The statute setting out the aggravating circumstances is vague under the

eighth and fourteenth amendments. The Supreme Court in *Richmond v. Lewis* explained:

> The relevant Eighth Amendment law is well defined. First, a
> statutory aggravating factor is unconstitutionally vague if it fails to
> furnish principled guidance for the choice between death and a lesser
> penalty. Second, in a "weighing" State, where the aggravating and
> mitigating factors are balanced against each other, it is constitutional
> error for the sentencer to give weight to an unconstitutionally vague
> aggravating factor, even if other, valid aggravating factors obtain.

506 U.S. 40, 46-47 (1992). *See also Maynard v. Cartwright*, 486 U.S. 356 (1988); *Godfrey v.*

*Georgia; Espinosa v. Florida*, 505 U.S. 1079 (1992).

Florida law creates a presumption of death if a single aggravating circumstance is found. This

creates a presumption of death in every felony murder case, and in nearly every premeditated murder

case. Once an aggravating factor is found, Florida law provides that death is presumed to be the

appropriate punishment, which can only be overcome by mitigating evidence so strong as to outweigh

the aggravating factor. This systematic presumption of death does not satisfy the Eighth

Amendment's requirement that the death penalty be applied only to the worst offenders. *See Furman*

*v. Georgia*, 408 U.S. 238 (1972)(recognizing that because death is different in kind from any other

punishment it cannot be imposed in a manner that creates a risk of arbitrary and capricious

application); *Jackson v. Dugger*, 837 F.2d 1469 (11th Cir. 1988).

Because of the arbitrary and capricious application of Florida's death penalty, the statute as it

exists and as applied is unconstitutional under the Eighth and Fourteenth Amendments to the United

States Constitution. *See Callins v. Collins*, 510 U.S. 1141 (1994)(Blackmun, J., dissenting) ("despite

the effort of the States and courts to devise legal formulas and procedural rules to meet this daunting

challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake."). As a result of inadequacies in Florida's sentencing statute, Mr. Allen's death sentence violates the Eighth Amendment. Relief is proper.

## CONCLUSION AND RELIEF SOUGHT

WHEREFORE, Petitioner Lloyd Chase Allen prays:

1.      That a writ of habeas corpus be directed to the Respondent;

2.      That the State of Florida be required to appear and answer the allegations of this petition;

3.      That Mr. Allen, who is indigent, be granted sufficient funds to secure expert and lay testimony necessary to prove the facts as alleged in this petition;

4.      That Mr. Allen be granted the authority to proceed *in forma pauperis*, including the right to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts as alleged in his petition;

5.      That Mr. Allen be accorded an evidentiary hearing on the allegations of his petition;

6.      That, after a full hearing, Mr. Allen be discharged from his unconstitutional conviction and sentence of death;

7.      That Mr. Allen be allowed a period of sixty (60) days, which shall commence after the completion of any hearing this Court determines to conduct, in which to brief the issues of law raised by this petition;

8.      That Mr. Allen be allowed to amend this petition before the Respondent files its Answer, and that he be permitted to file a traverse to any Answer filed by the Respondent; and

9.      That Mr. Allen be allowed other, further and alternative relief as may seem just, equitable and proper under the circumstances.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Petition for a Writ of Habeas Corpus has been sent via United States Mail to Sandra Jaggard, Assistant Attorney General, Department of Legal Affairs, Rivergate Plaza, Suite 950, 444 Brickell Avenue, Miami, Florida, 33131, this 14th day of October, 2003.

Respectfully submitted,

Kenneth M. Malnik
Florida Bar No. 351415

Dan D. Hallenberg
Florida Bar No. 0940615

Office of the Capital Collateral Regional
Counsel - Southern Region
101 N.E. 3rd Ave., Ste. 400
Fort Lauderdale, FL 33301
(954) 713-1284; FAX (954) 713 1299

Counsel for Petitioner

I, Lloyd Chase Allen, declare under penalty of perjury that the foregoing Petition For Writ Of Habeas Corpus By A Person In State Custody is true and correct. Executed on October 13, 2003.

Lloyd Chase Allen
Prisoner No.: 890793
Union Correctional Institution, Raiford, FL