# United States Court of Appeals

Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

**John Ley**
Clerk of the Court

For rules and forms visit
www.ca11.uscourts.gov

September 27, 2010

Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI  FL  33128-1813



FILED by⎯⎯⎯ D.C.

SEP 3 0 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**Appeal Number: 09-13217-P**
Case Style: Lloyd Chase Allen v. Sec., FL DOC
District Court Number:  03-10077 CV-JIC

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
    Original Exhibits, consisting of: 1 Box and 1 Folder
    Original record on appeal or review, consisting of: 1 Volume

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, <u>but not a copy of the court's decision</u>, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

John Ley, Clerk of Court

Reply To: Marcus Simmons (404) 335-6200

Encl.

MDT-1 (06/2006)

# United States Court of Appeals

## For the Eleventh Circuit

| | |
|---|---|
| No. 09-13217 | **FILED**<br>**U.S. COURT OF APPEALS**<br>**ELEVENTH CIRCUIT**<br><br>Jul 14, 2010<br><br>JOHN LEY<br>CLERK |
| District Court Docket No.<br>03-10077-CV-JIC | |

LLOYD CHASE ALLEN,

        Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
Walter A. McNeil,

        Respondent-Appellee.

--------------------------------------------------------------

Appeal from the United States District Court
for the Southern District of Florida

--------------------------------------------------------------

## J U D G M E N T

    It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:    July 14, 2010
For the Court:   John Ley, Clerk
By:    Simmons, Marcus

ISSUED AS MANDATE
SEP 27 2010
U.S. COURT OF APPEALS
ATLANTA, GA.

A True Copy - Attested:
Clerk, U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-13217

_____

| FILED |
| U.S. COURT OF APPEALS |
| ELEVENTH CIRCUIT |
| JULY 14, 2010 |
| JOHN LEY |
| CLERK |

D. C. Docket No. 03-10077-CV-JIC

LLOYD CHASE ALLEN,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
Walter A. McNeil,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 14, 2010)**

Before CARNES, HULL and WILSON, Circuit Judges.

CARNES, Circuit Judge:

In November of 1991 Dortha Cribbs left her home in Ohio to drive to Florida to sell a trailer and get her vacation home down there ready to sell. <u>Allen v. State</u>, 662 So. 2d 323, 325 (Fla. 1995) ("<u>Allen I</u>"). The year before, Lloyd Allen Chase had escaped from a prison work release program in Kansas and headed east. <u>Id.</u> at 327, 331. Unfortunately for Cribbs, their paths crossed at a truck stop in Atlanta, where they struck up a relationship. <u>Id.</u> at 325–26. Their relationship ended when Allen stabbed Cribbs to death and stole her car in Summerland Key, Florida on November 13, 1991. <u>Id.</u> at 325–27.

Allen was arrested in California three months later and brought back to Florida. During his first meeting with his appointed attorney, Allen set out the terms of their relationship. He said it was going to be "a Frank Sinatra case," by which he meant they were going to conduct the case the way he wanted. <u>Cf.</u> Frank Sinatra, <u>My Way</u> (Reprise Records 1969). He told the attorney that "from start to finish on my case we [are] going to do it my way; not the way [you] thought or the way [the prosecutors] thought, we will do it my way because it is my case." In the words of the song that served as his inspiration, Allen "planned each charted course, each careful step along the byway" of the defense, and when done he could

2

say that he "saw it through without exemption," and "I faced it all and I stood tall and did it my way." Id.  After he was convicted Allen insisted on his right to represent himself before the jury at sentencing, where he  told the jurors "[t]his is my trial and at this time we can do it my way," and "there is not going to be any excuses today and there will not be any mitigating factors here," and urged the jury to impose a death sentence.  The jury voted 11 to 1 to recommend the sentence he wanted, and the judge gave it to him, letting him "face the final curtain," id., on his own terms.  Allen I, 662 So. 2d at 327.

After Allen was sentenced to death, however, he changed his tune.  He no longer wants to boast about doing things his way.  Instead, he wants to shift the blame for his death sentence to his trial counsel on several grounds, including the fact that counsel followed Allen's orders not to investigate mitigating circumstances or attempt to put on any evidence of them during the sentence proceedings.

The convictions and sentences occurred in 1993.  Over the course of the next fourteen years, they were affirmed, state collateral relief was denied, and the denial of it was affirmed in the Florida courts.  See Allen v. State, 957 So. 2d 635 (Fla. 2007) ("Allen III"); Allen v. State, 854 So. 2d 1255 (Fla. 2003) ("Allen II"); Allen I, 662 So. 2d 323; Florida v. Allen, No. 92-30056-CF (Fla. Cir. Ct. Dec. 18,

3

2001). A recounting of the facts, evidence, and procedural history of the case is contained in those opinions and in the order of the United States District Court for the Southern District of Florida, denying Allen's petition for a writ of habeas corpus. Allen v. McNeil, No. 03-10077, 2009 WL 856017 (S.D. Fla. Mar. 31, 2009).

After denying Allen's habeas petition, the district court granted a certificate of appealability as to the Brady and ineffective assistance of counsel issues that Allen had raised in that court.

## I. THE LEGAL FRAMEWORK

Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court may not grant Allen habeas relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Hammond v. Hall, 586 F.3d 1289, 1306 (11th Cir. 2009); LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1259 (11th Cir. 2005). "We review de novo the district court's decision about whether the state court acted contrary to clearly established federal

law, unreasonably applied federal law, or made an unreasonable determination of fact." Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1332 (11th Cir. 2009).

"A state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Court's." Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1247 (11th Cir. 2009) (per curiam) (quotation and other marks omitted). A state court decision involves an unreasonable application of clearly established federal law when "it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (citation omitted).

"In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." Schriro v. Landrigan, 550 U.S. 465, 468, 127 S.Ct. 1933, 1937 (2007). The Supreme Court has instructed us that where there is no § 2254(e)(2) bar, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

would entitle the applicant to federal habeas relief." Id. at 474, 127 S.Ct. at 1940; see also Boyd v. Allen, 592 F.3d 1274, 1304–05 (11th Cir. 2010); Aron v. United States, 291 F.3d 708, 715 n.6 (11th Cir. 2002); Diaz v. United States, 930 F.2d 832, 834 (11th Cir. 1991); 28 U.S.C. § 2254(d)(2), (e)(1).

A district court is not required to hold an evidentiary hearing if the claims "are merely conclusory allegations unsupported by specifics," Boyd, 592 F.3d at 1305 (quotation marks omitted), or "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief," Schriro, 550 U.S. at 474, 127 S.Ct. at 1940. As the Supreme Court has explained, "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." Schriro, 550 U.S. at 474, 127 S.Ct. at 1940.

## II. ALLEN'S BRADY CLAIMS

In Brady v. Maryland the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97 (1963). A Brady violation has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been

6

suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948 (1999). The prejudice or materiality requirement is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383 (1985) (quotation marks omitted); see also Kyles v. Whitley, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565 (1995). Materiality is determined by asking whether the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict. See Kyles, 514 U.S. at 434, 436–37 & n.10, 115 S.Ct. at 1566–67 & n.10; see also Hammond, 586 F.3d at 1305–06; Smith, 572 F.3d at 1334.

Allen's Brady claims are based on allegations that the State withheld Florida Department of Law Enforcement laboratory reports indicating that: (1) two hairs found in or on Cribbs' hand did not match Allen's hair; (2) hair samples taken from Cribbs for comparison purposes were contaminated and could not be tested; and (3) none of the latent fingerprints recovered from Cribbs' car matched Allen's prints. The Florida Supreme Court denied Allen's Brady claims, determining that he was not prejudiced by the withholding of those reports. See Allen II, 854 So. 2d at 1258–60.

With regard to the report about the two hairs found in or on Cribbs' hand, the Florida Supreme Court explained that: "[a]lthough the hair analysis excluded Allen as the source, it did not exclude the victim; and due to contamination, the two hairs cannot be examined further.  Thus, the analysis neither supported nor negated Allen's argument that an unidentified third person committed the murder." Allen II, 854 So. 2d at 1260.  The court summarily rejected the other two Brady allegations, finding that they "lack merit because Allen was not prejudiced by [those and other] alleged errors."  Id. at 1258 n.5.  The reasoning behind the summary rejection of those two other Brady claims is not difficult to discern. Having a report indicating that some potential evidence, which was not introduced at trial, was too contaminated to use does not indicate that but for the contamination it would have implicated someone else in the crime.  While Allen argues that he could have used the fact that the hair samples were contaminated to argue that all of the forensic evidence was suspect, the only contamination error the allegedly suppressed report mentions is that a labeling error occurred.  That error had no impact on the evidence that was actually introduced at trial.  As for the report that Allen's fingerprints were not recovered from Cribbs' car, that proves nothing.  It was undisputed that Allen, who had taken up with and traveled

with Cribbs, was in her car numerous times.  He has never denied that, nor could he.

Allen nonetheless contends that the Florida Supreme Court's Brady analysis deserves no deference under AEDPA because it was contrary to, or an unreasonable application of, federal law.  Specifically, he asserts that the Florida Supreme Court failed to analyze the cumulative effect of the multiple non-disclosures.  Allen emphasizes that in Kyles the United States Supreme Court reversed a decision whose "repeated references dismissing particular items of evidence as immaterial . . . suggest[ed] that cumulative materiality was not the touchstone."  514 U.S. at 440, 115 S.Ct. at 1569.

The threshold problem with Allen's contention is that he has not convinced us that any of the undisclosed reports were favorable to the defense at all.  If they are not favorable, then there was no suppression of favorable evidence to begin with, and that is the end of the Brady inquiry.  Even assuming, however, that one of the reports was favorable to the defense in some useful way, cumulative materiality consideration would still be beside the point unless another report was favorable as well.  Adding nothing to any weight does not increase that weight.

In any event, even if we assume that the undisclosed reports somehow would have found their way into evidence at trial and would have helped the

9

defense, Allen has not carried his burden of showing that the Florida courts refused to conduct the cumulative materiality review required by Kyles.

In the motion for post-conviction relief he filed in the state trial court, Allen repeatedly asserted that the touchstone of that court's analysis should be cumulative materiality. He explained that the proper test is whether the court "can be confident that the jury's verdict would have been the same," Kyles, 514 U.S. at 453, 115 S.Ct. at 1575, and argued that he could meet that standard, "particularly in light of the cumulative effect of the other errors described in this pleading." Later in his motion, Allen told the court that it "must consider the cumulative effect of all the evidence not presented to the jury whether due to trial counsel's ineffectiveness, the State's misconduct, or because the evidence is newly discovered." He cited Kyles again, as well as two cases in which the Florida Supreme Court had assessed prejudice cumulatively. See Swafford v. State, 679 So. 2d 736, 739 (Fla. 1996) (per curiam) (granting an evidentiary hearing to determine the materiality of a new affidavit "when viewed in conjunction" with other evidence); State v. Gunsby, 670 So. 2d 920, 924 (Fla. 1996) (holding that cumulative effect of Brady violations and ineffective assistance undermined confidence in the verdict, and that a new trial was required because there was a reasonable probability of a different outcome).

Allen also devoted an entire claim in his motion for post-conviction relief to the argument that his trial "was fraught with procedural and substantive errors which cannot be harmless when viewed as a whole." He argued that "the sheer number and types of errors involved in his trial, when considered as a whole, virtually dictated the verdict and sentence that he would receive." To bolster that argument, Allen cited three more Florida Supreme Court decisions that ordered a new trial because the cumulative effect of numerous errors was prejudicial. See Jackson v. State, 575 So. 2d 181, 189 (Fla. 1991) ("[E]ven though each of the alleged errors, standing alone, could be considered harmless, the cumulative effect of such errors was such as to deny to defendant [a] fair and impartial trial . . . ." (quotation marks omitted)); Nowitzke v. State, 572 So. 2d 1346, 1350 (Fla. 1990) (cumulative effect of prosecutorial improprieties); Jones v. State, 569 So. 2d 1234, 1240 (Fla. 1990) (cumulative effect of penalty phase errors). Allen urged the state trial court to conclude, based on all the allegations in his petition, that "[t]he results of the trial and sentencing are not reliable." In response, the State never disputed that the materiality standard is to be applied cumulatively where there are multiple suppressions.

When the Brady issues reached the Florida Supreme Court, Allen again emphasized that cumulative materiality is the touchstone. He summarized the

11

Kyles decision and explained that it "requires a cumulative evaluation of the evidence." Allen compared his case to Gunsby, the leading Florida decision examining cumulative error. See Gunsby, 670 So. 2d at 924. "Similarly," Allen said, "the combination of trial counsel's deficient performance at the guilt phase, coupled with Brady violations, undermines the confidence in the outcome of the trial." Allen argued that all the alleged procedural and substantive errors, when considered "as a whole," resulted in prejudice requiring a new trial. Again, the State accepted the premise of Allen's argument—that prejudice should be considered cumulatively—but asserted that there was no cumulative error.

The Florida Supreme Court affirmed the state collateral trial court's denial of Allen's Brady claims. Allen II, 854 So. 2d at 1258–60. Although the court did not specifically refer to a "cumulative" analysis of materiality, or to the United States Supreme Court's discussion of that issue in Kyles, our deference to state court decisions does not depend on the use of keywords. The usual "presumption that state courts know and follow the law" is even stronger in the AEDPA context because § 2254(d)'s "highly deferential standard for evaluating state-court rulings . . . demands that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 360 (2002) (internal citation omitted); see also Bell v. Cone, 543 U.S. 447, 455, 125 S.Ct. 847, 853

12

(2005) ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."). "In order to merit AEDPA deference the state court need not expressly identify the relevant Supreme Court precedent, nor make a perfect statement of the applicable rule of law, nor provide a detailed opinion covering each aspect of the petitioner's argument." Smith, 572 F.3d at 1333; see also Parker v. Sec'y, Dep't of Corr., 331 F.3d 764, 776 (11th Cir. 2003) ("All that is required under § 2254(d)(1) is an adjudication on the merits, not a full state court opinion."); Wright v. Sec'y, Dep't of Corr., 278 F.3d 1245, 1254–56 (11th Cir. 2002).

With that presumption in mind, we have no problem finding that the Florida Supreme Court followed the applicable rule of law. For starters, the court did not disagree with the parties' joint understanding, as indicated in their briefs, that Brady prejudice or materiality, where there are multiple instances of favorable evidence being suppressed, must be assessed cumulatively. See Cone, 543 U.S. at 457 n.7, 125 S.Ct. at 854 n.7 (interpreting a state supreme court decision in light of the cases cited and discussed by the parties in their state court briefs).

The Florida Supreme Court also stated the correct, overall standard for assessing Brady prejudice. Allen II, 854 So. 2d at 1260 ("Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the

13

defense, the result of the proceeding would have been different. . . .  The United

States Supreme Court has defined 'reasonable probability' as 'a probability

sufficient to undermine confidence in the outcome.' (quoting <u>Strickler v. Greene</u>,

527 U.S. 263, 280, 119 S.Ct. 1936, 1948 (1999), and <u>Strickland v. Washington</u>,

466 U.S. 668, 694, 104 S.Ct. 2052, 2068 (1984))).  It is true that the court

mentioned that standard in a part of the opinion concerning the only one of the

<u>Brady</u> claims that it discussed at any length (the one regarding the hair analysis),

but that makes sense because the court had summarily dismissed the other two

<u>Brady</u> claims.  <u>See</u> <u>id.</u> at1258 n.5 & 1260.  And in its summary dismissal of those

two <u>Brady</u> claims (as well as four other non-<u>Brady</u> claims) the court assessed

prejudice cumulatively.  It said that the "[c]laims . . . lack merit because Allen was

not prejudiced by the alleged errors."  <u>Id.</u> at 1258 n.5.  Note the plural.  The court

did <u>not</u> say that "none of those individual alleged errors was prejudicial."  Instead,

it found that Allen was not prejudiced "by the alleged errors"—by all of them

taken as a whole—if there were in fact errors.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Smith</u>, 572 F.3d at

1333; <u>Parker</u>, 331 F.3d at 776; <u>Wright</u>, 278 F.3d at 1254 (holding that "the

summary nature of a state court's decision does not lessen the deference that it is

due" under AEDPA).

The fact that the Florida Supreme Court's own precedent required it to examine prejudice cumulatively is another strong reason for inferring that it did so. See Swafford, 679 So. 2d at 739; Gunsby, 670 So. 2d at 924; Jackson, 575 So. 2d at 189; Nowitzke, 572 So. 2d at 1350; Jones, 569 So. 2d at 1240. The United States Supreme Court has told us to presume "that state courts know and follow the law," Visciotti, 537 U.S. at 24, 123 S.Ct. at 360, and has also told us that "absent an affirmative indication to the contrary" we must presume that a state supreme court has followed its own prior precedent. See Cone, 543 U.S. at 456, 125 S.Ct. at 853 ("[T]he State Supreme Court had construed the aggravating circumstance narrowly and had followed that precedent numerous times; absent an affirmative indication to the contrary, we must presume that it did the same thing here."); see also id. at 455, 125 S.Ct. at 853 ("We do not think that a federal court can presume so lightly that a state court failed to apply its own law. As we have said before, § 2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt. To the extent that the Court of Appeals rested its decision on the state court's failure to cite [a state law case], it was mistaken. Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation." (quotation marks and citations

15

omitted)); Espinosa v. Florida, 505 U.S. 1079, 1082, 112 S.Ct. 2926, 2928 (1992) ("[W]e must . . . presume that the trial court followed [the] law"); Black v. Romano, 471 U.S. 606, 615, 105 S.Ct. 2254, 2260 (1985) (same); Ford v. Strickland, 696 F.2d 804, 811 (11th Cir. 1983) (en banc) ("[The] presumption of regularity in state proceedings . . . rise[s] to its highest level in considering the work of the highest court of the state." (citing, inter alia, 28 U.S.C. § 2254(d))).

We see no "affirmative indication," Cone, 543 U.S. at 456, 125 S.Ct. at 853, that the Florida Supreme Court declined to follow its own decisions that recognize Brady materiality analysis must be conducted in a cumulative fashion.  Allen argues that an affirmative indication of the court's failure to follow its own precedent can be found in its item-by-item analysis of materiality.  The existence of item-by-item analysis, however, is not inconsistent with a cumulative analysis. "Indeed, the only way to evaluate the cumulative effect is to first examine each piece standing alone." Maharaj v. Sec'y, Dep't of Corr., 432 F.3d 1292, 1310 (11th Cir. 2005); see also Kyles, 514 U.S. at 437 n.10, 115 S.Ct. at 1567 n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect . . . separately."); Hammond, 586 F.3d at 1313 ("[W]e size up each piece of evidence before aggregating it and considering the cumulative impact.  We then weigh that

16

cumulative impact against the inculpatory evidence presented at trial to decide whether our confidence in the guilty verdict is undermined."); Smith, 572 F.3d at 1346.  Allen has not overcome the presumption that the Florida state courts assessed prejudice cumulatively.

For all of these reasons, we conclude that the Florida courts' rejection of the Brady claims that Allen presented is not contrary to or an unreasonable application of federal law as established by the Supreme Court.  See § 2254(d)(1).

Allen has one Brady-related contention that the Florida courts did not decide because he failed to present it to them.  He argues that the Florida Supreme Court should not have limited its Brady materiality analysis to the potential effect of the suppressed reports on the guilt phase of his trial.  See Cone v. Bell, 129 S.Ct. 1769, 1784 (2009) ("Evidence that is material to guilt will often be material for sentencing purposes as well . . . .").  Allen theorizes that the suppressed reports might have helped him pursue a residual doubt strategy at sentencing.  There are two reasons he cannot win with this issue.  First, he did not raise it in the state courts and instead limited his Brady claims and arguments there to the effect of the suppressed reports on the guilt phase of his trial.  The first time Allen mentioned any potential effect on the penalty phase was in his brief to this Court.  That is too late.  The claim regarding a spill-over effect on the sentence stage is procedurally

17

barred. See 28 U.S.C. § 2254(b); Lambrix v. Singletary, 520 U.S. 518, 523, 117

S.Ct. 1517, 1522 (1997); Gray v. Netherland, 518 U.S. 152, 161, 116 S.Ct. 2074,

2080 (1996); Smith, 572 F.3d at 1340–42.

The second independently adequate reason that this new claim fails is that

under Florida law residual doubt is not considered mitigation. Zeigler v. Crosby,

345 F.3d 1300, 1310 (11th Cir. 2003) (per curiam) ("Florida does not recognize

residual or lingering doubt as a valid non-statutory mitigating circumstance.");

Darling v. State, 808 So. 2d 145, 162 (Fla. 2002) ("We have repeatedly observed

that residual doubt is not an appropriate mitigating circumstance."). And there is

no constitutional right to have residual doubt considered as mitigation. Oregon v.

Guzek, 546 U.S. 517, 526–27, 126 S.Ct. 1226, 1232–33 (2006) (holding that the

Constitution does not prohibit a state from limiting the innocence-related evidence

a capital defendant can introduce at a sentencing proceeding); Franklin v.

Lynaugh, 487 U.S. 164, 174, 108 S.Ct. 2320, 2327 (1988) (plurality opinion)

("This Court's prior decisions, as we understand them, fail to recognize a

constitutional right to have such doubts considered as a mitigating factor."). Thus,

in these circumstances evidence favorable to Allen on the issue of guilt could not

have been material in the Brady sense at the sentencing phase.

18

### III. ALLEN'S GUILT PHASE INEFFECTIVE ASSISTANCE CLAIMS

Allen claims that his Sixth Amendment right to counsel was violated at the guilt phase by his counsel's constitutionally ineffective performance as measured under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984). He contends that his counsel was ineffective for: (1) failing to investigate and discover evidence of innocence; (2) failing to challenge DNA evidence; (3) arguing that the victim may have committed suicide; (4) failing to impeach a witness who testified that Allen was at Cribbs' house on the morning of the crime; and (5) failing to discover and present a witness who arguably could have rebutted the State's case.

Under Strickland Allen must make two showings. First, he must show that his counsel's performance was deficient, which means that it "fell below an objective standard of reasonableness" and was "outside the wide range of professionally competent assistance." Id. at 688, 690, 104 S.Ct. at 2064, 2066; see also Smith, 572 F.3d at 1349. In deciding whether counsel performed deficiently, courts are to review his actions in a "highly deferential" manner and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. To overcome Strickland's presumption of reasonableness, Allen must show

19

that "no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Second, under Strickland Allen must also show that, but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different—that is, our confidence in the outcome must be undermined by counsel's deficient performance. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 697, 104 S.Ct. at 2069.

Under AEDPA, however, Allen must do more than convince a federal court that he can satisfy the Strickland standard. See 28 U.S.C. § 2254(d). Because the Florida courts have already rejected his ineffective assistance claims, Allen must show that their decision to deny relief on these claims was an objectively unreasonable application of the Strickland standard. See Schriro, 550 U.S. at 473, 127 S.Ct. at 1939 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); Bell v. Cone, 535 U.S. 685, 699, 122 S.Ct. 1843, 1852 (2002); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004) ("[T]he AEDPA adds another layer of deference.

20

. . . [The petitioner] must also show that in rejecting his ineffective assistance of counsel claim the state court applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner." (internal quotation marks and citation omitted)); <u>see also</u> <u>Hammond</u>, 586 F.3d at 1324.

### A. <u>Failure to Investigate and Discover Evidence of Innocence</u>

Allen claims that his counsel was ineffective at the guilt phase for failing to discover and present evidence that on the day Cribbs' body was discovered, Allen and another man were registered together as guests at the motel where Cribbs' vehicle was later recovered. Allen argues that evidence would have supported a defense that another man killed Cribbs, especially when viewed in light of the other evidence that the jury never heard due to alleged <u>Brady</u> violations and counsel's ineffectiveness.[1]

The state collateral trial court denied this claim based on <u>Strickland</u>'s performance element and did not mention the prejudice element. <u>See Strickland</u>, 466 U.S. at 697, 104 S.Ct. at 2069 ("[T]here is no reason for a court deciding an

---

[1] In an attempt to bolster this claim, Allen argues that Detective Jay Glover testified falsely during the sentencing phase that the motel did <u>not</u> have any records showing that Allen had registered there. <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150, 92 S.Ct. 763 (1972); <u>Napue v. Illinois</u>, 360 U.S. 264, 79 S.Ct. 1173 (1959). As the State of Florida points out, that allegation simply misrepresents Detective Glover's testimony. He never testified that the motel had no records showing that Allen had registered there. In any event, Glover's testimony during the sentencing phase could not have had any effect on the guilt stage verdict.

ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). The court determined that: "[Allen] did not give counsel any theory of innocence to investigate prior to the sentencing phase. Thereafter, the theory was put forward as a possibility, not as fact. Under those circumstances, Counsel cannot be deemed ineffective for failure to investigate the Defendant's subsequently disclosed theory of innocence." Florida v. Allen, No. 92-30056-CF, slip op. at 44. The Florida Supreme Court denied this claim based on Strickland's prejudice element. See Allen II, 854 So. 2d at 1258 n.5 (holding that this claim "lacks merit because Allen was not prejudiced by counsel's performance in the guilt phase"). Under AEDPA we owe deference to both of those decisions. See Hammond, 586 F.3d at 1331; see also Cone, 129 S.Ct. at 1784.

As for the deficient performance element of this ineffective assistance claim, the state collateral trial court's determination that the failure of Allen's counsel to investigate motel records was not "outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, 104 S.Ct. at 2066, is not contrary to or an unreasonable application of Strickland. We have recognized that: "no absolute duty exists to investigate particular facts or a certain line of defense. Under Strickland, counsel's conducting or not conducting an

22

investigation need only be reasonable to fall within the wide range of competent assistance." Chandler, 218 F.3d at 1317.

Most importantly for the circumstances of this case, "[i]n evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant." Newland v. Hall, 527 F.3d 1162, 1202 (11th Cir. 2008); see also Strickland, 466 U.S. at 691, 104 S.Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."); Chandler, 218 F.3d at 1318 (same); McClain v. Hall, 552 F.3d 1245, 1251–52 (11th Cir. 2008) (noting that whether defendant informed his trial counsel about defendant's abusive childhood is "extremely important" to determining reasonableness of counsel's performance); Blankenship v. Hall, 542 F.3d 1253, 1276 (11th Cir. 2008) (noting that "the petitioner is often in the best position to inform his counsel of salient facts relevant to his defense").

Allen has not established, or alleged, that at any time before the guilt stage was over he provided his counsel with any evidence, or even suggested to him,

23

that a friend or acquaintance had committed the murder and then registered and shared a room with him at the motel on the same day.  The record establishes that Allen did not inform counsel of that theory, or of any facts to support it, until Allen suggested it during his own penalty phase argument to the advisory jury. See Tr. at 905 ("Mr. Hooper heard this scenario and the theory that I put forth.  He heard it today for the first time, the same time the jury heard it . . . .").  Allen knew, according to his theory, that he and the other man registered together and shared a room together at the motel.  If he thought those facts were relevant, he should have informed his counsel of them.  We therefore conclude that the state collateral trial court's decision that counsel did not perform deficiently in this respect is not contrary to or an unreasonable application of Strickland.

Alternatively, even if no deference were due the state collateral trial court's decision on the performance element, we would conclude on de novo review that Allen had failed to establish it.  See Berghuis v. Thompkins, — U.S. —, 130 S.Ct. 2250, 2265 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a).").  Because this claim fails on the performance element, we need not address the prejudice element.

24

## B. Failure to Challenge DNA Evidence

Allen claims that his counsel was ineffective for failing to request a Frye hearing before the State's DNA evidence was admitted. See Stokes v. State, 548 So. 2d 188, 195 (Fla. 1989) (adopting the standard from Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), that "scientific evidence is not admissible unless the thing from which the deduction is made is sufficiently established to have gained general acceptance in the particular field in which it belongs" (quotation marks omitted)). Allen argues that the polymerase chain reaction (PCR) methodology for testing DNA was not generally accepted at the time of his trial, although it is now. The Florida state courts denied this claim based on Strickland's prejudice element. See Allen II, 854 So. 2d at 1258 n.5 (deciding that this claim "lack[s] merit because Allen was not prejudiced by the alleged error[ ]"); Florida v. Allen, No. 92-30056-CF, slip op. at 42 ("The DNA evidence did not prove the culpability of the Defendant with respect to the Victim's murder. The semen, blood and DNA evidence simply went to confirm the Defendant's presence in Summerland Key with the Victim, a fact that was not in dispute. The failure to conduct a Frye hearing or, alternatively, the exclusion of the DNA evidence would not have affected the outcome of the trial.").

25

The Florida courts' decision is not contrary to or an unreasonable application of federal law, particularly in light of Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838 (1993). The Fretwell case involved an ineffective assistance of counsel claim about the failure of counsel to raise at trial an issue that had merit at that time; however, by the time the case reached federal habeas review there had been a change in the law and the issue that counsel had not raised at trial was recognized not to have merit. Rejecting a pure outcome-determinative analysis for the Strickland prejudice element, the Supreme Court reversed the grant of habeas relief. It explained that: "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." Id. at 369–70, 113 S.Ct. at 842–43 (footnote omitted); see also id. at 374, 113 S.Ct. at 845 (O'Connor, J., concurring) ("[T]oday we hold that the court making the prejudice determination may not consider the effect of an objection it knows to be wholly meritless under current governing law, even if the objection might have been considered meritorious at the time of its omission."); Strickland, 466 U.S. at 687, 104 S.Ct. at 2064 (stating that the prejudice component "requires showing

that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"); Jefferson v. Fountain, 382 F.3d 1286, 1298 (11th Cir. 2004) ("As the Supreme Court explained in its Fretwell opinion, the critical focus of the Strickland prejudice inquiry is not results per se, but the fairness and reliability of the adversary proceeding in question.").

The Fretwell decision requires that Allen must show not only that he could have successfully challenged PCR DNA testing in 1993, but also that the basis of the challenge would be recognized as valid under current law.  He cannot do that. While PCR DNA testing was novel at the time of Allen's trial, see Murray v. State, 692 So. 2d 157, 163–64 (Fla. 1997), the Florida Supreme Court has since determined that it clears the Frye hurdle.  See Zack v. State, 911 So. 2d 1190, 1198 n.3 (Fla. 2005) ("[T]he PCR method of DNA testing is now generally accepted by the scientific community and is not subjected to Frye testing."); see also Wilson v. Sirmons, 536 F.3d 1064, 1102 (10th Cir. 2008) (collecting cases in support of the proposition that "[n]umerous federal and state courts as well as scientific investigators have found that PCR DNA analysis is reliable").  Because of those legal developments, Allen cannot establish Strickland-type prejudice from his counsel's failure to request a Frye hearing.

27

C. The Suicide Theory of Defense

Allen claims that his counsel was ineffective for adopting what Allen describes as the "desperate trial strategy" of arguing to the jury that Cribbs may have committed suicide. That strategy was objectively unreasonable, Allen says, because the evidence showed that Cribbs had been bound and stabbed: she had superficial stab wounds on her face, her carotid artery was cut, and she had abrasions and ligature marks on her wrists and ankles. The Florida Supreme Court denied this claim based on Strickland's prejudice element. The court explained:

> Although trial counsel did question the medical examiner about the possibility of suicide, such questioning was only a small part of an overall defense that Allen did not commit the murder. Consistent with this defense, counsel attempted to establish reasonable doubt by demonstrating that the State conducted a cursory and error-prone investigation. Counsel showed that (1) the crime scene technician did not send the medical examiner the knife found at the scene for comparison with the victim's wounds; (2) the knife was not examined for rag or fiber traces; (3) blood found in the sink was never tested; and (4) the medical examiner initially overlooked the fact that the victim may have been tied. Counsel also exposed that, in a previous case, the medical examiner ruled that a stab-victim had died of drowning. Counsel further established that the medical examiner summarily ruled out suicide as a cause of death even though it would have been medically possible for the victim to have stabbed herself. Counsel used the suicide theory merely to illustrate his argument about the superficial nature of the State's investigation. Although this particular illustration may not have helped Allen's cause, it did not undermine it either. Therefore, there is no reasonable probability that but for counsel's suggestion that the victim committed suicide, the result of the proceeding would have been different.

28

Allen II, 854 So. 2d at 1261 (emphasis added).

Allen argues that the Florida Supreme Court's decision deserves no deference under AEDPA because it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). He asserts that counsel did <u>not</u> use the suicide theory "merely to illustrate his argument about the superficial nature of the State's investigation," Allen II, 854 So. 2d at 1261, but instead used it to suggest the cause of Cribbs' death. Allen points out that counsel referred to the suicide theory in his closing argument and emphasized that Cribbs had lost her husband, was lonely, and was never seen in the company of men as reasons why she may have committed suicide.

Based on our review of the record, we find that the Florida Supreme Court's fact findings about this issue are reasonable. See 28 U.S.C. § 2254(d)(2) & (e)(1). Although Allen's counsel did mention suicide in his closing argument, the context of his statements about it supports the Florida Supreme Court's finding that he "used the suicide theory merely to illustrate his argument about the superficial nature of the State's investigation." Allen II, 854 So. 2d at 1261. In fact, Allen's counsel expressly stated to the jury that Cribbs' death "isn't a suicide death or that sort of thing," but that Allen should be acquitted because there was no evidence

29

that he was the murderer. Tr. at 551. Counsel argued that in order to accept the state's evidence, the jury would have to go "beyond reasonable doubt" and "really stretch [its] imagination." Id. at 554. One by one he disputed the testimony of the state's witnesses, contending that the investigation was haphazard and the evidence was inconclusive. He argued that the crime scene investigator had a "lackadaisical attitude that just rots through the whole investigation." Id. at 561. He also asserted that the serologist's failure to test some of the blood at the murder scene was "[i]nexcusable." Id. at 564.

Counsel primarily used the theoretical possibility of suicide, and how quickly the medical examiner had dismissed it, to argue that the examiner's work was shoddy and biased toward the prosecution. He accused the medical examiner of "blundering" by failing to compare the knife to the wound and of rushing through the autopsy. Id. at 566. Counsel then said that the medical examiner was "desperate to get in the scenario that fits the prosecution's theory" and that he had "casually" ruled out suicide "because he is uncomfortable with the thought." Id. at 566–67. Counsel said that the jury should "expect a little more of a scientific response" than what the examiner had given. Id. at 567.

Counsel also mentioned suicide later in his closing argument. Again, his point was that the investigation was unreliable and had failed to consider all the

30

possibilities. See id. at 571–73 (mentioning as an example of the investigators' mistakes that the State had disregarded the possibility of suicide, but concluding that if the jury did its job, the State would be "faced with trying to find a real killer"). That argument was consistent with the closing argument's overarching theme "that the State conducted a cursory and error-prone investigation." Allen II, 854 So. 2d at 1261; see also Allen I, 662 So. 2d at 328 n.3 ("Defense counsel essentially argued that Allen was a convenient suspect because he was a drifter without family ties, while the victim had a large family that the police wanted to mollify by arresting someone for the murder."); Tr. at 575 (arguing that the State's investigators had cut corners, and concluding with these words: "You all agreed to give Lloyd Chase Allen a fair trial. The corners they want you to cut are off the Constitution of the United States. Don't do it.").

To the extent that Allen's counsel said the possibility of suicide was itself grounds for reasonable doubt, he did not advance that argument to the exclusion of other defense theories. See Allen II, 854 So. 2d at 1261 (determining that the suicide theory "was only a small part of an overall defense that Allen did not commit the murder"); see also Tr. at 610 ("All I am saying is that we don't know who did it. There are different possibilities. [Allen] is a possibility; the realtor is a possibility; a third party is a possibility; suicide is a possibility. There are all

sorts of possibilities."). Counsel's mention of suicide was not antagonistic to his other arguments, cf. Gamble v. Sec'y, Fla. Dep't of Corr., 450 F.3d 1245, 1250–51 (11th Cir. 2006) (some of defense team's arguments were self-contradictory); it did not concede any material fact, cf. Florida v. Nixon, 543 U.S. 175, 190–91, 125 S.Ct. 551, 562–63 (2004) (finding no deficient performance even where counsel had made strategic decision to concede, at the guilt phase of the trial, the defendant's commission of murder); and it did not open the door to harmful evidence, cf. Gilliam v. Sec'y for Dep't of Corr., 480 F.3d 1027, 1034 (11th Cir. 2007) (per curiam) (defense counsel's strategy had opened the door to evidence of defendant's prior rape conviction).

Allen argues that we should "imagine the visceral response of the jury to a defense closing argument that the victim was responsible for her own death." On these facts, however, the Florida Supreme Court determined that imagined prejudice is no prejudice at all. Based on our review of the record and the context in which the suicide theory was mentioned, that determination was reasonable. See Strickland, 466 U.S. at 695, 104 S.Ct. at 2068 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.").

The suicide theory may not have helped the defense, but the determination that it did not hurt the defense either is a reasonable one.[2]

## D. Failure to Impeach Larry Woods

Allen claims that his trial counsel was ineffective for failing to adequately cross-examine Larry Woods, a witness who testified that he saw Allen at Cribbs' house about two hours before her body was discovered there. Woods, a siding contractor, said that he had an unobstructed view of Cribbs' home while he was working in the driveway of the house across the street. About 20 to 25 minutes before Woods went to lunch, a man left Cribbs' house, walked down the stairs, and looked at Woods twice before going back inside. When Woods returned from lunch he saw that Cribbs' car, which had been parked under her house in the morning, was no longer there. Soon thereafter Cribbs' body was discovered. The car would later be found at a motel from which Allen hailed a taxi on the day of the murder.

Woods testified that he was interviewed by the police on the afternoon of the murder and that he assisted in making a composite drawing of the person he

---

[2] Allen also argues that the Florida courts did not address the cumulative effect of this error. But if there was no prejudice at all, as the Florida Supreme Court decided, this claim adds nothing to the cumulative effect analysis.

33

saw.[3] That evening, Woods recounted, the police showed him a photograph of Allen that "compare[d] favorably" to the composite drawing. (The photograph was developed from film in a camera that was recovered at the crime scene.) Woods identified Allen as the person he saw at Cribbs' house and had depicted in the composite drawing.

Allen argues that counsel was ineffective for failing to ask Woods whether he saw anyone else near Cribbs' house on the morning of the murder. The premise of this argument is false. The state collateral trial court determined that counsel did establish during cross-examination "that Woods had not seen anyone else go near the house while he was there, and that he had no knowledge of what transpired during his lunch period." Florida v. Allen, No. 92-30056-CF, slip op. at 38. It also found that "[t]o the extent that [Allen] claims that some unknown third person committed the crime, Counsel established the window of opportunity to support [Allen's] theory." Id. Those factual determinations are more than reasonable; the record confirms they are entirely correct. See 28 U.S.C. § 2254(d)(2). The performance of Allen's counsel with regard to this sub-claim was not deficient.

---

[3] The composite drawing was not introduced into evidence.

34

Allen also argues that counsel was ineffective for failing to use Woods' initial statement to the police to impeach his identification of Allen at trial. In his statement, Woods said that the person he saw outside Cribbs' house "was either an anore[x]ic looking man or a very thin woman."[4] He described the person as approximately 5'5" to 5'8" tall, as weighing from 135–145 lbs., and as having "sandy blonde" hair. According to Allen, he is actually 6'1" tall, weighed 175 lbs. when he was brought into the Florida Department of Corrections, and has brown hair. Allen argues that counsel's performance was deficient because he failed to question Woods about the inconsistencies between his initial description of the person at Cribbs' house and his later identification of Allen as that person. The Florida courts denied this sub-claim on prejudice grounds. Allen II, 854 So. 2d at 1258; see also Florida v. Allen, No. 92-30056-CF, slip op. at 36–38.[5]

---

[4] The record does not include a copy of the initial statement that Woods provided to the police, but we will assume for present purposes that Allen's characterizations of it are true. See Aron, 291 F.3d at 715 n.6; Diaz, 930 F.2d at 834.

Allen alleges that he did not discover Woods' statement to the police until post-conviction proceedings were underway. We will assume that Allen's counsel knew, or should have known, about the statement before trial.

[5] The district court denied this sub-claim on performance grounds without reaching the prejudice issue. We do not reach the performance prong. See Strickland, 466 U.S. at 697, 104 S.Ct. at 2069.

35

The Florida courts' decision was not contrary to, or an unreasonable application of, clearly established federal law. Allen's argument overstates the inconsistency between Woods' initial description and Allen's actual appearance at the time of the murder. Allen alleges, and we will assume as true, that he weighed 175 lbs. when he was brought into the Florida DOC, but that did not happen until March 1993, which was more than a year after Woods saw the person at Cribbs' house on the day of the murder.[6] By then, other evidence established, Allen had gained a "considerable" amount of weight. Allen I, 662 So. 2d at 326. Allen does not dispute that finding, which was based on the trial testimony of four witnesses, including Woods. Because Allen weighed 175 lbs. after a considerable weight gain, the initial weight estimate that Woods provided (135–145 lbs.) was not inconsistent with his later identification of Allen.[7]

---

[6] Allen points out that his charging document, which was dated February 19, 1992—only three months after the murder—also says that he weighed 175 lbs. That document, however, proves little if anything because it was prepared before Allen was arrested. (The Florida Supreme Court inadvertently said that Allen was arrested on February 18, 1992, Allen I, 662 So. 2d at 326, but that was actually the day before the warrant for his arrest was filed. Allen was not arrested until April 13, 1992.)

[7] Woods' statement that he may have seen "an anorexic looking man," is not inconsistent with Allen's appearance at the time of the murder. A man who is 6'1" tall man would generally be "underweight" if he weighs less than 140 lbs., and he may be properly described as looking "anorexic" if he weighs less than 133 lbs. See John M. Grohol, PsychCentral, Anorexia Nervosa, http://psychcentral.com/disorders/sx2.htm (last visited July 8, 2010). In any event, a reasonable jury would not discredit a lay witness's identification of "an anorexic looking man" merely because his perception was not medically accurate.

Allen's counsel could not have made any significant headway by focusing on any of the other alleged discrepancies between Woods' initial description of the person he saw and his later identification of Allen. The description of a man with "sandy blonde" hair is not inconsistent with the fact that Allen's hair is light brown, a similar color. Woods initially described a shorter person than Allen, but when Woods saw him, Allen was walking down a flight of stairs connecting the house (which was on stilts) and the porch. The prosecution could have argued that it is not easy to estimate someone's height when they are not standing at eye level. And, even though Woods misjudged Allen's height under those circumstances, we have no reason to doubt that the jury still would have credited his identification of Allen's face and body type.

Allen's claim of prejudice is especially weak given that it is undisputed that the photograph of Allen recovered from the camera at the scene (and thus a contemporaneous one) compared favorably to the composite drawing that Woods had helped create.[8] Not only did Woods testify to that effect, but so did Detective

---

As for the statement that the person at Cribbs' house may have been a "very thin woman," it is reasonable to conclude that Allen's defense would not have benefitted from focusing on that fact. On the same afternoon when he gave an initial statement, Woods also recalled enough details to assist in the creation of a composite sketch that "compare[d] favorably" to a contemporaneous photograph of Allen.

[8] It is undisputed that Allen is the man shown in the photograph.

Phil Harrold.  Allen has not alleged any facts that would call those comparisons into doubt.[9]

For all of those reasons, Allen has failed to establish that the Florida courts' determination that there is no reasonable probability of a different result if his counsel had cross-examined Woods based on his earlier statements about the person he saw at Cribbs' house was unreasonable within the meaning of § 2254(d)(1).  See Vining v. Sec'y, Dep't of Corr., — F.3d —, 2010 WL 2557686, at *5 (11th Cir. June 28, 2010); Boyd, 592 F.3d at 1309.

### E.  Failure to Investigate or Present Tonia McClain

Allen claims that his counsel was ineffective for failing to investigate or present Tonia McClain as a witness at the guilt stage.  She allegedly would have testified that she saw two cars parked at Cribbs' house on both the evening before and the morning of the murder and that she saw a young, thin man with dirty blond hair on Cribbs' porch on the morning of the murder.

The "failure to investigate" part of this claim is procedurally barred.  Allen never presented this part of the claim or made this argument to the Florida courts.

---

[9] For whatever it is worth, we note in passing that there is no doubt that Woods' identification was accurate, because Allen himself has admitted that he was the person whom Woods saw at Cribbs' house on the morning of the murder.  See Tr. at 750–51.  Allen admitted that in his statements to the jury during the penalty stage of the trial.

See Allen II, 854 So. 2d at 1258 n.4; Florida v. Allen, No. 92-30056-CF, slip op. at 38–39. He cannot raise it for the first time here. See supra at 17–18. In any event, trial counsel did not insufficiently investigate what McClain would say. In fact, he took her deposition before trial.

The "failure to present" part of the claim concerning McClain does not fare much better. Trial counsel did not call her as a witness because he decided based on her deposition that she would not make a good witness. The Florida courts denied this claim based on Strickland's performance element, Florida v. Allen, No. 92-30056-CF, slip op. at 38–39, as well as its prejudice element, Allen II, 854 So. 2d at 1258 n.5. As to the performance element, the state collateral trial court determined that, "[g]iven the nature of the testimony [McClain] had to offer, Counsel can hardly be deemed ineffective for failure to call her." Florida v. Allen, No. 92-30056-CF, slip op. at 39.

Allen argues that conclusion deserves no deference because "[n]o one knows what the court meant by the 'nature of the testimony.'" To the contrary, the state collateral trial court explained what it meant:

> [U]nder oath at her deposition, [McClain] testified that she lived across the canal from the Victim; that she saw two persons on the Victim's porch when she went out to check on her fishing pole; that she didn't wear her glasses when she went out to check her fishing pole; that without her glasses she "see[s] people but I don't see"; that she could

39

> not identify the Victim if she saw her; that she would not recognize the
> Defendant if she saw him; and that perhaps the second car she saw was
> a neighbor's car.

Id. (third alteration in original) (internal citations omitted).  At her deposition,

McClain also testified that she was nervous and in shock when she first spoke with

the police.  Post-conviction Record at 1211.  She admitted that she would not be

able to recognize the man from Cribbs' porch if she saw him again.  She said that

"[t]he only thing I remember is tall and skinny," id. at 1210, which is not

inconsistent with Allen's appearance at the time of the murder.

　　　This Court has emphasized that "[w]hich witnesses, if any, to call, and when

to call them, is the epitome of a strategic decision, and it is one that we will

seldom, if ever, second guess."  Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir.

1995) (en banc); see also Rhode v. Hall, 582 F.3d 1273, 1284 (11th Cir. 2009)

(per curiam).  Given the obvious problems with McClain's potential testimony that

were revealed at her deposition, Allen cannot show that "no competent counsel

would have taken the action that his counsel did take."  Chandler, 218 F.3d at

1315; Stewart, 476 F.3d at 1209; see also Dorsey v. Chapman, 262 F.3d 1181,

1186 (11th Cir. 2001) ("[T]rial counsel's decision to not call the [ ] witness was

not so patently unreasonable a strategic decision that no competent attorney would

have chosen this strategy."). The decision of the Florida courts was not contrary

to or an unreasonable application of Strickland.[10]

## IV. ALLEN'S SENTENCE PHASE INEFFECTIVE ASSISTANCE CLAIM

Allen contends that his Sixth Amendment right to counsel was violated in

the sentencing phase because counsel conducted no mitigation investigation and

failed to present any mitigating evidence to the sentencing court. Trial counsel did

not present any mitigating circumstance evidence, and we take it as true that he

did not conduct an investigation into mitigating circumstances either. See Allen I,

662 So. 2d at 329 ("[T]here was no indication that counsel had investigated

Allen's background or history to determine whether particular mitigating evidence

was available. Counsel also made no proffer of mitigating evidence that could be

presented to the court.").

Counsel, however, was following Allen's explicit instructions. Eight weeks

before trial, Allen told his attorney not to investigate or present any mitigation

---

[10] Allen argues that he is entitled to an evidentiary hearing into the reasons his counsel did not present McClain. The adequacy of an attorney's performance, however, is an objective inquiry. See Chandler, 218 F.3d at 1315–16. "[I]t matters not whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight. The relevant question is not what actually motivated counsel, but what reasonably could have motivated counsel." McClain v. Hall, 552 F.3d 1245, 1253 (11th Cir. 2008) (quotation marks omitted); see also Harich v. Dugger, 844 F.2d 1464, 1470–71 (11th Cir. 1988) (en banc); Hammond, 586 F.3d at 1332. An evidentiary hearing into counsel's subjective intent would be pointless because it could not alter our conclusion that his strategy was objectively reasonable.

evidence because, if convicted, he "desire[d] to receive a death sentence in lieu of life in prison." Allen memorialized that instruction in a sworn document, which also set out that he understood the nature of the first degree murder charges and was aware that, if convicted, he would be entitled to present mitigation evidence. Allen's sworn statement said: "With full understanding that should I change my mind at a later date my attorney will not have sufficient time to prepare . . . I nonetheless refuse to provide any information or assistance relating to mitigation of the death sentence." Allen also said that while counsel would represent him during the guilt phase, if he was convicted he wished to represent himself during the sentence phase "so that I may offer no mitigation." He acknowledged that counsel had advised him not to waive mitigation and that, by representing himself in the penalty phase, he would be "precluded from an appeal based upon ineffective assistance of counsel as to that phase."

As he had insisted, after Allen was convicted of first-degree murder, he did represent himself before the advisory jury, and he did not present mitigating evidence there. See, e.g., Tr. at 740 ("So there is not going to be any excuses today and there will not be any mitigating factors here."). Allen urged the jury to give him a death sentence, see, e.g., id. at 733 ("I am also going to ask you for the death penalty but a little differently than [the prosecutor] did. . . . This is my trial

and at this time we can do it my way."), and warned that he would try to "escape [from prison] if given a chance because that is my job," id. at 740.  As Allen demanded that they do, the jury returned an advisory verdict recommending a death sentence by a vote of 11 to 1.  During the sentencing proceeding before the trial judge, which followed about two weeks later, Allen switched to being represented by counsel, but he continued to run things his way and refused to let his attorney present any mitigation evidence or arguments to the judge.  Trial counsel explained to the judge that Allen had "repeatedly requested that I not plead for life in his case."  Allen I, 662 So. 2d at 329.  "Counsel further stated that he was 'biting his lip' because he was 'not allowed to open up and say everything that I would like to say and argue everything that I want to argue,' but was instead respecting Allen's wishes on this matter and would 'do exactly what [Allen] asked me to do.'"  Id. (alteration in original).

The trial judge then questioned counsel regarding Allen's decision not to present mitigation evidence.

> THE COURT: Mr. Hooper, you indicated that Mr. Allen refused to present you with any mitigating factors.  Is your client aware of the statutory mitigating factors available to him?
>
> MR. HOOPER: Yes sir, that was discussed with Mr. Allen and myself.  As an extra measure, I brought up Mr. Mark Jones, an attorney in my office, and he independently discussed it with Mr. Allen to cover

43

anything that I may have missed.  It was discussed by two attorneys from the office.  I also have the document signed by Mr. Allen. . . .

[H]e can explain [that] he would be entitled to present mitigation. He does not wish any presented.  As a matter of fact, he made it clear over and over again that while I was free to try the evidentiary phase as best I could, he did not want mitigating factors entered. . . .

THE COURT: Is your client aware he is not limited to those statutory mitigating factors, and the court would consider virtually anything in mitigation of the sentence to be imposed?

MR. HOOPER: Yes, I have discussed all mitigating factors with him.  I have also presented him with a copy of the Public Defender's Annual Seminar called "Life Over Death."  That is a seminar we go to annually that updates us as to aggravating and mitigating factors and keeps us abreast of all of these.  I gave him his own copy and discussed it with him.  He is probably one of the most intelligent clients I have ever had.  That is why I respect his opinion the way that I do.

. . . . I don't want it to be interpreted that he is not cooperative[;] he is just clear on his reasons.

Tr. 803–04.

Removing any doubt that he might have changed his mind, Allen then told the judge: "I hope that I am intelligent today and speak forcibly enough to you that we don't get into technicalities. . . . [W]e have eleven people here and these eleven people said let's give him the death penalty.  I would hope we would do that."  Id. at 807–08.

44

With different counsel, Allen now argues that his trial counsel's failure to investigate and prepare mitigation evidence <u>before</u> Allen waived the right to present mitigation was deficient performance under <u>Strickland</u> and that his oral and written waivers of the right to present mitigating circumstances are invalid because he was not fully informed of what mitigation evidence he was giving up. He asserts that a reasonable probability exists that the trial court judge would not have sentenced him to death if he had heard about Allen's history of major depression, his turbulent childhood, and his alcohol abuse.

The district court denied habeas relief on this claim because Allen "chose to represent himself at [the] sentencing proceedings." <u>Allen v. McNeil</u>, 2009 WL 856017, at *26; <u>see also</u> <u>Faretta v. California</u>, 422 U.S. 806, 834 n.46, 95 S.Ct. 2525, 2541 n.46 (1975) ("[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"). The district court's reasoning, however, is based on an incorrect factual premise. Allen represented himself in the sentence proceeding before the jury, but he did not represent himself in the sentencing proceeding before the judge. <u>See</u> <u>Allen I</u>, 662 So. 2d at 329 (distinguishing between the "penalty proceeding" before the advisory jury and the "sentencing proceeding" before the judge). Allen's ineffective assistance of counsel claim

45

focuses on the sentence proceeding before the judge, not the one before the advisory jury. Allen is entitled to raise an ineffective assistance claim relating to the judge-stage proceeding, even though he has abandoned one relating to the jury-stage proceeding. See generally Hammond, 586 F.3d at 1324 n.12 ("An industrious effort on behalf of his client on other fronts does not bar a claim that trial counsel rendered ineffective assistance in one or more specific ways."); Jefferson v. Hall, 570 F.3d 1283, 1314 (11th Cir. 2009) (Carnes, J., dissenting) ("Adequate, or even stellar, performance in regard to one aspect of the trial does not bar a conclusion that counsel performed ineffectively in another regard."), vacated on other grounds, Jefferson v. Upton, 130 S.Ct. 2217 (2010).

Although the district court's rationale was incorrect,[11] we agree with its judgment dismissing Allen's federal habeas claim of ineffective assistance at the sentence phase. The Florida Supreme Court's decision rejecting this claim was not an unreasonable application of federal law as determined by the United States

---

[11] The district court believed that it was applying the same rationale as the Florida courts did, but we disagree. In Allen's direct appeal, the Florida Supreme Court acknowledged that Allen did not represent himself during argument to the judge at sentencing. Allen I, 662 So. 2d at 329. Instead of denying Allen's claim because he represented himself at all times after the guilt phase, which would have been factually incorrect, the Florida Supreme Court denied this claim primarily because of its finding that Allen's waiver of the right to present mitigating circumstance evidence was valid. See id.; see also Allen II, 854 So. 2d at 1258 n.4 (denying the ineffective assistance claims that were specific to mitigation evidence because they were raised on direct appeal).

Supreme Court. See 28 U.S.C. § 2254(d)(1). The United States Supreme Court has told us in no uncertain terms that if a competent defendant did instruct his counsel not to offer any mitigating evidence, "counsel's failure to investigate further <u>could not have been prejudicial under Strickland</u>."[12] Schriro, 550 U.S. at 475, 127 S.Ct. at 1941 (emphasis added); cf. Hill v. Lockhart, 474 U.S. 52, 58–59, 106 S.Ct. 366, 370 (1985) ("In the context of guilty pleas, . . . in order to satisfy [Strickland's] 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").

As we recently explained, the <u>Schriro</u> rule "follows naturally from <u>Strickland</u>'s formulation of the prejudice prong, for there cannot be a reasonable probability of a different result if the defendant would have refused to permit the introduction of mitigation evidence in any event." <u>Cummings v. Sec'y, Dep't of Corr.</u>, 588 F.3d 1331, 1360 (11th Cir. 2009) (citing <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. at 2068). Allen therefore must show "that—but for his counsel's supposedly unreasonable conduct—helpful [mitigation] evidence actually would

---

[12] The present case is an even stronger one for application of the <u>Schriro</u> rule than the <u>Schriro</u> case itself. In that case the court of appeals found that the defendant's decision not to permit any mitigating circumstances to be presented was a "last-minute decision." <u>See</u> 550 U.S. at 478, 127 S.Ct. at 1942. Here, by contrast, Allen made his decision eight weeks before the trial began, and he never wavered from it.

47

have been heard by the jury" or the sentencing court.  Gilreath v. Head, 234 F.3d 547, 552 n.12 (11th Cir. 2000).  If Allen "would have precluded its admission in any event, [he] was not prejudiced by anything that trial counsel did."  Id.; see also id. at 551–52.

The Florida courts reasonably determined that Allen had waived the presentation of any and all mitigating circumstances, that he "was entitled to control the overall objectives of his defense, including the decision to disavow mitigation," and that he had in fact "decided not to present mitigating evidence." Allen I, 662 So. 2d at 329–30.  That determination of the facts was entirely reasonable.  See 28 U.S.C. § 2254(d)(2); Schriro, 550 U.S. at 477, 127 S.Ct. at 1942.  Allen's pre-trial waiver made clear that he did not want to present mitigation evidence, and the trial court was repeatedly informed of that.  Allen himself stood before the jury and argued in favor of a death sentence, telling the jury that it would be "torture" if he had to sit in jail—in a cage, as he put it—for 25 years.  Allen also repeatedly instructed his counsel not to plead for his life in the hearing before the sentencing judge, Allen I, 662 So. 2d at 329, making that position clear "over and over again."

Not once has Allen even alleged that he would have allowed trial counsel to present (or that he himself would have presented) mitigation evidence if only he

had known about the evidence that his collateral proceedings counsel have since collected. Allen pleaded in his post-conviction motion that today he would be willing to present a mental health expert at an evidentiary hearing to testify that he suffers from severe depression, and we take that allegation as true. See App. Br. at 58; Post-conviction Record at 827.[13] Allen's willingness to present mitigation evidence today, however, does nothing to alter his steadfast desire at the time of his trial to seek the death penalty instead of life in prison. Having alleged no specific facts that, if true, would entitle him to federal habeas relief, Allen is not entitled to an evidentiary hearing. See Schriro, 550 U.S. at 474, 477, 127 S.Ct. at 1940, 1942; Boyd, 592 F.3d at 1305.

Allen argues that his waiver should be deemed invalid because counsel, having conducted no pre-waiver investigation, failed to inform Allen of the mitigating evidence that he was giving up. The United States Supreme Court's

---

[13] In Allen's motion to the state collateral trial court for post-conviction relief, he said:

Mr. Allen's history also is marked by severe bouts with depression, a major mental illness. However, because trial counsel failed to investigate and obtain the services of a mental health expert, this issue was not explored. At an evidentiary hearing, Mr. Allen is prepared to demonstrate through the testimony of a qualified mental health expert that Mr. Allen suffers and suffered from severe depression, which alone and in conjunction with the above-described background, would establish the presence of statutory and nonstatutory mitigation.

Post-conviction Record at 827 (emphasis added).

Schriro decision forecloses that argument.  The Court held that "it was not

objectively unreasonable for that [state] court to conclude that a defendant who

refused to allow the presentation of any mitigating evidence could not establish

Strickland prejudice based on his counsel's failure to investigate further possible

mitigating evidence." Schriro, 550 U.S. at 478, 127 S.Ct. at 1942.  The Court also

stated that it was not clearly established federal law that a defendant's refusal to

allow the presentation of mitigating evidence must be informed and knowing.  Id.

("We have never imposed an 'informed and knowing' requirement upon a

defendant's decision not to introduce evidence.").[14]

---

[14] Allen cites Battenfield v. Gibson, a Tenth Circuit decision, in support of his argument that an inadequate pre-waiver investigation renders his waiver of mitigation invalid.  236 F.3d 1215, 1234 (10th Cir. 2001).  The Tenth Circuit, however, did not have the benefit of the later decision in Schriro, and in any event, a Supreme Court decision obviously trumps a circuit court decision on the same issue.  Indeed, in Schriro it was the dissenting Justices who relied on the Battenfield decision, see 550 U.S. at 491–92, 127 S.Ct. at 1950 (Stevens, J., dissenting), and their argument based on it was implicitly rejected by a majority of the Court.  And even if there were no Schriro decision, Battenfield would not establish that the state courts' adjudication of Allen's federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  A federal court of appeals decision, even one with a holding directly on point, does not clearly establish federal law for § 2254(d)(1) purposes.  Renico v. Lett, --- U.S. ---, 130 S.Ct. 1855, 1865–66 (2010); Bowles v. Sec'y, Dep't of Corr., --- F.3d ---, 2010 WL 2431996, at *2 (11th Cir. June 18, 2010).

Allen also refers us to Ferrell v. State, 29 So. 3d 959 (Fla. 2010), in which the Florida Supreme Court held that counsel's failure to adequately prepare for mitigation rendered the defendant's waiver of mitigating evidence invalid.  See id. at 981–85.  However, a state supreme court decision does not clearly establish federal law for § 2254(d)(1) purposes.  See Thaler v. Haynes, — U.S. —, 130 S.Ct. 1171, 1173 (2010) ("A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of [the United States Supreme] Court."); Marshall v. Sec'y, Fla. Dep't of Corr., — F.3d —, 2010 WL 2557751, at *6

Moreover, it is apparent from the record that Allen knowingly and intelligently refused to present mitigating evidence.  See id. at 479, 127 S.Ct. at 1943.  We have already mentioned a number of statements—including Allen's pre-trial instructions to his counsel and his statements to the advisory jury—that indicate his understanding of the consequences of waiving mitigation.  In addition, when counsel advised the trial court that Allen wanted to represent himself before the jury at the sentencing phase, the court conducted a Faretta inquiry in order to be sure that Allen "fully understand[s] the possible consequences" of his request. See Allen I, 662 So. 2d at 329; see also Schriro, 550 U.S. at 479, 127 S.Ct. at 1943 ("[W]e have never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence."); Faretta, 422 U.S. 806, 95 S.Ct. 2525.  Although the court did not doubt Allen's mental competence, it decided "out of an abundance of caution" to have Allen examined by two mental health experts, who testified that Allen was competent to represent himself.[15]  See Allen I, 662 So. 2d at 326–27.  When it concluded that Allen's

_____

(11th Cir. June 28, 2010) ("It must be United States Supreme Court precedent, not state-law precedent, that is contravened or unreasonably applied . . . ."); Clark v. Crosby, 335 F.3d 1303, 1310 (11th Cir. 2003).

[15] Allen asserts that neither mental health expert knew that he wanted to waive mitigation, but that argument is factually incorrect.  The court specifically asked Dr. James Holbrook whether Allen was competent to waive mitigation.

waiver of the right to counsel at the sentence proceeding before the jury was voluntarily and intelligently made, the trial court was fully aware of what Allen's counsel described as Allen's "intent not to present mitigation and possibly to affirmatively request the death sentence." It necessarily follows that Allen's decision not to present any mitigating circumstances evidence, a decision he stuck to throughout the sentence proceedings, was also made voluntarily and intelligently. Because Allen has not shown that counsel could have done anything regarding mitigating circumstance evidence that would have led to the presentation of it, he has failed to establish the prejudice element of this ineffective assistance of counsel claim. As the Supreme Court concluded in Schriro, "it was not objectively unreasonable for that [state post-conviction court] to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish Strickland prejudice based on his

---

THE COURT: Did he seem to understand the nature of the penalty phase of the capital trial procedure?

THE WITNESS: He impressed me as very knowledgeable and well-informed relative to this phase.

THE COURT: In your opinion is Mr. Allen competent to make a decision not to present mitigating factors if he so chooses?

THE WITNESS: I think he has the mental and emotional capacity to meet that competency criteria.

Tr. at 694–95 (emphasis added).

counsel's failure to investigate further possible mitigating evidence."[16] 550 U.S. at 478, 127 S.Ct. at 1942.

Allen, a mentally competent, intelligent defendant, having been convicted of a brutal murder, faced life imprisonment or death. Insisting on doing things his way, he chose death and prevented his counsel from attempting to secure a life sentence through the development and presentation of mitigating circumstances evidence. That is not a choice that most people would have made, but it is one that he had the right to make, and he made it voluntarily and with full awareness of the consequences. Cf. Sanchez-Velasco v. Sec'y, Dep't of Corr., 287 F.3d 1015, 1033 (11th Cir. 2002) ("As a death row inmate, Sanchez-Velasco does not have many choices left. One choice the law does give him is whether to fight the death sentence he is under or accede to it. Sanchez-Velasco, who is mentally competent to make that choice, has decided not to contest his death sentence any further. He has the right to make that choice."). What Allen does not have is the right to escape the consequences of his own decision not to present any mitigating circumstances evidence by shifting the blame for it to someone else.

---

[16] Because we decide this claim on lack of prejudice grounds, we have no need to decide whether counsel performed deficiently by following Allen's instructions. See Strickland, 466 U.S. at 697, 104 S.Ct. at 2069.

## V. CONCLUSION

The denial of Allen's petition for a writ of habeas corpus is AFFIRMED.

WILSON, Circuit Judge, concurs in the judgment.

A True Copy - Attested:
Clerk, U.S. Court of Appeals,
Eleventh Circuit

By_____
Deputy Clerk
Atlanta, Georgia

55